**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

JAN RAMJERDI, individually,
and on behalf of all others similarly
situated,

        Plaintiff,

        v.

THE CITY OF NEW YORK, THE CITY
UNIVERSITY OF NEW YORK,
QUEENSBOROUGH COMMUNITY COLLEGE,
FELIX V. MATOS RODRIGUEZ, in his
official capacity, CHRISTINE MANGINO,
in her individual capacity, MARTHA ASPROMATIS,
in her individual capacity, YSABEL MACEA,
in her individual capacity, SANGEETA NOEL,
in her individual capacity, and AMARIS MATOS,
in her individual capacity,

        Defendants.

**Case No. 24 Civ. 3380**

**CLASS ACTION COMPLAINT**

**Demand for Trial by Jury**

1.     Plaintiff Jan Ramjerdi ("Plaintiff" or "Ramjerdi"), by her attorneys, The Dugger Law

Firm, PLLC, makes the following allegations against Defendants: (1) the City of New York

("NYC" or the "City"); (2) the City University of New York ("CUNY"); (3) Queensborough

Community College ("QCC"); (4) CUNY Chancellor Dr. Félix V. Matos Rodríguez ("Chancellor

Matos Rodríguez" or "Matos Rodríguez") in his official capacity; (5) QCC President Dr. Christine

Mangino ("President Mangino" or "Mangino") in her individual capacity; (6) former Interim

Executive Director for Human Resources for QCC Sangeeta Noel ("Noel") in her individual

capacity; (7) QCC Human Resources Director, Acting Human Resources Director, and/or

Employee Relations Manager Martha Aspromatis ("Aspromatis") in her individual capacity; (8)

QCC Human Resources Director for Benefits Ysabel Macea ("Macea") in her individual capacity;

and (9) QCC ADA Compliance Coordinator/Assistant Vice President for Equity, Inclusion, and Belonging Amaris Matos ("Amaris") in her individual capacity (collectively, "Defendants").

2.     Although, upon information and belief, the CUNY system represents one of the nation's top networks of higher education institutions, the teaching excellence provided by faculty to students has not been reciprocated by NYC, CUNY, and/or QCC in how they treat their faculty with respect to faculty's disability accommodation and medical leave rights.

3.     Upon information and belief, Defendants' failure -- driven by a one-size-fits all in-person teaching mandate prohibiting fully remote teaching -- to abide by the requirements of the federal, state, and city reasonable disability accommodation and medical leave laws -- has been nothing short of egregious.

4.     Upon information and belief, this failure and dogged non-compliance with reasonable accommodation law has been most poignantly centered on the denial of remote work accommodations for faculty requesting these disability accommodations because of mental health disabilities.

5.     Upon information and belief, this failure to ensure compliance with reasonable accommodation law, has only been matched, if not *exceeded*, by NYC, CUNY, an/or QCC's pattern and practice of *retaliation* and interference with rights towards faculty who requested remote work disability accommodations.

6.     This pattern or practice of disability discrimination includes, but is not limited to: (1) a standard operating procedure of illegal denial of remote work disability accommodation; (2) disparate impact discrimination resulting from a policy against fully remote teaching by faculty; (3) intentional disability discrimination through the continued maintenance of a policy against fully remote teaching by faculty despite knowledge of its discriminatory disparate impact on

2

disabled persons with mental health disabilities and/or disabled persons who request remote work accommodations; and (4) creation, promulgation, and enforcement of a medical separation policy designed to circumvent reasonable accommodation provisions and/or that makes no provision for the applicability of and right to reasonable accommodations (such as remote work) that would permit faculty to satisfy their employment responsibilities with a reasonable accommodation.

7.     This pattern or practice of retaliation and interference, includes, but is not limited to, a standard operating procedure of retaliation against faculty who request remote work accommodations including creation, promulgation, and enforcement of a medical separation policy designed to retaliate against faculty who make remote work accommodation requests based on mental health disabilities.

8.     NYC, CUNY, and/or QCC further engaged in a pattern or practice of Family and Medical Leave Act ("FMLA") leave denial and related retaliation against faculty who requested FMLA leave.

9.     NYC, CUNY, and/or QCC further engaged in a pattern or practice of medical inquiry violations and related interference with rights, harassment, and retaliation.

10.     NYC and/or QCC further engaged in a pattern or practice of aiding and abetting, or attempting to aid and abet, CUNY's pattern or practice of disability discrimination and retaliation.

11.     In summary, through their pattern and practice of discrimination, retaliation, interference, and aiding and abetting of the same, NYC, CUNY, and/or QCC have flagrantly violated almost every aspect of Plaintiff's reasonable accommodation and FMLA leave rights under the Rehabilitation Act, FMLA, and NYCHRL.

12.     This is an action brought by Plaintiff, on an individual basis, against Defendants for: (1) disability discrimination, including failure to accommodate, disparate treatment, and

3

disparate impact in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the

"Rehabilitation Act"); (2) retaliation in violation of the Rehabilitation Act; (3) interference with

disability rights in violation of the Rehabilitation Act; (4) medical inquiry violations in

violation of the Rehabilitation Act; (5) retaliation in violation of the Family and Medical Leave

Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"); (6) interference with FMLA rights in violation of

the FMLA; (7) disability discrimination, including failure to accommodate, disparate treatment,

disparate impact, and disability-based hostile work environment and/or disability harassment,

in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*

("NYCHRL"); (8) retaliation in violation of the NYCHRL; (9) interference with, and attempted

interference with, disability rights in violation of the NYCHRL; (10) failure to engage in

cooperative dialogue regarding a reasonable accommodation in violation of the NYCHRL; and

(11) aiding and abetting and attempted aiding and abetting of NYCHRL violations in violation

of the NYCHRL.

      13.    This action is additionally alleged, on a class action basis (as defined below), on

behalf of similarly situated full-time faculty of NYC, CUNY, and/or QCC, against NYC,

CUNY, CUNY, QCC, and/or Chancellor Matos Rodríguez, in his official capacity, based on an

illegal pattern, practice, policy, procedure, custom, and/or standard operating procedure of:

    (1)    denial of faculty disability-based accommodation for fully remote work requests, despite the absence of an undue hardship, and despite a prior policy of fully remote work, in violation of the Rehabilitation Act and the NYCHRL;

    (2)    failure to engage in the cooperative dialogue process required by the NYCHRL for disability-based fully remote work reasonable accommodation requests, including automatic or presumptive denials;

    (3)    retaliation, and rights interference, against protected reasonable accommodation requests for fully remote work, through the retaliatory reassignment of faculty to administrative roles, threat of designation and

designation of absences as unauthorized, pretextual disciplinary charges, threatened or actual terminations, medical separations, retaliatory class and/or scheduling assignments, and retaliatory harassment, in violation of the Rehabilitation Act and/or the NYCHRL;

(4)    retaliation, and rights interference, against protected requests for FMLA leave, through the retaliatory reassignment of faculty to administrative roles, threat of designation and designation of absences as unauthorized, pretextual disciplinary charges, medical separations, threatened terminations and actual terminations, retaliatory class and/or scheduling assignments, in violation of the FMLA;

(5)    retaliatory and/or rights interfering FMLA leave denials because of, or in part because of, a concurrent protected request for a reasonable disability accommodation, in violation of the FMLA, the Rehabilitation Act, and/or the NYCHRL;

(6)    retaliatory and/or rights interfering FMLA leave denials because of, or in part because of, the permanent or semi-permanent nature of a serious health condition, in violation of the FMLA;

(7)    failure to engage in the cooperative dialogue required by the NYCHRL for reasonable disability accommodation requests based on: (i) consideration and approval of disability-based remote work accommodations only as non-protected "general accommodation" accommodations; (ii) failure to fully consider disability-based remote work accommodations for faculty positions; and (iii) failure to fully consider NYCHRL leave as an available reasonable accommodation, including in conjunction with, or in addition to, FMLA leave requests, in violation of the NYCHRL;

(8)    failure to consider, and/or denials of, alternative requests for leave as a reasonable disability accommodation, as an alternative to a remote work accommodation, and/or failure to concurrently consider such leave at the same time as or in addition to FMLA leave requests, in violation of the Rehabilitation Act and/or the NYCHRL;

(9)    retaliatory, harassing, and/or rights interfering pretextual and/or bad faith requests for additional medical records to approve disability-based remote work accommodations, as well as unnecessary direct, bad faith, and/or pretextual and/or harassing communications with medical providers, in violation of the NYCHRL;

(10)    failure to engage in the cooperative dialogue required by the NYCHRL for reasonable disability accommodation requests based on bad faith, pretextual, and unnecessary requests for additional medical documentation

or direct contact with providers, to support reasonable accommodations, in violation of the NYCHRL;

(11)     failure to engage in the cooperative dialogue required by the NYCHRL for reasonable disability accommodation requests based on failure to provide a written final determination identifying any accommodation granted or denied (as opposed to claiming the accommodation was granted as a non-disability accommodation);

(12)     retaliatory and/or rights interfering categorization of FMLA-protected absences and/or Rehabilitation Act and/or NYCHRL disability accommodation protected absences, as "unauthorized" absences in violation of the FMLA, Rehabilitation Act, and/or NYCHRL;

(13)     retaliatory and/or rights interfering pretextual and/or bad faith requests for additional medical records to approve FMLA leave, and/or unnecessary bad faith and/or pretextual direct and harassing communications with medical providers, in violation of the FMLA;

(14)     FMLA interference for failure to provide the required written FMLA leave designation notice within five business days as required by 29 C.F.R. § 825.300(d), in violation of the FMLA;

(15)     FMLA retaliation and interference for requiring medical releases for consideration for FMLA leave requests, in violation of 29 C.F.R. §§ 825.306(e), 29 U.S.C. § 2613(b), in violation of the FMLA;

(16)     FMLA interference for demanding a medical release prior to: (1) advising that an FMLA certification was "incomplete or insufficient"; (2) "stat[ing]in writing what additional information [was] necessary to make the certification complete and sufficient"; and (3) providing, "seven calendar days . . . to cure any such deficiency," was a violation of FMLA regulation 29 C.F.R. § 825.305(c);

(17)     FMLA interference by demanding submission of otherwise complete and sufficient medical certifications, in a particular format, such as required submission of "originals" or with particular fax markings, in violation of the FMLA;[1]

---

[1]     *U.S. Department of Labor: Fact Sheet #28G: Medical Certification under the Family and Medical Leave Act* ("Employers must accept a complete and sufficient medical certification, regardless of the format."), https://www.dol.gov/agencies/whd/fact-sheets/28g-fmla-serious-health-condition; *The Employers Guide The Family and Medical Leave Act* ("The employer cannot refuse: • A fax or copy of the medical certification, • A medical certification that is not completed on the employer's standard company form, or • Any other record of the medical documentation, such as a communication on the letterhead of the health care provider."), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/employerguide.pdf; 29 C.F.R. § 825.306.

(18)   retaliatory and/or rights interfering threats of designation and/or designation of unexcused absences, disciplinary actions, medical separations, and/or terminations because of, or in part because of, requests for protected leave under the FMLA, Rehabilitation Act, and/or NYCHRL, in violation of the FMLA, Rehabilitation Act, and/or NYCHRL;

(19)   retaliatory and/or rights interfering threats of designation, and/or designation of, unexcused absences, medical separations, and/or terminations because of requests for disability-based remote work accommodation, in violation of the Rehabilitation Act and the NYCHRL;

(20)   retaliatory and/or rights interfering requirement to recertify approval for disability-based remote work accommodation, each semester, for a permanent or semi-permanent disability, in violation of the Rehabilitation Act and the NYCHRL;

(21)   coercion, interference, intimidation and/or threats, and or attempts at the same, through threat of disciplinary action, threats of designation and/or designation of unexcused absences, medical separations, and/or terminations if in-person teaching assignment was refused despite entitlement to fully remote work disability accommodation, in violation of the NYCHRL;

(22)   medical inquiries that were not job-related and consistent with business necessity, including, but not limited to, inquiries requiring: (1) signature of a medical release as a prerequisite to consideration of any and all reasonable accommodation requests and/or submission of the reasonable accommodation request form incorporating a general release; (2) signature of a general release, a release of ambiguous scope, and/or a release that was not sufficiently limited in scope; and/or (3) signature of a release that was not limited to a list of specific questions to the health care or vocational professional;

(23)   seeking to obtain clarification and authentication of an FMLA leave certification, through direct contact with a medical provider, prior to providing seven calendar days to cure any such deficiency, after stating in writing what additional information was necessary to make the certification complete and sufficient, in violation of the FMLA, and instead of approving FMLA leave request;

(24)   requiring submission of original copies of medical certification forms as a condition of ultimate approval of all reasonable accommodations and/or

FMLA leave, in violation of the FMLA, Rehabilitation Act, and/or NYCHRL;

(25)    presumptively prohibiting faculty from teaching fully remotely (absent undefined "unusual circumstances"), resulting in, upon information and belief, a disparate impact on disabled faculty and/or faculty who requested a disability-based remote work accommodation;

(26)    upon information and belief, intentional disability discrimination through the continued maintenance of a prohibition (absent undefined "unusual circumstances") on fully remote work, despite knowledge of its disparate impact on disabled employees and/or faculty who requested a disability-based remote work accommodation;

(27)    aiding and abetting of CUNY's disability discrimination, including failure to accommodate, through the implementation of CUNY's policy prohibiting fully remote work for faculty, in violation of the NYCHRL; and

(28)    an intentionally discriminatory, harassing, and/or retaliatory accommodation process concerning disability-based fully remote work accommodation requests, particularly concerning mental health-based chronic, ongoing, and/or permanent, or likely permanent mental health disabilities, in violation of the Rehabilitation Act and/or NYCHRL.

14.    Plaintiff alleges that each of the above-described patterns, practices, customs, and/or policies are continuing violations.

## JURISDICTION AND VENUE

15.    The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 2617(a)(2).

16.    The Court has jurisdiction over Plaintiff's NYCHRL claims pursuant to 28 U.S.C. § 1367(a).  Plaintiff's NYCHRL claims are so closely related to Plaintiff's claims under the Rehabilitation Act and FMLA that they form part of the same case or controversy under Article III of the United States Constitution.

17.    Defendants are subject to personal jurisdiction in New York.

18.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C.

§ 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

19.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202, 29 U.S.C. § 2617(b), and N.Y.C. Admin. Code § 8-502.

20.     The Court is empowered to issue an injunction pursuant to 29 U.S.C. § 2617(b) and N.Y.C. Admin. Code § 8-502.

## PARTIES

**Plaintiff**

21.     Plaintiff Jan Ramjerdi is the Plaintiff in this matter.

22.     Plaintiff has been a tenured Associate Professor of English at QCC since September 1, 2009, and an Associate Professor at QCC since 2003.

23.     Plaintiff received her B.S. in Economics and Mathematics and Master's Degree in Economics from the University of Illinois Urbana-Champaign, and her Doctorate of Arts in English and Creative Writing from University at Albany.

24.     At all times relevant to the Complaint, one or more of NYC, CUNY, and/or QCC employed and/or jointly employed Plaintiff.

25.     At all times relevant to the Complaint, Plaintiff was an employee of NYC, CUNY, and/or QCC within the meaning of the FMLA, Rehabilitation Act, and NYCHRL.

**Defendant City of New York**

26.     Defendant NYC is a municipal entity created and authorized under the laws of the State of New York.

27.     Upon information and belief, NYC has received and currently receives federal financial assistance.

28.     Upon information and belief, NYC is financially responsible for satisfying any judgments against CUNY's community colleges including QCC.

**Defendant City University of New York ("CUNY")**

29.     Defendant CUNY is the publicly-funded public university system of NYC, comprised of both senior and community colleges.

30.     CUNY is the largest urban university system in the United States.

31.     Upon information and belief, the central administration of CUNY's senior and community colleges is managed, run, and operated out the offices 205 E. 42nd St., New York, NY 10017 ("CUNY Central"), with CUNY's Chancellor as its head.

32.     CUNY has approximately 7,000 full-time faculty.

33.     Since approximately May 2019, CUNY's Chancellor has been Chancellor Matos Rodríguez.

34.     CUNY has received, and receives, federal financial assistance.[2]

**Defendant Queensborough Community College**

35.     QCC is a community college within the CUNY system with over 400 full-time faculty members.

36.     Upon information and belief, QCC received, and currently receives federal

---

[2]     *CUNY Distributes $118 Million in Federal Pandemic Emergency Grants to 150,000 Students*, May 6, 2021 ("The CARES Act also provided the University with $118 million for institutional needs, including the purchase of computers, tablets and internet hotspots for students who needed them to fully participate in remote education; an expansion of mental health and wellness services; and tuition and fee refunds. Similarly, CRRSAA also provides the University with $337 million to support the institutional needs of the University and its 25 campuses as they move toward recovery in the coming academic year."), https://www1.cuny.edu/mu/forum/2021/05/06/cuny-distributes-118-million-in-federal-pandemic-emergency-grants-to-150000-students/; *CUNY Receives More than $12 Million in Federal Funding to Support Campus* Programs, Feb. 16, 2023, https://www1.cuny.edu/mu/forum/2023/02/16/cuny-receives-more-than-12-million-in-federal-funding-to-support-campus-programs/; *CCNY receives $5M federal grant to increase research activity and doctoral graduations*, Feb. 6, 2024, https://www1.cuny.edu/mu/forum/2024/02/06/ccny-receives-5m-federal-grant-to-increase-research-activity-and-doctoral-graduations/.

financial assistance.

37.     QCC, and its administrative offices, are located at 222-05 56th Ave., Queens, NY 11364.

**Defendant CUNY Chancellor Félix V. Matos Rodríguez**

38.     Since May 2019, Defendant Chancellor Félix V. Matos Rodríguez has been the eighth Chancellor of CUNY.  Upon information and belief, Chancellor Matos Rodríguez has no formal medical training.

**Defendant QCC President Christine Mangino**

39.     Since August 2020, Defendant QCC President Christine Mangino has been the sixth president of QCC.  President Mangino formerly served as the Provost and Vice President for Academic Affairs at Hostos Community College of the City University of New York.  Upon information and belief, Mangino has no formal medical training.

**Defendant Martha Aspromatis**

40.     At all times relevant to the Complaint, Defendant Martha Aspromatis was either QCC's Human Resources Manager, Acting Human Resources Director, or Employee Relations Manager.  Upon information and belief: (1) during all or most of her role as Acting Director of Human Resources, as of July 2018, Aspromatis reported to QCC Interim Executive Director for Human Resources Sangeeta Noel; and (2) previously reported to QCC Director of Labor Relations/Counsel to the President Lois Florman ("Florman" or "Counsel Florman"), during her prior tenure as an Employee Relations Manager for QCC.  Upon information and belief, Aspromatis was recently promoted to Human Resources Director, was previously a University Records Manager for CUNY, from May 2008 to July 2018, and has no formal medical training.

11

**Defendant Ysabel Macea**

41.     Defendant Ysabel Macea was the QCC Human Resources Director for Benefits at some or all times relevant to the Complaint. Upon information and belief, during all or most of her role as Director for Benefits, Macea reported to Interim Executive Director for Human Resources Sangeeta Noel. Upon information and belief, Macea's current role at QCC is Associate Director of Personnel. Upon information and belief, Macea has no formal medical training.

**Defendant Sangeeta Noel**

42.     Defendant Sangeeta Noel was, until October 10, 2023, the Interim Executive Director for Human Resources for QCC, when she was replaced by Nelmy Negrete as the permanent Executive Director of the Office of Human Resources. Upon information and belief, Noel served as the Interim Executive Director for Human Resources for QCC for approximately one year, prior to which she served as a QCC Education Officer. Upon information and belief, Noel reported to William Faulkner while she served as Interim Executive Director for Human Resources. Upon information and belief, Noel retired from QCC on or about October 31, 2023, and has no formal medical training.

**Defendant Amaris Matos**

43.     Defendant Amaris Matos has been the QCC ADA Compliance Coordinator and Assistant Vice President for Equity, Inclusion, and Belonging (a cabinet level positions at QCC) for several years. Upon information and belief, Amaris reports directly to President Mangino in her role as Assistant Vice President for Equity, Inclusion, and Belonging, and was previously an Interim Executive Advisor to the President for Equity for President Mangino (a cabinet level position) beginning in September of 2020. Upon information and belief, during February 2022,

Amaris was appointed to oversee the QCC office of Office of Equity, Inclusion, and Belonging (previously known as the office of Affirmative Action, Pluralism, Diversity and Compliance). Upon information and belief Matos has no formal medical training.

## **FACTUAL BACKGROUND**

44.     CUNY has received, and currently receives, federal financial assistance.

45.     Upon information and belief, NYC and QCC, have received, and currently receive, federal financial assistance.

46.     Upon information and belief, CUNY has 25 colleges, including senior and community colleges, across New York City.

47.     Upon information and belief, the central administration of CUNY, is managed, run, and operated out of the offices located at 205 E. 42nd St., New York, NY 10017 CUNY Central (defined above)[3], and the head of CUNY (the entire entity), including CUNY Central, is the Chancellor of CUNY.

48.     Since approximately May 2019, CUNY's Chancellor Matos Rodríguez ("Chancellor Matos Rodríguez").

49.     Plaintiff is an Associate Professor in the English Department of QCC.

50.     Plaintiff is an individual with disabilities within the meaning of the Rehabilitation Act and the NYCHRL.

51.     Plaintiff has mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well

---

[3]     CUNY Central is synonymous with named defendant CUNY, and is utilized only to highlight, upon information and belief, the overall administrative arm of the CUNY entity.

as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

52.     Plaintiff is a qualified individual with disabilities within the meaning of the Rehabilitation Act.

53.     At all times during her employment, Plaintiff was qualified to work as an Associate Professor with or without a reasonable accommodation of her disabilities.

54.     Plaintiff is a person with serious health conditions, with the meaning of the FMLA and was at all times relevant an FMLA-eligible employee.

### *Plaintiff Is a Tenured Associate Professor*

55.     Plaintiff has been employed by QCC, CUNY, and/or NYC since September 1, 2003.

56.     Initially, Plaintiff began teaching as an Assistant Professor in the English Department for QCC, CUNY, and/or the City.

57.     In or around September 2008, QCC, CUNY, and/or NYC awarded Plaintiff tenure, and Plaintiff was promoted to Associate Professor, effective September 2009.

58.     Plaintiff excelled in her role as an Associate Professor.

### *Defendants Are Aware of Plaintiff's Disabilities and/or Serious Health Condition*

59.     QCC, CUNY, NYC, President Mangino, Aspromatis, Macea, and/or Noel knew, or should have known, of the existence of Plaintiff's disabilities and/or serious health conditions, including that Plaintiff suffered and suffers from mental health conditions and illness(es) due to exposure to environmental toxins, because they had previously approved (and/or were aware of the approval of) Plaintiff's FMLA leave on approximately three prior occasions in the years

2016, 2017, and 2019.

60.     For example, in 2019, Plaintiff took FMLA leave from approximately August 25, 2019 through December 20, 2019.  Her treating psychiatrist at the time submitted a certification of her serious health condition to QCC, CUNY, and/or NYC.

61.     At that time, the Chair of the QCC English Department was Jennifer Maloy.

62.     Plaintiff's treating psychiatrist indicated that the approximate date of Plaintiff's condition commenced was in the "1970's with worsening as of Spring, 2016."  When responding to the "[p]robable duration of the condition," Plaintiff's treating psychiatrist wrote: "Lifelong, ongoing, waxing & waning with occasional flares, or relapses."

63.     In describing Plaintiff's condition requiring leave, Plaintiff's treating psychiatrist wrote:

> Patient has difficulty managing stress and has had flares of anxiety-related symptoms that have caused great incapacity including exacerbation of physical symptoms and marked dysfunction in work and personal life.  Patient reports a mold sensitivity, when she perceives exposure to mold/toxin, she experiences marked physical & psychiatric symptoms (anxiety) with significant distress and inability to function.  It is hoped that with proper treatment she will be able to manage stress more effectively in the future, without disruption in functioning.

64.     On or about December 11, 2019, Aspromatis approved Plaintiff's accommodation request for use of a service dog, in response to her request for a disability accommodation, for the spring semester in 2020.[4]

65.     Prior to the COVID-19 pandemic, prior QCC English Department Chairs,

---

[4]     QCC and President Mangino would later acknowledge, on July 17, 2023, that they knew that Plaintiff was "granted a medical leave from teaching for the Fall 2019 semester due to a mental health condition for which she was receiving treatment (anxiety triggered by the anticipation of being in an environment which might expose her to unclean air)."

including Jennifer Maloy, also accommodated Plaintiff's disabilities with regard to classroom assignments, office space, and/or where she held office hours.

66.     These accommodations were granted to Plaintiff because of her disabilities, namely the debilitating and severe physical and mental health symptoms she suffered when exposed to environmental toxins such as mold.

67.     Because of the severity of Plaintiff's disabilities, namely her severe response to environmental toxins, prior QCC Chairs, including Jennifer Maloy, were well aware that Plaintiff could not teach in most classrooms in the Humanities Building because of the poor air quality and/or exposure to environmental toxins.

### *Defendants Required All QCC Faculty to Work Fully Remotely During the COVID-19 Pandemic & Plaintiff Successfully Fulfilled Her Responsibilities by Working Fully Remotely*

68.     During approximately mid-March 2020, QCC, CUNY, and/or the City required all of its faculty at QCC, CUNY, and/or NYC, including Plaintiff, to work fully remotely.

69.     QCC, CUNY, and/or the City required their faculty to work remotely through the spring 2021 semester because of the COVID-19 pandemic.

70.     Upon information and belief, all, or almost all, faculty at QCC, CUNY and/or NYC, performed their teaching remotely during this time-period.

71.     As required by QCC, CUNY and/or NYC, Plaintiff successfully performed all of her professional duties while working fully remotely, including teaching, during the COVID-19 pandemic, from mid-March 2020 through the spring 2021 semester (approximately three academic semesters).

### *CUNY Central Announces Expectation that Its Faculty and Staff Return to In-Person Work*

72.     Shortly before May 13, 2021, CUNY Central, via Chancellor Matos Rodríguez, announced its decision that staff and faculty would be returning to in-person work at CUNY.

Specifically, Chancellor Matos Rodríguez's statement stated, in part:

> As we move closer to the reopening of our city and state and New York's massive vaccination program continues, my office has made the careful decision to mark the week of August 2 as the date for staff to return to their workplaces in preparation for more in-person fall. Faculty will follow in accordance with the academic calendar of their campus.[5]

73. Upon information and belief, at this time, CUNY Central was pushing to achieve a 50% in-person presence throughout the university system, senior and community colleges alike.

74. Upon information and belief, CUNY Central permitted hybrid courses (*i.e.*, courses that are part online and part in-person) to count as in-person courses for fall 2021, which it then dispensed with in spring of 2022.

### Plaintiff Continued to Teach Remotely with a Disability Accommodation

75. During approximately June 2021, QCC, CUNY and/or NYC notified faculty at QCC that they should return to teaching classes in person in fall 2021, at least on a hybrid basis.

76. As explained further below, Plaintiff continued to teach remotely based on what she understood to be a disability-based accommodation that QCC, CUNY, and/or the City granted her for the fall 2021, as well as subsequently the spring 2022 and fall 2022 semesters. However, upon information and belief, Plaintiff was only apparently only granted a "general accommodation" available to all faculty, not just disabled members of faculty.

### Chair Maloy Gives Plaintiff all Online Classes for Fall 2021

77. Plaintiff had been in communication with Aspromatis about needing a disability-

---

5       Statement by Chancellor Matos Rodríguez on "Returning to In-Person Work," https://www.baruch.cuny.edu/wp-content/uploads/sites/28/2021/05/May-13-Staff-to-Return-to-Campus.pdf  (see page 2)

based accommodation for fall 2021 to teach fully remotely.  Plaintiff had previously submitted her medical records documenting her "lifelong" mental health condition, in support of her 2019 FMLA leave.

78.     However, Plaintiff was not required to go through the QCC, CUNY, and/or City "accommodation process" for fall 2021 because her then Chair of the QCC English Department, Jennifer Maloy ("Chair Maloy"), gave Plaintiff all online classes for the fall 2021.  Therefore, Plaintiff was not asked to submit accommodation medical paperwork or required to go through the QCC, CUNY, and/or the City accommodation process at that time.

79.     Upon information and belief, CUNY Central was directing the return-to-work process for faculty and staff at CUNY's colleges and community colleges, including, without limitation, by providing directives, guidance, and direction, including about how to handle reasonable accommodations.

*Plaintiff Inquires about the Reasonable Accommodation Process for Spring 2022*

80.     During approximately September 15, 2021, because the Chair of the QCC English Department was already trying to schedule her for classes for the following semester, Plaintiff contacted Aspromatis to inquire whether "the process for requesting a disability accommodation for Spring 2022 had been finalized."  Plaintiff also asked Aspromatis to "tell [her] what [she] need[ed] from [her]" and noted, "[m]y records in your office document my chronic disability in FMLA forms."  In response, Aspromatis informed Plaintiff that they were "still waiting for guidance" from the CUNY Central Office "for anything past the December 31, 2021 date":

> Hi, Dr. Ramjerdi:
>
> Thank you for  the update. *We are still waiting for guidance for anything past the December 31, 2021 date*. I have made a note in

> my records of your request for the spring and *will reach out as soon as we get guidance from the Central Office*.
>
> Martha

(emphasis added).

81.     Upon information and belief, NYC, CUNY, and/or QCC did not have a system in place whereby Plaintiff's request for an accommodation could be processed in September 2021 (for the spring semester) even though her Chair was attempting to make decisions about her schedule in September 2021.

82.     Upon information and belief, CUNY Central was providing QCC and other CUNY community colleges and senior colleges with mandates as to remote work and/or reasonable accommodation processes for remote work.

### CUNY Central Announces a Target of 70% Fully In-Person Courses for Spring Semester 2022

83.     Around this time, during approximately late August 2021/early September 2021, CUNY Central announced its target to return to 70% fully in-person courses for the spring semester 2022, and professional staff to work seven out of ten days on campus.

84.     Upon information and belief, "[p]ractically and immediately," as to the 70% in-person requirement for courses, the CUNY Central "guidelines for planning the spring term," as set forth by Interim Executive Vice Chancellor and University Provost of CUNY Daniel Lemons ("Interim EVC Lemons"), included:

- *Aim for 70% in-person/HyFlex courses and 30% hybrid and online courses*.

- Select courses for hybrid/online that, to the best of your knowledge, match student needs as well as the likely future mix of program delivery modalities.

- Prioritize instructors for online/hybrid/HyFlex who have done at least one training sequence in those modalities

and/or demonstrated success.

- A*side from unusual circumstances, all full-time faculty members should teach at least one in-person course on campus.*[6]

(emphasis added).

85.     The policy in the aforementioned communication (the "70/30 In-Person/Remote Policy") did not make any specific provision or exception for faculty requiring a disability-based accommodation exception to this policy.

86.     There was both faculty, staff, and student concern about CUNY Central's 70% in-person and 30% online mandate.[7]

87.     For example, the Professional Staff Congress ("PSC"), "the union that represents 30,000 faculty and staff at [CUNY] and the CUNY Research Foundation," issued a statement in December 2021 entitled, *Concerns about CUNY's Spring Plan: Inadequate Details on Safety Measures.*

88.     In part, the PSC statement read:

> CUNY Central is aiming for 70% on-campus work for the Spring 2022 semester, with a minimum of 70% of courses offered in person and professional staff working seven of ten work days on campus. The PSC, along with other faculty and staff advocates, *have objected to this "one-size-fits-all" approach, which ignores disparities in*

---

[6]     *Faculty Executive Committee Meeting*, September 28, 2021, https://www.qcc.cuny.edu/governance/faculty/FEC-Meeting-Agenda-09-28-2021.pdf (emphasis added); *see also* OOA This Week, Oct. 21, 2021, https://myemail.constantcontact.com/OAA-This-Week--Thursday-Edition.html?soid=1134130875871&aid=da7juhDWkew.

[7]     Robbie Sequeira, *As CUNY opens for spring semester on Friday, tensions continue to rise*, Bronx Times, Jan. 26, 2022, (emphasis added) ("'I feel like invisible to them, like I'm just an ID number and a financial figure to them,' said Hostos College student Fatima Bah, who is also a mother. 'Hostos has said that they took all precautions for COVID, only we're only getting answers from an email. *Sometimes there's no access to anyone to meet about certain accommodations, and no one answers emails*.'"), https://www.bxtimes.com/as-cuny-opens-for-spring-semester/.

*safety conditions among CUNY campuses and fails to take into consideration individual faculty, staff and student needs.*

. . . .

At the other end of town, more than 150 faculty members at the Borough of Manhattan Community College (BMCC) signed an open letter, organized in part by the college's PSC chapter, to demand more remote and flexible work options for the Spring. *The letter also reiterated that some PSC members' requests for accommodations have been "on hold."*

*"We ask that vulnerable faculty, staff and students have online options as needed. Yet, chairs have been told that every faculty member must teach at least one class in person in the Spring," the letter said. "Staff are currently required to come in person, even though they cannot see students in their individual offices because it's not safe."*

John Verzani, the chair of the College Council at the College of Staten Island and an Executive Committee member of CUNY's University Faculty Senate, noted that there is wide variation among CUNY campuses regarding physical readiness and staffing when it comes to returning to a 70% in-person teaching schedule.

For example, Verzani said, some campuses like his own have open areas and space to spread out, while some campuses, like Baruch College, are urban, vertical buildings where students and PSC members have often complained about a lack of ventilation and an inability to maintain social distance.

"These decisions should be made locally and not centrally, and each campus deserves the respect to make these decisions on their own," said Verzani. "Department chairs should be driving it, based on some data."

**Remote Work**

*The PSC urged "college HR officers to honor remote work requests from employees who live with someone who is immune-compromised, and urge[d] supervisors to extend remote work agreements to staff who would primarily be working remotely (via computer or telephone) despite reporting in person," and allow departments to use their judgment when it comes to how many classes should be in-person.*

The letter added that CUNY should "Count hybrid classes toward the in-person category for Spring 2022, as they were in Fall 2021, and define what qualifies a course as hybrid," as well as "preserve in-person classes with lower-than-expected enrollments if demand for hybrid or remote sections exceeds demand for in-person sections." CUNY should also "refrain from offering HyFlex courses absent an agreement with the PSC about the terms and conditions under which instructors undertake HyFlex teaching."

**Ventilation Reports**

*Resistance to uniform mandates comes in part from members' unresolved concerns about proper ventilation. According to a union statement, the PSC requested ventilation reports prepared by the engineering consultant firm Ramboll, but many "colleges have failed to provide the data, which is essential to minimizing the risk of COVID transmission." The union is circulating petitions for the release of this data.*

*Jean Grassman, the co-chair of the PSC Health & Safety Watchdogs, said this information is important because "CUNY is dilapidated in a lot of ways and HVAC [heating, ventilation and air conditioning] systems don't often get repaired. They're kind of invisible. People don't want to spend money on them, so they tend to be neglected. Because of energy efficiency, they tend to recirculate a lot of air, but it also means that in terms of airborne viruses it's not a great thing. You can use the filters, but that hasn't always been the case."*

*At City Tech, for example, chapter activists alerted the administration to the existence of mold and raised worries that there are underlying ventilation and plumbing problems in City Tech buildings.*

*"We're dealing with a respiratory pandemic," said George Guida, a professor of English at City Tech, noting that the mold only raised the anxiety levels members already have around COVID.*

*. . . .*

**CUNY Central Problem**

*For Cally, the flaws in the Spring return plan flow from CUNY Central, not his local administration. "We will continue to stress to our local administration that while CUNY Central's poor leadership and communication is not [the college's] fault, it is indeed their problem and it is [our local administration that] the PSC holds*

> *responsible for the safety of all members of the campus community*,"
> said Cally.
>
> . . . .
>
> *All of this underscores the union's problem with the 70/30 mandate:
> it lacks any consultation with campus governance or department
> chairs, resulting in an impractical reopening plan*.[8]

(emphasis added).

89.     On December 19, 2021, the President of PSC, James Davis, wrote a letter to

Chancellor Matos Rodríguez, in light of the Omicron surge, which, in part, asked for reevaluation

of the 70% in-person minimum requirement across the university for the spring 2022 semester:

> The scale of the recent COVID surge in the city and the tri-state area
> has us deeply concerned. I'm sure you share that concern and are
> consulting regularly with state and city health authorities. Various
> private universities in the state and city have reduced their on-
> campus presence in response to alarming rates of infection. I'm
> writing to urge you to take the following measures to keep
> employees and students safe while maintaining academic and
> operational continuity.
>
> *For the professional staff:* Starting now through the end of January,
> non-essential employees should be given the choice to work
> remotely. CUNY should make a new assessment mid-January about
> the expectations for in-person and remote work in Spring 2022
> semester.
>
> *For faculty and students: Winter intersession should be fully online.
> CUNY should take the current COVID surge as an occasion to re-
> evaluate the 70% in-person minimum across the university in Spring
> 2022 semester*.[9]

(emphasis added).

---

[8]     *Concerns about CUNY's Spring plan*, Dec. 2021, https://psc-
cuny.org/clarion/2021/december/concerns-about-cunys-spring-plan/#.

[9]     *PSC notice to Chancellor*, Dec. 22, 2021, https://psc-cuny.org/news-events/psc-notice-
chancellor/.

90. According to an article written in *The John Jay Sentinel* on January 3, 2022:

> The PSC started a petition to CUNY Chancellor Félix V. Matos Rodriguez to encourage the administration to provide clear, sensible, and safe guidance for the Spring 2022 semester while being responsive to emerging information about new COVID variants.
>
> *The petition encourages CUNY to permit academic departments to exercise independent judgment about the appropriate percentage of Spring 2022 in-person classes rather than adhere to the mandated 70%. The petition also asks to count hybrid classes toward the in-person category for Spring 2022, as they were in Fall 2021, and for the Chancellery to define what qualifies a course as hybrid.*
>
> "*Not only do we need a safe workplace, we also need to reestablish flexibility for staff to work remotely and reclaim faculty authority over curriculum, scheduling, and related matters over which CUNY administrators have asserted authority in the emergency conditions of recent semesters*," Davis said.
>
> . . . .
>
> John Pittman, a John Jay Professor of Philosophy and Co-chair of the John Jay chapter of the PSC, said the hybrid policy decision by the Chancellor was "pedagogically questionable."
>
> "Pedagogical decisions are made by the faculty and by the elected representatives of the faculty, who are in the best position to judge the specific needs of the students," Pittman said.
>
> According to Pittman, when decisions are made on high and then passed down as demands that everyone has to fall in line and carry out, it goes against the basic principles of what a university is supposed to be.
>
> *One problem that arose from CUNY's scheduling mandate was a difficulty in accommodating faculty members who wanted to instruct online courses when the availability of such classes was drastically reduced. Many members who are or live with someone immunocompromised often sought online instruction.*
>
> Jay Gates, a John Jay English Professor who chairs both the English Department and the Committee of all Department Chairs, said that CUNY's way of making decisions over the pandemic has made his role as Department Chair a nightmare.
>
> According to Gates, the decisions made have been untimely, lacking in transparency, and frustrating. He said that it has just been a

scramble every semester to figure out how to put a schedule together.

"When it comes to decisions that come from CUNY, yes, we have been left out," Gates said.[10]

(emphasis added).

91.    Nonetheless, upon information and belief, on or around January 5, 2022,

Chancellor Matos Rodríguez issued a message updating the Spring 2022 Guidance, which

indicated that the 70% requirement would commence on February 28, 2022.

92.    The letter stated in-part:

In accordance with existing CUNY campus plans, CUNY offices will continue to operate at the 50% in-person capacity guidelines that have been in place since August now through February 25. Starting on Monday, February 28, staff members will work 70% of the time in person. Please start to make any needed preparations to be ready for this transition. [11]

93.    Upon information and belief, the CUNY Central mandate that 70% of courses be

in-person and 30% online/hybrid commenced during approximately late February 2022.

94.    On February 18, 2022, Council of Faculty Governance Leaders at CUNY issued a

Resolution Affirming the Prerogatives of Faculty and Department Chairpersons over Scheduling

Course Sections and their Modalities, which opposed the in-person mandate, and stated:

**WHEREAS,** the assignments of faculty to course sections rests solely with the chairpersons of academic departments in accord with the CUNY BOT BYLAWS, Article 9.3—which states the duties of

---

[10]    James Van Bramer, *Governor Hochul Announces a Vaccine Mandate for CUNY and SUNY Faculty as Calls for Workplace Flexibility Continue*, The John Jay Sentinel, Jan. 3, 2022, https://johnjaysentinel.com/12924/campus-news/governor-hochul-announces-a-vaccine-mandate-for-cuny-and-suny-faculty-as-calls-for-workplace-flexibility-continue/.

[11]    Office of the Chancellor, https://www.qc.cuny.edu/covid/wp-content/uploads/sites/28/2022/02/Read_Chancellors_Message_Regarding_Updated_Spring_2022_Guidance.pdf.

a department chairperson is to "Assign courses to and arrange programs of instructional staff members of the department"; and

**WHEREAS,** for the Spring 2022 semester, inconsistent with these bylaws, the CUNY Chancellery issued a directive for a distribution of classes involving the modalities of instruction, mandating a 70% in person, 30% online distribution of classes; and

**WHEREAS,** the assignments of faculty to course sections involves making academic judgments by both the department chairpersons and the instructional staff members; and

**WHEREAS,** such academic judgments are traditionally left to the faculty to make, who better understand their subject matters, their students, and the effectiveness of instructional modalities for producing the desired learning outcomes for departmental courses; and

**WHEREAS,** such academic judgments are an expression of the academic freedom of teaching faculty and department chairpersons; and

**WHEREAS,** imposing limitations and quotas for the use of instructional modalities infringes upon the academic freedom of faculty and department chairpersons; and

**WHEREAS**, imposing *a single set of limitations and quotas on all units of CUNY* ignores significant differences in the identities, academic programs, courses, and needs of students served by each unit; and

**WHEREAS,** implementing *a single set of limitations and quotas* undermines the ability of faculty and campus governance bodies to fulfill their BOT-assigned academic responsibilities to ensure the integrity and strength of their academic programs; and

**WHEREAS,** the results of the enforced 70/30 in person/online ratio has led to a drastic underenrollment of in person classes, which will have future economic consequences, as budgets are determined by enrollment numbers;

**WHEREAS,** the lack of demand for in person classes was evident in the late fall of 2021, even before the Omicron variant of COVID-19 emerged, which has since further restricted in person enrollment numbers; and

**WHEREAS,** *no rationale for the 70/30 in person/online ratio has ever been laid out and shared with the faculty*,

**THEREFORE, BE IT RESOLVED:** That the Council of Faculty Governance Leaders of the City University of New York rejects the legitimacy of the 70/30 mandate, or any future *CUNY-wide, uniform mandate regarding scheduling*, and;

Asserts that decisions about the modality of course sections are to be kept as the primary responsibility of department chairpersons, consistent with policies approved by their college's governance body.[12]

(emphasis added).

95.     On or about March 29, 2022, the University Faculty Senate of CUNY adopted a

resolution entitled, *A Resolution Calling on the UFS Academic Affairs Committee and the CUNY*

*Office of Academic Affairs Consultative Decision Making*, which similarly opposed the mandate,

and stated:

**WHEREAS** inconsistent with CUNY BOT BYLAWS Article 8.10 of shared governance, the CUNY Chancellery issued a directive for Spring 2022 distribution of class assignments on campuses involving the ratio of course modalities without prior consultation with the UFS, or its Academic Affairs Committee (AAC): and

**WHEREAS** the Chancellery *took over the decision-making process* despite the BOT BYLAWS, Article 9.3.a.2 that states that the department chairperson shall "Assign courses to and arrange programs of instructional staff members of the department"; and

**WHEREAS** the assignments of faculty to course sections involves making academic decisions by both the department chairpersons and the instructional staff members because they understand the needs of their students in their individual departments and on individual campuses; and

**WHEREAS** CUNY Office of Academic Affairs (OAA) imposing a single set of limitations and quotas regarding courses and teaching (*i.e., 70% in-person, 30% online teaching) on all CUNY campuses*

---

[12]     *Resolution Affirming the Prerogatives of Faculty and Department Chairpersons over Scheduling Course Sections and their Modalities*, Feb. 18, 2022, https://www1.cuny.edu/sites/cunyufs/wp-content/uploads/sites/48/2022/07/UFS_FGL_Res_Prerogative_over_Schedules_approved_R.pdf.

disregards the actual, unique needs of each campus and their student bodies; THEREFORE,

**BE IT RESOLVED** that the University Faculty Senate, via its Academic Affairs Committee (AAC),

pursuant to the CUNY BOT BYLAWS on shared governance, invite the CUNY Office of Academic Affairs (OAA) and Chancellery to engage in collaborative consultative decision-making with the UFS through its AAC, because the UFS can offer invaluable educational insights from campus grounds that could enhance the results of the decision-making process for all parties involved.[13]

96.    On PSC's website, on or around March 29, 2022, Philip Pecorino, a member of the CUNY University Faculty Senate's Academic Freedom Committee and a professor of philosophy at QCC, published a piece entitled, *CUNY Modalities Threaten Faculty Freedom*, which stated, in part:

> There is an old adage that says crisis produces both danger and opportunity. As can sometimes be the case, opportunities include an increase in power for those who want to marshal more extensive power. At CUNY during the COVID pandemic crisis, the power of the chancellor's office may be advancing at the expense of faculty's academic freedom and their robust role in shared governance. *CUNY's decision, as communicated by CUNY Interim Provost Daniel Lemons, for a 70/30 split for Spring 2022 course offerings, divided between classes taught in-person versus those taught in modalities wholly or partly online, is a strong case of diminished faculty autonomy*. Such teaching decisions are traditionally the purview of the faculty member in consultation with their department chair. *However, during the pandemic, such faculty decisions have been <u>abrogated to those in administrative roles</u>. CUNY administration's overreach in regards to teaching modality decisions raise the specter of what other faculty decisions may be abrogated in a moment of crisis*.[14]

---

[13]    *A Resolution Calling on the UFS Academic Affairs Committee and the CUNY Office of Academic Affairs Consultative Decision Making*, https://www1.cuny.edu/sites/cunyufs/wp-content/uploads/sites/48/2022/07/UFS_AAC_Res_2022_March29_R.pdf.

[14]    *CUNY modalities threaten faculty freedom*, April 2022, https://psc-cuny.org/clarion/2022/april/cuny-modalities-threaten-faculty-freedom/ (emphasis added).

*Plaintiff Submitted a Reasonable Accommodation Request for Spring 2022 While Initial Concerns about CUNY Central's 70% In-Person Requirement Were Raised by PSC, Faculty, and Staff*

97.     Consistent with the overall CUNY Central messaging demanding return to in-person work for staff and faculty, on or about November 19, 2021, Aspromatis informed Plaintiff in part: "In accordance with *CUNY guidance*, which calls for a greater on-campus presence going forward, *we will only be considering those requests that meet the **standards established by CUNY for ADA . . . accommodations**. . . . We will not be considering General accommodations*. If you would like to apply for an ADA accommodation, please reach out to me and we can begin the interactive process to review your request."  (emphasis added).

98.     Upon information and belief, in light of CUNY Central's guidance, Aspromatis's email to Plaintiff was an effort to discourage and interfere with her right to request an accommodation for the spring 2022 semester.

99.     Upon information and belief, Aspromatis's email also conveyed that CUNY, NYC, and/or QCC viewed Plaintiff's prior remote accommodation as an unprotected "general accommodation" not based on her disability, but instead based only on CUNY's and QCC's remote work procedures during the COVID-19 pandemic. This position disregarded and/or attempted to ignore her prior and existing right to a disability-based accommodation.

100.     Upon information and belief, in an effort to pursue CUNY Central's mandate of a 70% in-person work requirement and/or 70% in-person courses, NYC and/or QCC were beginning to "crack down" on remote work.

101.     NYC, CUNY, and/or QCC did so irrespective of whether employees had protected disabilities warranting remote work.

102.     NYC, CUNY, and/or QCC also did so by discouraging employees from

requesting accommodations by indicating that the analysis of an accommodation would be

tougher and/or more stringent because of CUNY Central's mandate of a "greater" on campus

presence (meaning the 70% in-person courses requirement).

103.     In or around December 2021, as the initial concerns about the 70% in-person

requirement were being raised by PSC (union), faculty, other staff, and even students, Plaintiff

submitted reasonable accommodation paperwork (including medical documentation) to work

fully remotely for the spring 2022 semester.

104.     Plaintiff explained, in part, in her reasonable accommodation paperwork:

> I am requesting a work-from-home accommodation. I would like to
> teach my classes and hold office hours synchronously and attend
> meetings virtually. I have a ***chronic*** *mental disability* which is
> *medically documented* in FMLA leaves for the Spring 2016, Fall
> 2017, and Fall 2019 semesters when severe symptom flare-ups
> triggered by stress prevented me from working and commuting to
> work. *Working from home I can control my environment to lessen
> stress and I do not have to commute. My symptoms are triggered by
> poor air quality and I have been unable to use the English Dept
> offices, meeting rooms, library, and most classrooms for the past
> four years. Working from home, I am better able to manage the
> symptoms of my disability so that I can work effectively. Since going
> online in March 2020, despite the added stress of being high risk for
> Covid, I have been able to work continuously for the longest period
> in five years.*

(emphasis added).

105.     Plaintiff's psychiatrist at the time completed the required Health Care Provider

Accommodation Form, dated December 9, 2021, which was submitted to QCC, CUNY, and/or

NYC.  In response to a question (question one) about whether the patient (Plaintiff) has "a

physical or mental impairment that substantially limits one or more major life activities . . . .",

the doctor responded:  "Patient's self care, ability to engage in person, and engage in the world at large is severely limited."

106.    In response to question 2 about whether the condition was "Temporary" or "Permanent," he wrote under "Permanent," "Unclear – likely x years."

107.    The doctor responded "Yes" to question 3, which asked, "Does your patient have a physical, mental or medical impairment, infirmity or condition that is demonstrable by accepted clinical or laboratory diagnostic techniques?"

108.    In response to question 4 about functional limitations, the doctor wrote: "Pt is unable to focus for long periods of time.  She is unable to appear in person in most venues, self care is somewhat limited.  She is likely to be able to function well from home."

109.    In response to question 5 ("After reviewing the attached job description, please describe how your patient's impairment, infirmity, or condition limits the patient's ability to perform the essential functions of the job.  Please specify the essential job functions you believe your patient cannot perform.), the doctor responded: "Flare up symptoms impede ability to write, communicate, teach, read and do research[.]"

110.    The doctor checked off "Yes" to question 6, which read: "Do you believe a job modification or other work accommodation will enable your patient to perform the essential functions of the position?"

111.    In response to question 7 ("If the answer to question 6 is YES, please describe the job modifications or work accommodations that you believe would enable your patient to perform the essential functions of the position.  Also, if known, please indicate the estimated time/duration of the need for the job modification or accommodation.)", the doctor responded:

*"The patient will need to work from home for at least the next 1-2 years but probably longer."* (emphasis added).

112.    On or about December 23, 2021, NYC, CUNY, and/or QCC approved Plaintiff's request to work remotely but only for *one semester* -- the spring 2022 semester (through May 31, 2022).  Aspromatis's email to Plaintiff (copying Chair Edlin) stated, in part: "This is to inform you that your request for permission to work remotely has been approved. This approval is valid through May 31, 2022.  NYC, CUNY, and/or QCC only approved Plaintiff to work remotely for one semester despite the medical accommodation documentation making clear that Plaintiff had a chronic condition for which she would need to work from home for "at least the next *1-2 years* but *probably longer*." (emphasis added).

113.    QCC and President Mangino would later admit, within disciplinary charges for Plaintiff, that "[a]t that time the Colleges were permitted to grant some employees fully remote work schedules as a general accommodation, on a case-by-case basis."  QCC and President Mangino would similarly later admit within disciplinary charges for Plaintiff, that Plaintiff was permitted to "teach fully remotely in [s]pring 2022, as a 'general accommodation.'"

114.    Approving Plaintiff's disability-based remote accommodation request for 1-2 years, or longer, would not have been an undue hardship on NYC, CUNY, and/or QCC, particularly given their recent university-wide use of remote teaching for *all professors* during COVID-19.

115.    Granting Plaintiff only a semester long "general accommodation" when her conditions were certified as lasting for a minimum of a year, was an ineffective accommodation of her disability, as well as interference with her disability rights.

32

116.    Upon information and belief, CUNY gave QCC and other community or senior

colleges permission and/or leeway to extend the remote work for those with disability

accommodations -- only as a "general accommodation" -- but only for one additional semester.

117.    Upon information and belief, NYC and/or QCC only approved Plaintiff's

accommodation for one semester because of CUNY Central's overarching mandate to return all

faculty employees (irrespective of their disabilities) to in-person work to meet the requirement

that 70% of courses would be taught in-person.

### *Defendants Terminate Plaintiff's Fully Remote General Accommodation and Demand Her Return to at least 70% In-Person in Line with CUNY Central's Mandate*

118.    On or about May 5, 2022, consistent with the CUNY Central 70% in-person

campus mandate, and irrespective of Plaintiff's known disabilities, NYC, CUNY, and/or QCC,

via Aspromatis, initially communicated with Plaintiff about her reasonable accommodation for

the upcoming semester (fall 2022) as follows:

> Good morning, Dr. Ramjerdi,
>
> *As you may be aware, CUNY has recently updated its policy to require a greater on-campus presence for all faculty and staff*. You were granted a temporary accommodation to permit you to work from home. *That accommodation will not be extended beyond May 31, 2022. You will therefore be expected to return to campus in at least a 70% in-person presence at the conclusion of your current accommodation. Your chair will discuss with you your return schedule*.
>
> Pursuant to CUNY policy, employees who have concerns about returning to work onsite for reasons such as medical, high-risk, childcare, or the health of others in the household may be eligible for other options (i.e., FLMA, leaves of absence, use of annual leave). If you need to explore those options, please contact the Benefits Office at benefits@qcc.cuny.edu.
>
> Thank you,

>           Martha
>
>           . . . .

(emphasis added).

119.     Notably, Aspromatis's email did not explicitly mention the possibility of a disability-based remote work *accommodation* of Plaintiff's known disabilities, Instead, it steered her towards, and implied that only, *leave options* were available as alternatives.

120.     This correspondence omitted that re-applying for a disability-based accommodation was possible, which communicated, or strongly implied, that only other leave "options" besides a disability-based accommodation would be considered.

121.     Upon information and belief, in line with CUNY Central's mandate, and irrespective of the Plaintiff's disabilities, NYC, CUNY, and/or QCC were communicating a denial of Plaintiff's fully remote accommodation for fall 2022, and/or attempting to dissuade Plaintiff from seeking and/or reapplying for a fully remote accommodation for fall 2022.

122.     This communication was a denial of Plaintiff's pending and ongoing request for a disability-based remote work accommodation beyond a single semester -- in line with the *at least* year-long duration of her mental health disability.

123.     Aspromatis sent this accommodation denial even though Plaintiff's recently submitted medical documentation that reflected that she had an additional minimum duration of at least another six months, and likely an additional year and a half, of a mental health disability that required a remote work accommodation.

124.     This communication was a failure to accommodate, retaliation for Plaintiff's prior accommodation requests, interference with Plaintiff's right to a disability-based accommodation,

34

and a failure to engage (and/or fully engage) in the required interactive process and/or cooperative dialogue concerning Plaintiff's accommodation request.

125.    It was only when Plaintiff questioned whether she was being denied an accommodation for fully remote work that Aspromatis reluctantly inform her that she could "re-apply for an ADA accommodation."

126.    They did so despite having sufficient information, including sufficient medical documentation, supporting Plaintiff's ongoing need for a reasonable accommodation to work fully remotely because of her disabilities.

127.    The stress and uncertainty caused by the medical recertification requirement and related process of resubmission of medical records exacerbated Plaintiff's disabilities.

128.    Nonetheless, on or about August 2, 2022, Plaintiff submitted new disability accommodation paperwork for fall 2022, including the required medical documentation form (Health Care Provider Accommodation Assessment Form) from the same treating psychiatrist as for the prior semester.

129.    Plaintiff submitted a Health Care Provider Accommodation Assessment Form dated July 14, 2022, which reiterated that Plaintiff "will need to work from home for at least the next 1-2 years but probably longer." The form also stated: "she is likely to be able to function well from home."

130.    NYC, CUNY, and/or QCC eventually allowed her to work fully remotely for the fall 2022 semester because her Chair assigned her to a fully online schedule.

131.    Upon information and belief, CUNY Central was involved in setting the process, procedure, guidance, and/or directive relating to "extensions" of fully remote accommodations because of CUNY Central's mandate to return faculty and staff to 70% in-person work.

132.    Upon information and belief, QCC, CUNY and/or the City held discriminatory and/or retaliatory animus towards Plaintiff because of her disabilities and/or her requests for an accommodation to work fully remotely because of her disabilities.

133.    Upon information and belief, QCC, CUNY and/or the City only approved Plaintiff's accommodation as a non-disability-based accommodation (*i.e.*, a "general accommodation") and/or never formally approved or denied her disability-based accommodation in writing.  This action was retaliatory, interfered with her disability rights, and/or violated the obligation to engage in a cooperative dialogue under the NYCHRL.

### Defendants Engaged in Discriminatory and/or Retaliatory Conduct Because Plaintiff Requested an Accommodation and/or Because of Her Disabilities

134.    Although NYC, CUNY, and/or QCC granted Plaintiff's accommodation to work fully remotely for fall 2022, NYC, CUNY, and/or QCC began to harass, discriminate against, and/or retaliate against Plaintiff because of her disabilities and/or requests for and/or use of disability accommodations.

135.    For example, on or about August 8, 2022, approximately two weeks before the beginning of the fall semester, Chair Maloy advised Plaintiff that QCC's Interim Provost and/or Dean of Faculty Sandra Palmer ("Palmer")[15] stated that Plaintiff's schedule had to be changed. The mandated change was from, the courses and times that Plaintiff was originally assigned to teach, to requiring Plaintiff to teach two sections of a course that she had not taught for at least eight years -- with only two weeks of notice to prepare.

136.    Blindsided by the change, Plaintiff immediately contacted Palmer, copying Chair Maloy and Aspromatis, and requested that she be assigned the two sections of the course she was originally assigned to as online courses -- as in the prior semester.

---

[15]    Upon information and belief Palmer became Interim Provost during September 2017.

137.    Plaintiff, noting her submitted "disability accommodation" and "chronic disability," and expressed concern to Palmer that, "[s]witching courses last minute would aggravate" her medical symptoms.

138.    Palmer, however, informed Plaintiff that her request to be switched to the courses she was originally assigned could not be approved.

139.    Plaintiff responded, in part, by stating that she would be complaining to "the Nyc Commission on Human Rights regarding this issue," because: (1) she did not believe it was fair to change her agreed upon schedule for the fall because of her request for a disability accommodation; and (2) the change would require her to "prepare an online curriculum for a course [she] ha[d] not taught for at least 8 years two weeks before the semester beg[an]."

140.    On or about August 9, 2022, Plaintiff complained about disability discrimination and/or retaliation, including the punitive last-minute change to her teaching schedule, to the Mayor's Office of People with Disabilities.

141.    Only following these complaints did Chair Maloy eventually resolve the assignment issue by assigning Plaintiff the same course she had been originally assigned -- albeit on a different day.

142.    Generally, in academia, faculty having input into their schedule is the norm. Moreover, senior tenured faculty are typically given the schedule and courses they request without changes absent unique circumstances.

143.    Prior to August 2022, Plaintiff had never had a last-minute schedule change imposed on her at QCC.

144.    Plaintiff had similarly not been subjected to such a change in her prior tenure as a professor at Cal State.

145.    Upon information and belief, by changing Plaintiff's courses and course times with two weeks' notice, NYC, CUNY, and/or QCC were engaging in disability discrimination and/or retaliation against Plaintiff for having requested and/or previously utilized a reasonable accommodation to work fully remotely.

146.    Upon information and belief, NYC, CUNY, and/or QCC changed Plaintiff's courses and her course times to attempt to pressure Plaintiff to resign and/or force her retirement because of her disabilities, use of and need for reasonable accommodations, and/or reasonable accommodation requests.

***CUNY Central Reiterates Its 70% In-Person Policy for Fall Semester 2022***

147.    On or about August 11, 2022, Chancellor Rodríguez reminded staff members of the 70% in-person requirement for fall 2022 (*i.e.*, the 70/30 In-Person/Remote Policy), which had been place since spring 2022.[16]

148.    Upon information and belief, CUNY Central also continued with its requirement of 70% in-person courses, with all full-time faculty members required to teach at least one in-person course on campus (*i.e.*, the 70/30 In-Person/Remote Policy).

***Defendants Unlawfully Requires Plaintiff to Reapply for a Reasonable Accommodation to Work Fully Remotely for the Spring 2023 Semester***

149.    On or about November 15, 2022, Aspromatis emailed Plaintiff informing her that: "In accordance with CUNY guidance, which calls for a greater on-campus presence going forward, we will not be automatically extending your ADA . . . accommodation beyond December 31, 2022."

---

[16]    *Chancellor Matos Rodríguez, 70% In-person Work*, Aug, 11, 2022, https://www.ccny.cuny.edu/sites/default/files/2022-08/OFFICE%20OF%20THE%20CHANCELLOR-%20Message%20from%208112022-%2070%20Percent%20In-Person.pdf.

150.    Despite NYC, CUNY, and/or QCC having ample documentation and information about her disability, and ongoing need for a disability accommodation, Plaintiff was (once again) required to reapply for her accommodation for a new semester – *i.e.*, on a semester-by-semester basis.

151.    Upon information and belief, this semester-by-semester reapplication requirement was imposed in an effort to discourage reasonable accommodations and otherwise harass and deter Plaintiff (and other disabled person) from re-applying for an accommodation.

152.     The communication also informed Plaintiff: "If you wish to extend your accommodation you must have your doctor *recertify* your need. . . . If you would like to recertify your accommodation, please reach out to me for the appropriate paperwork."  (emphasis added).

153.    In response, on or about December 10, 2022, Plaintiff requested to be exempted from semester-by-semester re-certification, for her chronic mental health disability:

> Hi Martha,
>
> I believe I have provided ample medical verification of my chronic disability *over the past 3 semesters* as well as for 3 FMLA *leaves over the past 5 years*. My last doctor's form *indicates my disability is permanent*. I will require the accommodation of all remote work now and in the future. My *medical condition has not changed* and the accommodation has allowed me to continue to fully meet all requirements of my job. I have had no absences since being granted this accommodation.
>
> The request for *additional documentation to recertify every semester is excessive*. I do not believe I should be required to recertify every semester. This is disruptive to scheduling and planning as well as causing extra stress *which increases the symptoms of my disability* as prior doctor forms verify.
>
> Please grant me an exception to the recertification process.
>
> Thank you for considering my request.

Jan Ramjerdi
Associate Professor
English Dept

(emphasis added).

154.    In addition to being a protected accommodation request, this communication by Plaintiff was a protected complaint and/or protected opposition to disability discrimination and/or related retaliation and interference.

155.    The requirement for Plaintiff (and other faculty) to recertify her chronic, permanent and/or semi-permanent disability and need for accommodation, on a semester-by-semester basis, was not job-related and based on business necessity, as required by the Rehabilitation Act.

156.    This semester-by-semester recertification requirement was also retaliatory and interfered with Plaintiff's (and other faculty's) disability accommodation rights.

157.    Demands to obtain recertification from medical providers, particularly under - deadlines, exacerbated Plaintiff's underlying mental health conditions.

158.    Obtaining these certifications from medical providers took time as medical providers were not always available to provide these certifications on short notice. In addition, the demands created significant uncertainty, and resulting emotional distress, as to whether or not Plaintiff would be granted an accommodation.

159.    On or about December 14, 2022, Plaintiff followed up with Aspromatis about her request for an accommodation exemption from the semester-by-semester reasonable accommodation recertification requirement.

160.    Aspromatis informed her that her request was "under review."

161. On or about December 21, 2022, ignoring Plaintiff's request for an exemption from the semester-by-semester recertification requirement, Aspromatis emailed Plaintiff stating that she needed, "to have updated information from [Plaintiff's] medical provider" by January 3, 2023.

162. On or about the same day, Plaintiff expressed her intent to appeal the decision about the recertification requirement.

163. The next day, on or about December 22, 2022, Plaintiff again informed Aspromatis of her intention to appeal the request for recertification of her well-documented disability as discriminatory.

164. Nonetheless, on or about December 27, 2022, Plaintiff complied with NYC, CUNY, and/or QCC's unlawful requirement of semester-by-semester recertification for a chronic disability.

165. Plaintiff submitted the accommodation paperwork for fully remote work, based on the permanent nature of her disabilities, for the spring 2023 semester, including the required Health Care Provider Accommodation Assessment Form.  The Health Care Provider Accommodation Assessment Form, dated December 22, 2022, was completed by her treating psychiatrist at the time who -- *once again* -- indicated that her condition was "Permanent."

166. On or about the same day, Plaintiff also emailed Aspromatis and expressed concern (a protected complaint), among other things, about CUNY Central's policy "requir[ing] recertification every semester for disability accommodation requests even if the disability is permanent":

Hi Martha,

> I sent a few minutes ago in a separate email the requested medical form for recertification of my *permanent* disability.
>
> *I spoke with a person at CUNY Central HR who told me it is* *CUNY policy to require recertification every semester* *for disability accommodation requests even if the disability* *is permanent.*
>
> *I am very concerned about this for the reasons I've stated in multiple prior emails this semester*. The last minute scheduling chaos that occurred two weeks prior to the Fall 22 semester was a big problem as I had been assigned a hybrid class which had to be switched to a synchronous at the last minute as my disability accommodation request was approved so close to the beginning of the semester.
>
> I would like to avoid this in the future. If I must be recertified every semester I request the decision on the remote work accommodation be completed prior to the scheduling of my classes.
>
> I will be pursuing my request for an exemption from recertification every semester for the reasons I have stated in numerous recent emails.
>
> Jan Ramjerdi
>
> . . . .

(emphasis added).

167.    In her email, Plaintiff explained that the timing of the accommodation

(recertification) process caused chaos, because it was done so close to the beginning of the

semester.

168.    While Plaintiff informed Aspromatis that she would still be pursuing an

exemption from recertification every semester, she also requested that, if "[she] must be

recertified every semester, "the decision on the remote work accommodation be completed prior

to the scheduling of [her] classes." Plaintiff also reiterated her request for an accommodation and/or exemption from being required to recertify every semester.

169.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of unnecessarily requiring recertification and/or repeated submission of reasonable accommodation requests and/or medical documentation, on a semester-by-semester basis, which was retaliation for, and/or interference concerning, these protected accommodation requests.

170.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of timing the accommodation process (and/or recertification process) close in time to the beginning of the semester.

171.    Upon further information and belief, the purpose of such timing was to: (1) dissuade requests for accommodations; (2) not leave sufficient time for individuals with disabilities to contest the denial of accommodations before the commencement of the upcoming semester; and/or (3) not provide individuals with disabilities time to adequately prepare if/when NYC, CUNY, and/or QCC denied their accommodation requests – all in retaliation because of, and/or to create interference concerning, these disability-based accommodation requests.

172.    NYC, CUNY, and/or QCC have devised and developed a standard operating procedure of a discriminatory and/or retaliatory accommodation process concerning disability-based remote work accommodation requests, especially concerning chronic, ongoing, and/or permanent or likely permanent mental health disabilities.

***Defendants Unlawfully Deny Plaintiff a Reasonable Accommodation & Escalate Their Discrimination, Harassment, and/or Retaliation of Her Exacerbating Her Disabilities, and Otherwise Interfered with Her Disability Rights***

173.    On or about January 19, 2023, without providing any basis, NYC, CUNY, and/or QCC -- despite Plaintiff having successfully performed her teaching and related work responsibilities fully remotely -- unlawfully denied her request for an accommodation to work fully remotely for the spring 2023 semester (and apparently beyond).

174.    Specifically, Aspromatis's email to Plaintiff on January 19, 2023, stated, in part: "We are unable to grant your request for an accommodation allowing you to teach 100% remotely on a permanent basis."

175.    NYC, CUNY, and/or QCC discriminatorily and/or retaliatorily denied her a disability accommodation to work fully remotely, for spring 2023, or otherwise on a permanent basis.

176.    On or about January 20, 2023, then Acting Chair Maloy[17] informed Plaintiff that she would be assigned to one in-person class on Saturday and two synchronous remote classes for the spring 2023 semester.  Plaintiff was advised that if she declined the in-person class she could be subjected to "disciplinary action."

177.    NYC, CUNY, and/or QCC provided Plaintiff with extremely limited time, to internally appeal the decision denying her a reasonable accommodation before the beginning of the spring 2023 semester.

---

[17]    Upon information and belief, Margot Edlin ("Chair Edlin") became the Chair of the English Department on or about July 1, 2021, and her term will continue until on or around June 30, 2024.  Upon information and belief, from on or about January 28, 2022, through on or about January 25, 2023, Chair Edlin moved from her Chair position in the English Department to the temporary position of Interim Dean.  During this time period, former Chair Maloy was elected to fill the Chair position as Acting Chair of the English Department.

178.    As most professors had recently taught all classes completely remotely, it would

not have been an undue hardship for NYC, CUNY, and/or QCC to have granted Plaintiff the

reasonable accommodation of remote work for three classes instead of two classes – *i.e.*, one

additional class.

179.    Plaintiff informed Aspromatis that she had begun the process of internally

"appealing the rejection of [her] ADA accommodation request for fully remote work with

Amaris Matos, the 504 ADA Compliance Co-coordinator."

180.    NYC, CUNY, and/or QCC's discriminatory and/or retaliatory denial occurred just

*days before* the spring 2023 semester was to begin.

181.    NYC, CUNY, and/or QCC imposed this denial with full knowledge of Plaintiff's

serious disabilities (including mental health disabilities), which would likely be exacerbated by

the stress of a drastic change, with no real transition period to any in-person work environment.

182.    In addition, NYC, CUNY, and/or QCC knew that these disabilities would require

accommodations regarding any in-person environment because of how gravely ill Plaintiff could

become if exposed to certain toxins because of her illnesses (disabilities).

183.    NYC, CUNY, and/or QCC knew that Plaintiff's disabilities also necessitated

accommodations in any in-person environment if her remote work accommodation was rejected

based on her prior: (1) accommodations and/or FMLA paperwork; and (2) Chairs having worked

with her prior to the COVID-19 pandemic to ensure that her in-person classrooms/offices were as

safe as possible given her health conditions -- inclusive of allowing her flexibility on where to

hold office hours.

184.    Given Plaintiff's disabilities, her disability paperwork, and her prior

accommodations, NYC, CUNY, and/or QCC were also well-aware that her in-person

accommodation need for a mold/toxin free classroom environment would require time to properly coordinate.

185.    Nonetheless, instead of working with Plaintiff to accommodate her disabilities during a transition period, NYC, CUNY, and/or QCC, on the eve of the semester, denied Plaintiff's request for an accommodation regarding a mold/toxin free room without engaging in any interactive process and/or cooperative dialogue about alternative accommodations.

186.    NYC, CUNY, and/or QCC actions contributed to the exacerbation of Plaintiff's disabilities and she became even more severely ill as result of their discriminatory and retaliatory conduct.

187.    On or about January 20, 2023, Plaintiff began to internally appeal the denial of her accommodation request to work fully remotely with Amaris, the ADA Compliance Coordinator/Assistant Vice President for Equity, Inclusion, and Belonging for QCC.  Plaintiff subsequently followed up with Amaris by providing her previously submitted documentation.

188.    In addition, on or about January 23, 2023, Plaintiff emailed Amaris a protected complaint indicating her awareness that NYC, CUNY, and/or QCC were discriminatorily applying CUNY Central's "return to in-person work" mandate on her -- 70% in-person courses, with all full-time faculty members required to teach at least one in-person course on campus -- irrespective of her disabilities and her success performing the essential functions of her job by teaching fully remotely:

> Hi Amaris,
>
> I believe the history of my disability, effective previous accommodations (including a Service Dog accommodation in 2019, classroom and office reassignment accommodations 2015-2019 and my three semester-long FMLA leaves (from 2016-2019) should be considered in my appeal for remote work accommodation.

Is your office considering the documents on file at QCC HR? You have not indicated if your office has access to these records. If not, I would like these records and documents considered in the appeal as I believe these add support and a longer-term view of my disability, need for accommodation, and effectiveness of the remote work accommodation in enabling me to work at QCC.

As an example of the relevance of these records to my appeal, I am attaching the medical from for the FMLA leave I had in Fall 2019 as further support for my appeal to continue working remotely. This is from my prior doctor (since 2005) who also documented my earlier 2 FMLA leaves.

*Remote work has been a very successful accommodation to enable me to work with no absenteeism for 4 years after having to take 3 3-mo fmla leaves in the prior 3.5 years.*

*I understand the CUNY policy that all full-time faculty teach at least one in person class is being applied to my case. I believe my case warrants an exemption to this rule.*

Jan Ramjerdi

(emphasis added).

189. On or about January 24, 2023, Amaris unlawfully denied Plaintiff's appeal,

largely based on misrepresenting that the essential functions of her position required an in-person

presence.

190. This representation was both untrue and nonsensical. Plaintiff (and most, if not

all, faculty throughout CUNY) had been performing her job fully remotely since the beginning of

the COVID-19 pandemic in March 2020 without issue.

191. Specifically, Amaris stated, only days before the spring 2023 semester was

scheduled to begin:

Dear Professor Ramjerdi,

I am responding to your request to appeal the College's denial of your request for a permanent accommodation to teach remotely.

I reviewed your application for an accommodation, including your doctor's assessment forms going back to 2019 and the email communications you forwarded to me. After considering all the information, I do not see any basis for finding that the denial of your request for a permanent accommodation was improper.

*I noted that your medical documentation states that you have a condition that requires that you work from home "for at least the <u>next one to two years, but probably longer</u>." I have been advised that the essential functions of your position as an Associate Professor include both teaching and fulfilling your responsibilities to the English Department and to the College, <u>all of which require an in-person presence</u>. This includes attending department meetings, participating in committees and interacting with students. The accommodation you are requesting requires a major restructuring of your primary job duties. This would be a significant burden to the College and, therefore, not a reasonable accommodation.*

I am aware that the College has permitted you to take FMLA time, and that it continued to allow you to work remotely on a temporary basis after your FMLA expired. *However, <u>given the long-term nature of your condition,</u> as indicated by your doctor<u>, it was not unreasonable for the College to deny a further extension of your accommodation</u>.*

*I was advised that you have been assigned two classes that can be taught remotely and one class to be taught in person. You may contact Ms. Aspromatis if you wish to discuss possible ways to reduce your stress while you are working in person.*

If you would like to explore the possibility of leave options, please contact the Benefits Office at benefits@qcc.cuny.edu.

Please let me know if I can be of further assistance.

> Be well,
> Amaris
>
> Amaris Matos
> Assistant Vice President for Equity, Inclusion, and Belonging

(emphasis added).

192.    Amaris's statements were misrepresentations, particularly given that Plaintiff (and many others similarly situated) had been performing the essential functions of her job fully remotely since March 2020 without any "major restructuring" of her job taking place, or any "significant burden" on NYC, CUNY, and/or QCC.

193.    Amaris's statement did not address the relevant question of whether the accommodation would have been an "undue hardship," (as opposed to a "significant burden") as actually legally relevant to Plaintiff's disability-based accommodation request.

194.    Amaris's statement did not address any of the legally relevant factors to evaluating the existence of an undue hardship under the Rehabilitation Act or NYCHRL.

195.    Plaintiff had successfully performed her job fully remotely without issue during a period (March 2020 through the spring 2021 semester) when NYC, CUNY, and/or QCC *required it* because of the COVID-19 pandemic,[18] and then subsequently with a remote accommodation through fall 2022.

---

[18]    The EEOC has stated the following about remote work requests as a reasonable accommodation subsequent to teleworking during the COVID-19 pandemic.

> D.16. Assume that prior to the emergence of the COVID-19 pandemic, an employee with a disability had requested telework as a reasonable accommodation. The employee had shown a disability-related need for this accommodation, but the employer denied it because of concerns that the employee would not be able to perform the essential functions remotely. In the past, the employee therefore continued to come to the

196.    Amaris' assertion that an in-person aspect to Plaintiff's teaching position was an "essential function" of her position if accurate (which it was not) would have meant that, for several semesters, essentially *all faculty at NYC, CUNY, and/or QCC* were failing to carry out the "essential function" of their role as faculty, between March 2020 through the spring 2021 semester, when essentially all teaching was required to be done fully remotely.

197.    In addition, Amaris unlawfully correlated the *long-term* nature of Plaintiff's disabilities to the supposed "reasonableness" of NYC, CUNY, and/or QCC's decision to deny her an accommodation at all.  Amaris did so despite the reasonableness of Plaintiff's accommodation request, as evidenced by Plaintiff having taught remotely for several years prior with no ascertainable undue hardship.

198.    NYC, CUNY, and/or QCC held animus towards Plaintiff because of her disabilities and/or mental health disabilities, the long-term nature of her disabilities, and/or her request(s) to work fully remotely because of her disabilities.

---

workplace. However, after the COVID-19 crisis has subsided and temporary telework ends, the employee renews the request for telework as a reasonable accommodation. Can the employer again refuse the request? *(9/8/20; adapted from 3/27/20 Webinar Question 22)*

Assuming all the requirements for such a reasonable accommodation are satisfied, *the temporary telework experience could be relevant to considering the renewed request. In this situation, for example, the period of providing telework because of the COVID-19 pandemic could serve as a trial period that showed whether or not this employee with a disability could satisfactorily perform all essential functions while working remotely, and the employer should consider any new requests in light of this information*. As with all accommodation requests, the employee and the employer should engage in a flexible, cooperative interactive process going forward if this issue does arise.

*EEOC: What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (emphasis added), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

199.    Upon information and belief, NYC, CUNY, and/or QCC believed Plaintiff's disabilities and/or accommodation requests interfered with CUNY Central's mandate to return to 70% in-person work and/or 70% in-person courses across the university.

200.    NYC, CUNY, and/or QCC's position was also disingenuous because NYC, CUNY, and/or QCC had assigned Plaintiff to *two remote classes* (out of a *total of three*) for spring 2023 -- belying their position that an *essential* function of her job *required* an in-person presence.

201.    Moreover, upon information and belief, by assigning Plaintiff to one in-person class, NYC, CUNY, and/or QCC were strictly and unlawfully adhering to the CUNY Central mandate of 70% in-person courses and 30% other modalities (*e.g.*, remote teaching) split, including the mandate that "[a]side from unusual circumstances*, all full-time faculty members should teach at least one in-person course on campus*."  (emphasis added)

202.    Without regard to disability laws that protect people like Plaintiff who require accommodations, NYC, CUNY, and/or QCC were subjecting Plaintiff to the CUNY Central mandate, without consideration of disability accommodations, even though it would not have caused an undue hardship to have accommodated Plaintiff because of her disabilities, as required by the Rehabilitation Act and the NYCHRL.

203.    Moreover, by working fully remotely from approximately mid-March 2020 through fall 2022, Plaintiff had already performed successfully remotely, and was able to work without requiring a medical leave, for the longest period in several years of teaching.

204.    As a result, providing Plaintiff (as well as other faculty) with a fully remote teaching accommodation would have *benefited* NYC, CUNY, and/or QCC, as it would decrease

the likelihood of Plaintiff (as well as other faculty) requiring a medical leave (as opposed to utilizing a remote work accommodation) and to continue teaching.

205.    The essential functions of Plaintiff's position did not require an in-person presence.

206.    Other than reliance on CUNY Central's 70joi maximum remote campus mandate, there was no substantive information in Amaris's correspondence explaining or substantiating how or why -- spontaneously in spring 2023 -- Plaintiff's job had come to require an in-person presence as an essential function of the position.

207.    There had been no such assertion by NYC, CUNY, and/or QCC during the pandemic (spring 2020, fall 2021, and spring 2021 semesters), or when Plaintiff was afforded a protected disability accommodation and/or general accommodation (fall 2021, spring 2022, and fall 2022).

208.    Moreover, Amaris, failed to: (1) offer Plaintiff any alternative accommodations to support an in-person teaching requirement; and/or (2) to take any affirmative action to engage in an interactive process and/or cooperative dialogue with Plaintiff to accommodate her disabilities relating to the in-person teaching requirement.

209.    In fact, as the 504/ADA Coordinator, upon information and belief, in violation of CUNY's own policies and/or disability anti-discrimination laws, Amaris did not "mediate to try to resolve the issues between the employee and College or unit to find an acceptable accommodation, and instead simply denied the requested accommodation."[19]

---

[19]    *CUNY Procedures for Implementing Reasonable Accommodations and Academic Adjustments*, https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/legal-affairs/policies-resources/reasonable-accommodations-and-academic-adjustments/Reasonable-Accommodations-and-Academic-Adjustments-2016.pdf.

*Chair Edlin Returns to the QCC English Department*

210.    In the midst of the denial of Plaintiff's accommodation, on January 25, 2023, Acting Chair Maloy informed Plaintiff that her last day in her role as Interim Chair had been January 24, 2023.

211.    On or about January 25, 2023, Chair Edlin returned to her role as Chair of QCC's English Department.

*Plaintiff Is Formally Assigned to One In-Person Class & Requests Time to Return Onsite*

212.    On or around January 25, 2023, consistent with CUNY Central mandate, Plaintiff was formally assigned to one in-person class and two synchronous remote classes for the spring 2023 semester on the CUNY Blackboard.  Her first Saturday in-person class was scheduled for January 28, 2023.

213.    On or about January 26, 2023, Plaintiff (who had just been formally assigned one in person class) asked Aspromatis (copying Palmer, Chair Edlin, and Amaris) that she be afforded 14 days to return onsite from January 25, 2023.

214.    Plaintiff quoted from a CUNY policy, which stated: "'Remote employees will be given a minimum of seven (7) calendar days' notice of a requirement to return to on-site work. Where possible, fourteen (14) days' notice will be provided. Additional time to return to onsite work will be granted if necessary to meet documented travel restrictions or quarantine requirements.'"

215.    On or about January 26, 2023, in separate responses, Aspromatis and Counsel Florman both informed Plaintiff that the CUNY policy she referred to applied to staff, not faculty.

216.   When Plaintiff -- a professor with over 20 years of service to CUNY -- asked to be provided with the same courtesy as staff, Florman stated, in part: "You have stated that you require 'at least two weeks' to start your class.  Given that this is a course you have taught before, please advise why you feel the need for more than the allotted time to prepare to teach your class."

217.   Aspromatis and Florman threatened Plaintiff for requesting time to return on-site despite being fully aware of her disabilities and that she needed in-person accommodations that had not been approved.

218.   In response to Florman, on or about January 26, 2023, Plaintiff responded:

> Dear Lois Florman,
>
> Thank you for your response.
>
> I am asking that I, a 20-Year full-time employee of QCC, be granted the same professional respect and courtesy promised CUNY staff in the quoted CUNY policy on remote work agreements. *The adjustment to onsite work from almost 3 years of fully offsite work takes time especially for those of us with disabilities. There are endless logistics of travel, access to indoor environments, and medical equipment.*
>
> As to the timing of my reassignment—I did not understand the new schedule had been decided upon until yesterday 1/25 when I received the customary email from the Chair with the schedule and request for acceptance and posting on CUNYFirst. Since the course had not been posted and I didn't get the email, I thought the status of the course was on hold during the appeal of the remote work denial.
>
> Thank you for considering my request.
>
> Best,
> Jan Ramjerdi
> Associate Professor/English
> QCC/CUNY

. . . .

(emphasis added)

219.    On January 26, 2023, Counsel Florman told Plaintiff, in part, that "her request to be permitted additional time to begin teaching [was] unreasonable," despite Plaintiff's email stating that she was in need of accommodations to return and teach on site.

220.    Florman minimized Plaintiff's understanding that the status of her class was on hold pending appeal, and failed to recognize Plaintiff's need for accommodations to return to in-person teaching:

> Dear Professor Ramjerdi,
>
> You responded to the email that was sent by your Chair on January 20, the same day you received it. You advised your Chair that "I accept the newly assigned schedule." You were never advised that your assignment would be put on hold pending the outcome of the appeal.
>
> *Your request to be permitted additional time to begin teaching is unreasonable.* The students have registered for a class that begins on Saturday. It is not fair to them to begin a class with one instructor and have another instructor replace them several weeks into the semester.
>
> As a "courtesy" you will be permitted to miss the first day of class and take it as a sick day. However, you must be present in class from the second day of class, February 4, forward. Please confirm that you will be present on February 4 to begin your assignment.
>
> Lois Florman

(emphasis added).

221.    When quoting Plaintiff, Florman's email misleading failed to also quote Plaintiff's next sentence to then Acting Chair Maloy on January 20, 2023, which both sentences together read: "I accept the newly assigned schedule. *I do so under protest and have begun the process of*

*appealing the rejection of my ADA accommodation request for fully remote work with Amaris Matos, 504 ADA Compliance Coordinator*." (emphasis added).

222.    NYC, CUNY, and/or QCC failed to engage in an interactive process and/or cooperative dialogue with Plaintiff about accommodations she might require to return on-site -- such as assignment to a mold-free classroom with ventilation -- in light of her disabilities and their denial of her fully remote accommodation request.

223.    Plaintiff had traveled to the Mojave Desert in California approximately one month prior to the spring semester, primarily for medical reasons because of a bad mold exposure in or around the Christmas season.  Plaintiff had intended to, if well enough, conduct some short-term research for a novel at Cal State University Desert Studies Center.

224.    Attempting to find a solution in the wake of the denial of the remote accommodation that she desperately needed, Plaintiff asked Chair Edlin for an option of research leave.

225.    Chair Edlin declined Plaintiff's request.

226.    Plaintiff was later reprimanded by Palmer (Interim Provost) for requesting a research leave.

**Plaintiff Formally Requests In-Person Accommodations to Enable Her to Return to In-Person Work**

227.    On or about January 28, 2023, following NYC, CUNY, and/or QCC's failure to engage in the interactive process and/or cooperative dialogue and propose alternative accommodations for their in-person teaching requirement, Plaintiff requested disability accommodations for her mandated in-person class.

228.    Plaintiff emailed Aspromatis with the subject, "Requesting 3 ADA Accommodations for Spring 2023," and copied Chair Edlin, Palmer, Amaris, Counsel Florman, and Zinger.

229.    In summary, Plaintiff requested at least three disability-related reasonable accommodations for in-person teaching. This included, without limitation: (1) classroom and office assignments in rooms with the good air quality (she explained that she has been unable to use most classrooms and the office in the Humanities building because "[t]he air quality in the Humanities is very poor") because her disabilities were "triggered immediately by exposures to mold and other toxins"; (2) a computer classroom (where students would have access to computers because she had been teaching remotely), and if not possible, a podium with a working microphone and smart screen; and (3) an extension of her accommodation for her medical service dog from spring 2020 (a prior approved accommodation).

230.    Plaintiff also provided Aspromatis with information on why she required these accommodations:

> Hi Martha,
>
> I am making plans to return to onsite and will be seeing two of my doctors next week to determine ways to maximize the probability of a successful return to in person teaching on Sat 2/4.
>
> 1. Classroom and office assignments in rooms with good air quality.
>
> My disabling symptoms are triggered immediately by exposures to mold and other toxins. If the classroom and office I am assigned to has these I may become quickly too ill to teach.
>
> The air quality in the Humanities is very poor. I have not been able to use most of the classrooms and the office since 2016 when I first developed this disability. Chairs have kindly worked with me in assigning me to classrooms I could

tolerate and allowing me t[o] conduct office hours in hallways and outside.

I am requesting the Sat 9:10-1 class and my office be moved to a building with the best air quality possible. Ideally this would be one using Hepa filters and with newer hvac and clean ducts. Ideally I'd like the classroom tested for mold, pesticides, and other toxins.

I emailed Joseph Cartolano at B&G today to ask for suggestions.

2.      I am also requesting a computer classroom if possible. Since I have been teaching solely online for 3 years, I need students to be able to work online with me in class. If a computer room is not possible I am requesting a podium with working mic and smart screen. I will need to use a medical carbon filter mask sometimes and as this is not a Covid mask I wear a second mask. I'll need a microphone.

3.      I am also requesting that the accommodation for my medical Service Dog be extended from Sp 20.

Please let me know if you require further medical documentation to consider my requested accommodations.

Thank you.


Jan Ramjerdi
Assoc Prof /English

. . . .

231.    Aspromatis never reached out to Plaintiff to ask her which classrooms in the Humanities Building she could teach in and/or to engage in an interactive process and/or cooperative dialogue about the accommodations she requested.

232.    Since approximately 2016, Plaintiff had not been assigned to the H-436 classroom in the Humanities Building at QCC.

233.    However, without engaging in an interactive process and/or cooperative dialogue, on or about January 31, 2023, Aspromatis without explanation, responded by assigning Plaintiff

to a non-computer classroom in the Humanities Building (H-436) -- *the very type of classroom Plaintiff had indicated she could not teach in because the air quality in the Humanities Building was poor*:

> Good afternoon, Jan,
>
> I am in receipt of your recent request for accommodations in the classroom. In response to your request, we are able to provide you with the following:
>
> You have been assigned room H-436 which has smart podium technology, with a microphone, projector, computer with monitor and document camera.
>
> You may bring your service dog with you to the classroom. Please provide proof that the dog has a current license issued by the Department of Health and Mental Hygiene.
>
> I will also need to speak with your doctor to verify the information he previously provided in the form you submitted last month. As a reminder, *accommodations are considered* <u>on the condition that</u> *you consent to allow us to speak with the doctors who complete the forms*.
>
> Thank you,
>
> Martha

(emphasis added).

234.    NYC, CUNY, and/or QCC unlawfully denied Plaintiff's in-person teaching accommodation requests by assigning her to a mold-affected non-computer classroom (H-436) in the Humanities Building.

235.    NYC, CUNY, and/or QCC assigned Plaintiff to a classroom in the Humanities building with full knowledge that Plaintiff was not able to teach in most classrooms in the building, including H-436, because she would likely become very ill because of her disabilities.

236. Upon information and belief, Aspromatis' retaliatory and unnecessary request to speak directly with Plaintiff's medical provider, was beyond the disability-related inquiry permitted under the Rehabilitation Act and/or NYCHRL for disability-based because it was not job-related or based on business necessity.

237. This *across-the-board requirement* of consideration of *any* disability-based accommodation request, *on the "condition"* that employees consent to allow NYC, CUNY, and/or QCC to speak directly with the doctors, facially violated the medical inquiry protections of the Rehabilitation Act and the NYCHRL.

238. Upon information and belief, Aspromatis, NYC, CUNY, and/or QCC (without Plaintiff's knowledge) were discriminatorily and/or retaliatorily requesting unnecessary contact with medical providers, unnecessary medical documents, and/or trying to bring Plaintiff up on pretextual and false disciplinary charges based on her medical records.

239. On or about February 1, 2023, Plaintiff responded to Aspromatis's January 31, 2023 communication, and repeated her request for reasonable accommodations for in-person teaching in an email to Aspromatis (an email which she also addressed to Chair Edlin, Palmer, and Amaris).

240. In her email, Plaintiff reiterated that she could not teach in H-436 because of her disabilities. She also reasserted her accommodation request not to be placed in the Humanities Building or comparable buildings by explaining, yet again, that she could not teach "in the Humanities Building or any building with ongoing construction and high levels of mold and other toxins."

241. Plaintiff noted that this was something that two prior Chairs were aware of and that they had previously accommodated her disability by "assigning [her] rooms that don't make

[her] sick and allowing [her] to hold office hours in hallways and outdoors." Plaintiff further explained why she required a computer lab for the transition period.

242. Plaintiff informed Aspromatis that she was in the process of meeting with doctors, and that if Plaintiff was forced to take FMLA leave because both her remote and in-person accommodations had been denied, she was not sure which doctor would be providing the documentation.

243. Plaintiff, for this reason, asked that Aspromatis not call her doctors while she was in the process of getting reevaluated.

244. At the end of her email, Plaintiff pled: "Please assign me to rooms I have a *better chance of successfully teaching* in *without disabling symptoms*." (emphasis added). Her email read:

> Hi Martha,
>
> Thank you for considering my requests.
>
> I cannot teach in the Humanities Building or any building with ongoing construction and *high levels of mold* and other toxins. There are only a couple rooms on the 2nd floor that I have been able to teach in since 2016 as two prior Chairs are aware and I have not been able to use the English Dept offices. Chairs have informally *accommodated my disability* by assigning me rooms that don't make me sick and allowing me to hold office hours in hallways and outdoors. My problems with the air quality and mold in the Humanities building are documented in my many emails over the years since 2016.
>
> Also, I require a computer lab in the transition from my fully remote to inperson pedagogy and teaching materials. They need to be on computers.
>
> I am meeting with 2 doctors tomorrow for my 2 different related conditions. The environmental illness is the main issue regarding return to site work. *My doctors are in agreement as they have been all along that I am fully able to work from my home office where I can control the air quality*

*as I have successfully done since March 2020*. They advise strongly against working in rooms with poor air quality and mold. I am seeing both doctors tomorrow and Friday as well as having blood tests done.

If I am *forced to take an FMLA leave*, I am not sure which doctor would be writing the form. *Please do not call my doctors until I can have them evaluate me*. I will be providing new documentation once I have had the opportunity to consult with my doctors and tests done. I am doing this in as timely a fashion as possible while teaching my classes.

Please do not call Dr [C.S.]. *You have ample documentation from him for considering my accommodation requests. I do not give you permission to talk to him*.

Please assign me to rooms I have *a better chance* of successfully teaching in *without disabling symptoms*.

Thank you for considering my request.

Jan Ramjerdi

(emphasis added).

245.    It would not have been an undue hardship to assign Plaintiff to one of several available rooms on the 2nd floor that were not impacted by mold and/or had good air circulation.

246.    On or about February 2, 2023, Aspromatis interfered with Plaintiff's disability rights, retaliated against her, and/or otherwise effectively denied her request for an in-person teaching accommodation, by placing: (1) unreasonable requirements on her including requiring additional medical documentation directly from her medical provider; and (2) an unnecessary authorization to speak to her provider before considering her request.

247.    Aspromatis also asserted that she required "originals" before they could even proceed with reviewing her accommodation request:

Good morning, Jan,

> I am in receipt of your response. Regardless of whether you are seeking FMLA leave or an accommodation, *please be advised that <u>no action will be taken until we receive your written authorization</u> to speak with your doctors. Additionally, any medical evaluation forms must be sent to us directly by your medical provider. <u>We must have originals</u> in order to proceed with the review of your application*. Please have your medical provider fax the completed forms to 718-281-5499 to my attention.
>
> Thank you,
>
> Martha

(emphasis added).

248.    The demand for a medical release, as a prerequisite to consider any request for FMLA leave, was a facial violation of FMLA regulation 29 C.F.R. § 825.306(e).

249.    The demand for a medical release, prior to advising Plaintiff that an FMLA certification was "incomplete or insufficient," and "stat[ing]in writing what additional information [was] necessary to make the certification complete and sufficient," and providing her with "seven calendar days . . . to cure any such deficiency," was a violation of FMLA regulation 29 C.F.R. § 825.305(c).

250.    The demand for a medical release to directly contact Plaintiff's medical provider regarding her provided medical documentation was unnecessary, not job-related and consistent with business necessity, and constituted retaliation and/or interference under the FMLA, Rehabilitation Act, and/or the NYCHRL.

251.    The demand for "original" medical documentation before any final approval of disability accommodations or FMLA leave, was unnecessary, not job-related and consistent with business necessity, and constituted retaliation and/or interference under the FMLA, Rehabilitation Act, and/or NYCHRL.

252.    Later the same day, when Plaintiff sought clarification on what was *actually* needed because of the time constraints, and because NYC, CUNY, and/or QCC already *had* sufficient medical information, Aspromatis responded with further interference and retaliation, and again denied her accommodation:

> Hi, Jan,
>
> If you wish us to consider any additional accommodations beyond those already given to you, we must have the medical provider form sent to us directly from your provider. *We will also <u>need your written authorization</u> to speak with the provider <u>before we will consider the request</u>. If the form is faxed to us, it must have the telephone number of the fax from which it was sent printed on each page.* We <u>must also have the original prior to finalizing</u> our decision.
>
> Please remember that it is expected that you will return to work while any accommodations are pending.
>
> Martha

253.    Again, the requirement of a general medical release, to speak directly with medical providers, prior to consideration of the accommodation was a violation of the Rehabilitation Act and the NYCHRL.

254.    Unbeknownst to Plaintiff, around this time, in or around late January 2023, February 2023, and/or March 2023 Aspromatis began to harass at least one of her doctors by aggressively interrogating them based on a prior medical release.

255.    Aspromatis, NYC, CUNY, and/or QCC were discriminatorily and/or retaliatorily planning to bring Plaintiff up on false disciplinary charges about her prior medical documentation being forged.

256.    However, at the time, Aspromatis did <u>not</u> tell Plaintiff that there were any questions and/or concerns about her prior medical documentation being forged, falsified, and/or altered.

257.    Plaintiff would *later* learn that, upon information and belief, Aspromatis was not actually contacting her doctor to inquire about her needs and/or requests for an accommodation at the time.  Instead, in further retaliation, she was attempting to bring her up on pretextual and false disciplinary charges of medical records forgery.

258.    At one point, on February 3, 2023, Plaintiff was actually so concerned that her in-person teaching accommodation requests were not getting resolved, that she asked for another accommodation (a logical one under the circumstances), to be permitted, "to teach fully remotely until the [in-person teaching] accommodation issues can be resolved."

259.    Yet, NYC, CUNY, and/or QCC, without any possibility of incurring an undue hardship, unlawfully denied this temporary accommodation request and continued to make numerous unlawful demands on Plaintiff.  These included additional medical documentation demands, unnecessary signature of a general medical release, before they would even *consider* any of her requests for an accommodation.

260.    NYC, CUNY, and/or QCC made these demands of Plaintiff despite having sufficient medical documentation at the time about her disabilities to make a determination about her accommodation requests concerning in-person teaching and/or remote teaching accommodation.

261.    For example, on February 3, 2023, Aspromatis, circularly stated, in part: "As I previously advised you, no further accommodations will be granted unless or until additional accommodations have been approved."

262.    Aspromatis also indicated that Plaintiff: (1) "also must sign your approval to speak with your medical provider on page 1 of the Health Care Provider Accommodation Assessment Form . . . *no requests for accommodations will be <u>considered</u>* until we receive (1) a *signed authorization to speak with your provider*; (2) the *original form*, sent by your provider; and (3) we have *had the opportunity to speak with your provider* to clarify or verify any information written on the form. . . . You may ask your provider to fax the form, with the telephone number of the fax machine stamped on each page, *but no final decisions will be made at that time*. (emphasis added).

263.    Aspromatis threatened Plaintiff (who was very ill at the time) by stating: "You have indicated that you will not be present tomorrow.  Please be advised that failure to appear will be considered an unauthorized absence."

264.    Plaintiff's requested accommodation of a room assignment with good air quality out of the Humanities Building, which had no financial cost associated with it, would not have been an undue hardship for NYC, CUNY, and/or QCC.

265.    Upon information and belief, it was common knowledge that many CUNY academic buildings, including buildings at QCC, had ventilation and/or mold problems.  For example, in the December 2021 statement made by PSC (the union) in response to CUNY's announcement of its 70% in-person (and 70% of courses in-person) requirement, PSC's statement included concerns about proper ventilation and/or mold during a pandemic -- a respiratory pandemic.

266.    Upon information and belief, among faculty and staff of the English Department at QCC as well as the QCC administration, it was (and is) common knowledge that the conditions in the Humanities Building at QCC were (and are) terrible, and unsafe for employees

and students, including, without limitation: (1) problems with chronic mold; (2) rodent infestations; (3) asbestos leaks; (4) elevator breakdowns; (5) the only ADA bathroom frequently not working; (6) questionable water; (7) classrooms with no heat; (8) a prior bedbug infestation; and (9) ongoing construction and gutting of the first floor large theatre for years, all of which led to numerous air quality issues, including, significant dust in the building, etc.

267. Granting Plaintiff a: (1) a room assignment that was not impacted by mold and/or had good air circulation; or (2) a fully remote teaching accommodation, would have had no financial cost associated with it, and would not have otherwise been an undue hardship for NYC, CUNY, and/or QCC.

***Plaintiff Becomes Ill While Attempting to Return to In-Person Work***

268. By unlawfully denying her accommodation, close in time to the beginning of the semester, and not providing her with in-person accommodations to teach in-person, NYC, CUNY, and/or QCC caused a significant exacerbation of Plaintiff's disabilities, including her mental health disabilities.

269. Despite Aspromatis, NYC, CUNY, and/or QCC's discriminatory and/or retaliatory conduct, Plaintiff attempted to travel back to New York City for her in-person class on February 4, 2023.

270. Unfortunately, on or about February 3, 2023, Plaintiff became extremely ill due to mold exposure at a hotel as she was attempting to travel back and could not travel as a result.

271. On February 3, 2023, Plaintiff informed Chair Edlin: "I have just come from urgent care. I am ill, and cannot return to work until 2/6."

67

*Defendants Strip Plaintiff of Her In-Person Teaching Class While Her In-Person Teaching Accommodation Requests Were Allegedly Pending*

272.    Days later, on February 7, 2023, in a letter from Palmer to Plaintiff, while her in-person room assignment teaching accommodation requests were still pending, NYC, CUNY, and/or QCC retaliated against Plaintiff by stripping her of her in-person teaching class, and blaming her for her excused absence on January 28, 2023 and her mold/travel-related illness on February 4, 2023:

> I am writing to advising you that your class, ENGL102 C6A, has been assigned to another instructor, due to your failure to appear to teach the class in person.
>
> I understand you were excused from teaching the first session, on January 28, 2023, as a courtesy. This was done to allow you additional time to return from the Mojave Desert, where you indicated that you had recently relocated. However, at the same time, you were advised that you must be present to teach your class on February 4. You were reminded of this several times in email exchanges over the past week. Nonetheless, despite these repeated reminders, you notified your Chair on the evening of February 3 that you would not be coming to class the following day.
>
> Your students are entitled to consistency and continuity of instruction. They are registered for a class that meets once a week for four hours. They missed the first class because you immediately cancelled it without first discussing it with your Chair, who was prepared to hire a substitute. (And without notifying your students, who all came to class.) They almost missed the second week of class because you notified your Chair the night before the February 4 class that you would be absent. Fortunately, she was able to find a substitute at the last-minute, so the class was held.
>
> Based on communications you have recently had with the College, we have no assurance as to when you intend to return. We cannot risk repeating what has occurred over the past two weeks. It is therefore in the best interest of all to assign this class to another instructor.

273.     In furtherance of NYC, CUNY, and/or QCC's discrimination and/or retaliation against Plaintiff, the letter from Palmer largely misstated and misrepresented what had occurred since Plaintiff's accommodation to teach fully remotely was denied by NYC, CUNY, and/or QCC on or about January 19, 2023.

274.     Moreover, not only did NYC, CUNY, and/or QCC retaliate and/or discriminate against Plaintiff by stripping her of her in-person teaching assignment, they also assigned Plaintiff to *administrative duties* -- with 4.50 hours per week to be done in person and 2.00 hours per week to be done remotely.

275.     Specifically, the letter continued:

> You will be assigned administrative duties in lieu of teaching this class effective Monday, February 13 through the remainder of the semester (thirteen weeks). *Administrative duties require your presence on campus on a weekly basis. You will be assigned a total of 6.5 hours per week, replacing 52 teaching hours. Of those hours, you must work 4.50 hours per week in person and 2.00 hours remotely.* Your Chair will contact you to advise you of your new schedule and assignment this week.
>
> Please be aware that failure to adhere to your assigned schedule may be considered an unauthorized absence.
>
> . . . . .
>
> (emphasis added).

276.     Consistent with the CUNY Central's mandate, and irrespective of Plaintiff's disabilities, NYC, CUNY, and/or QCC continued to discriminatorily/retaliatorily enforce a policy prohibiting disability-based fully remote teaching policy (*i.e.*, the 70/30 In-Person/Remote Policy) against Plaintiff, even with respect to her punitive administrative work assignment.

277.    NYC, CUNY, and/or QCC continued to discriminate and/or retaliate against Plaintiff by requiring that 4.50 hours of administrative work be done *in-person*, even though NYC, CUNY, and/or QCC were aware of her "pending" in-person accommodation needs and accommodation requests.

278.    NYC, CUNY, and/or QCC continued to fail to engage in any interactive process and/or cooperative dialogue about the accommodations that they would or would not be providing for the in-person administrative duties requirement.

279.    NYC, CUNY, and/or QCC took this discriminatory and/or retaliatory action against her even though they had sufficient medical documentation to make a determination on her in-person teaching accommodation requests at that time.

280.    During the time that Plaintiff's in-person accommodation requests were pending, Plaintiff also made accommodation requests to the Chair requesting that she, due to her disabilities and/or illnesses, be allowed to perform the reassigned administrative duties fully remotely.

281.    Chair Edlin, however, declined her request to reach a solution of a reasonable accommodation, as had happened with Chairs is the past.

282.    In summary, following NYC, CUNY, and/or QCC's denial of her request for a reasonable accommodation to work fully remotely on January 19, 2023, NYC, CUNY, and/or QCC began to escalate their harassment, discrimination, interference, and/or retaliation against Plaintiff because of her disabilities, requests for accommodations, and/or opposition to discrimination, including, without limitation by:

       a.    denying her internal appeal of the denial of her fully remote accommodation request;

       b.    failing to propose alternative accommodation(s) for her disabilities when they denied her request for an

70

accommodation to work fully remotely on January 19, 2023;

c.    failing to engage in an interactive process and/or cooperative dialogue with her about her disabilities and the accommodations that she might need to return to any in-person environment;

d.    placing the onus exclusively on Plaintiff to request alternative accommodations for any in-person work despite, the failure to provide an alternative accommodation and/or failure to engage in the interactive process with her regarding her request for an accommodation to work fully remotely;

e.    requiring documentation directly from her doctor(s) (faxed and original copy mailed) instead of her emailing forms to them as she had in the past, and that they would need to speak to her doctor(s) based on her requests for reasonable accommodations for her in-person class, when Defendants already had sufficient documentation and information, including medical documentation, about her disabilities that needed to be accommodated;

f.    deceptively (unbeknownst to Plaintiff) creating pretextual and/or false claims and/or launching a retaliatory investigation of her and/or her accommodation requests because of her accommodation requests;

g.    harassing at least one of Plaintiff's medical providers;

h.    failing to provide Plaintiff with reasonable accommodations for in-person teaching, including, without limitation, by continuing to knowingly assign her to teach in a classroom that she could not teach in within the Humanities Building, which Defendants knew Plaintiff was unable to do because of her disabilities, as teaching in most classrooms in that building would compromise her health either because of the air quality and/or mold or other toxins in the building;

i.    failing to accommodate Plaintiff by not allowing her to work fully remotely while working on a transition plan with her healthcare providers as to position her to be successful with any in-person requirement;

j.    failing to accommodate Plaintiff by giving her (an individual with mental health disabilities and illnesses due

to environmental toxins) adequate time to prepare for a return to in-person work given her disabilities, and thereby causing an exacerbation of the symptoms of her disabilities;

k.  failing to accommodate Plaintiff by not allowing her to work fully remotely while seeking in-person accommodations, including in-person teaching accommodations;

l.  stripping Plaintiff of her in-person teaching duties while she was attempting to obtain accommodations that would permit her to teach the in-person class, and then intentionally humiliating her by assigning her to administrative duties instead of teaching the in-person class, which administrative duties required her presence on campus on a weekly basis with 4.5 hours in-person work and 2.0 hours remote work;

m.  failing to engage in an interactive process and/or cooperative dialogue with Plaintiff about her disabilities and accommodations that might be required for in-person administrative work; and

n.  failing to provide Plaintiff with adequate accommodations for in-person work requirements.

### Plaintiff Is Too Ill to Return In-Person

283.  On February 9, 2023, Plaintiff asked Aspromatis to add documents, including medical documentation, to her medical file that demonstrated that she became very sick on Friday, February 3 "due to mold exposure in the hotel enroute to New York to teach 2/4 as required and could not fly."

284.  Plaintiff informed Aspromatis that "[t]he [medica] practice does not fax records directly to employers."

285.  At this point completely desperate for an accommodation, Plaintiff also gave Aspromatis, "permission to talk to the doctor about the mold exposure."

286.  On or about February 10, 2023, in response to a request from Aspromatis for the originals, Plaintiff mailed the original medical documentation to Aspromatis.

287.     In furtherance of their retaliation and discrimination, NYC, CUNY, and/or QCC

subjected Plaintiff to arbitrary scheduling for her administrative schedule -- determined by Chair

Edlin -- with no input from Plaintiff (a tenured faculty member). This was largely unprecedented

and meant to further punish Plaintiff because of her accommodation requests, her complaints

and/or opposition to discrimination, and/or her disabilities.

288.     On or about February 13, 2023, Plaintiff emailed Chair Edlin as follows:

> Hi Margot,
>
> I require a schedule for my new work assignment onsite administrative duties for the Spring 2023. *This is necessary for making the medically required special arrangements to get to and from onsite work.* I also require that all documents I handle in administrative work be digital. *I cannot use printers, xerox machines, or handle recently inked paper*.
>
> You have changed the time I am to report to onsite work three times without the professional courtesy of informing me since 1/25-from Saturdays 9:10-1, Tues 2/14 9:30 am, Thurs 2/16 am. Please provide me with a Sp 23 schedule and sufficient time to plan the rest of the semester's onsite work requirement.
>
> Thank you.
>
> Jan Ramjerdi

(emphasis added).

289.     Ignoring Plaintiff's accommodation request for her administrative work to be

digital, Chair Edlin only responded by providing her schedule: "Your schedule is Thursdays from

9:30 to 1 pm at your desk in the English Department."

290.     On or about February 15 and 16, 2023, Plaintiff, who was suffering from an

emergency and debilitating illness, corresponded with Chair Edlin that she was unable to come to

the university in-person for her administrative work hours on February 16 because of her

emergency illness.

291.    Consistent with CUNY's policy, Plaintiff asked Chair Edlin for instructions to do

the onsite work that she would have been given on February 16, 2023, offsite (remotely), given

that she was ill.

292.    The next day, on or about February 17, 2023, Plaintiff followed up with Chair

Edlin for the third time.  Plaintiff again asked for her off site administrative tasks as well as the

onsite tasks that she would have been given on February 16, 2023.

293.    Plaintiff's request to do her onsite work remotely given her illness was another

request for a reasonable accommodation.

294.    Upon information and belief, Plaintiff's request was consistent with CUNY's

policies.

295.    On or about February 17, 2023, Chair Edlin responded to Plaintiff by stating in

part:

> I did not send you information about your remote assignment
> because *it is intended* to supplement *in-person work*.  I
> expected to provide you with this information yesterday,
> when you were scheduled to come in.  *Administrative
> assignments require that the faculty member be present on
> campus 70% of the time*.  Work that has been assigned for
> you to perform in person *may not be performed remotely*. . .
> . You have called in sick both days when you were expected
> to appear in person.  This a reminder that the college has not
> received *any authenticated medical documentation
> regarding your absences, or substantiated your request for
> accommodations on campus*.

(emphasis added).

296.    Upon information and belief, because Plaintiff was sick/ill, Chair Edlin could

have assigned her in-person work to be performed remotely.  However, in furtherance of NYC,

CUNY, and/or QCC's discrimination, Chair Edlin falsely told Plaintiff that the administrative

work could not be performed remotely.

297.    On or about February 20, 2023, Plaintiff reiterated a request for an

accommodation to work remotely because of her illness.

298.    On or about February 22, 2023, Plaintiff's doctor, Dr. M.C., wrote a letter

explaining the interconnectedness of Plaintiff's disabilities and the severity of her disabilities and

condition:

> To Whom It May Concern:
>
> The above patient has been under our group's care, in particular, my care since 2018. She suffers from debilitating anxiety and mental health conditions that have been well documented by her Psychiatrist. Additionally, this is confounded by her severe physical reaction to mold strong scents/fumes. This is a tragic loop of mental and physical illness that is intimately connected with one exacerbating the other. Depending on the particular exposure, her physical symptoms can last indefinitely. This unfortunately limits her ability to travel and work in other environments and or remote locations. Most recently I have conducted telemedicine visits with her on 1/25/23 and 2/15/23 with exacerbation of the above conditions. There is no other option in my opinion than to have her continue to work fully and permanently from a remote location as it appears impossible for her to work in other environments. If you have any additional questions, please feel free to contact my office.

299.    As Plaintiff was too ill to travel and/or to return to in-person work without

accommodations, Plaintiff informed Chair Edlin that she could not report on site on February 23,

2023, because of her illness, and that medical documentation would be sent.

*Chair Edlin Places a February 8, 2023 Email in Plaintiff's Personnel File that Plaintiff Never Received and Plaintiff Contests It*

300. On or about February 23, 2023, Plaintiff received notification from the Office of Faculty and Staff Relations that a document had been placed in her file. When Plaintiff looked at the document, she was surprised by its content, as the document, an email, began, "Dear Jan," but Plaintiff had never received it.

301. Chair Edlin apparently only sent the email to Florman and Palmer -- but never to Plaintiff.

302. Chair Edlin's email -- never actually sent to Plaintiff -- asserted concerns about Plaintiff's alleged conduct at a February 8, 2023 Department Meeting.

303. The email (which Plaintiff did not receive on February 8, 2023) read:

> Dear Jan,
>
> I am writing to you regarding your conduct in the Departmental Meeting today, which you attended by Zoom. During the meeting you repeatedly interrupted the discussion about academic matters to complain to the department about the denial of your request to teach all of your classes remotely and the grievance you recently filed against the college.
>
> Please be advised that sharing your complaints about personal matters at a department meeting is inappropriate and disruptive. Going forward, please contact me directly if you have any complaints or concerns.
>
> Sincerely,
> Margot Edlin, Ed.D.
> . . . .

304. Upon information and belief, because the February 8, 2023 document was not initialed by Plaintiff, the February 23, 2023 email sent by the Office of Faculty and Student Relations to Plaintiff stated:

'In compliance with Article 19 of the Agreement between CUNY and the PSC', we ask that you acknowledge receipt of the attached document as follows:

1) Select Forward when replying to ensure you include the attached document
2) Copy and paste the message below

My reply indicates that I understand this email serves as notification that the memorandum will be placed in my personal file without my initials.

If we do not receive your response by March 02, 2023, the document will be placed in your personal file without your initials along with the email notification which will indicate that you have been given the opportunity to review, initial, and attach comment.

305.    On March 2, 2023, Plaintiff contested the placement of the email in her file by following the instructions and stating:

My reply indicates that I understand this email serves as notification that the memorandum will be placed in my personal file without my initials

This is an insulting and *gross misrepresentation* of my contribution to the meeting. In addition this email was never sent to me. The first time I saw it was when your office informed me it was going to my file. I spoke briefly and only once following the Chair's Report when Chair asked if there were questions. *I spoke in response to her report on the broken elevators and 4th floor handicapped bathroom*. I spoke in support of *all faculty, staff, and students with disabilities including myself who lack access to classrooms, elevators, bathrooms because of these conditions*. I spoke with colleagues later who agreed and thanked me for speaking up.

(emphasis added).

306.    Upon information and belief, because Plaintiff had complained about the denial of her accommodation to teach fully remotely and/or requested accommodations, Chair Edlin

retaliated against Plaintiff by placing a document (email) in her file that misrepresented what had actually occurred during the departmental meeting in question.

307. Plaintiff had instead raised concerns about building issues that impacted those with disabilities, including herself, in response to the Chair's report about such issues.

308. This was a protected complaint of and/or opposition to disability discrimination.

309. Plaintiff's opposition to and/or complaint of disability discrimination against others (and herself) during the meeting was protected activity, which resulted in the materially adverse action of discipline and/or attempted discipline by Chair Edlin.

**Defendants Dock Plaintiff's Pay and Falsely Claim She Falsified an Absence**

310. On or about the week of February 27, 2023, NYC, CUNY, and/or QCC cut Plaintiff's pay, claiming she had taken unauthorized absences. NYC, CUNY, and/or QCC did so even though she took legitimate sick days, as she reported her absences because of illness to the Chair, and had not taken more than five consecutive sick days. Defendants also falsely claimed that Plaintiff had falsified an absence when she had not done so.

**Plaintiff Informs Chair Edlin that She Was Ill on March 2, 2023**

311. On March 1, 2023, due to an emergency illness, Plaintiff informed Chair Edlin that she could not be on site for her administrative work on March 2, 2023.

**Plaintiff Makes a Protected Complaint of Retaliation and/or Discrimination**

312. On March 2, 2023, Plaintiff complained (a protected complaint) to Counsel Florman about QCC's actions since the denial of her accommodation request for fully remote work on January 19, 2023:

> Here is a summary of my situation:
>
> I am temporarily in the Mojave Desert where I came 12/28/22 for medical reasons and to do research for a novel

set here. I planned to spend 4-6 weeks then return to 72nd St. My schedule was fully remote and had been Sp 22 and F22 with accommodation. Plans changed abruptly when I received the denial of fully remote accommodation decision on 1/19/23 and the change in SP 23 schedule with in person class on 1/2[8].

I have been trying to travel back home and comply with the multiple SP 23 schedule changes I have been assigned since then but have been too ill to travel. New medical documentation is in progress following HR requirements and originals will be sent to HR by doctors offices hopefully by early next week.

*The aggressive <u>threatening</u> actions of the QCC administration since the denial of my request for fully remote accommodation 1/19 /23 have added a huge amount of work-related stress to my life, <u>exacerbating the symptoms of my disability</u>. I am working with my doctors to get well enough to travel back*.

I am *able to perform all my job tasks remotely* and am teaching two classes synchronously. I have made repeated requests of the Chair that I be permitted to perform the reassigned administrative duties reading syllabi fully remotely until I am able to fly back. I have also requested the Chair correct my time sheets for week ending 3 /3 which misreport my absenses [sic] as unauthorized and reduced my weekly pay.

Jan Ramjerdi

313.    Upon information and belief, Florman, NYC, CUNY, and/or QCC did nothing to address Plaintiff's discrimination and/or retaliation complaint and continued to ignore her accommodation request regarding her administrative duties.

314.    Because of the additional requirements placed on Plaintiff by Counsel Florman, NYC, CUNY, and/or QCC, it took Plaintiff time to have one of her medical providers submit additional paperwork to QCC, as requested.

315.     On or around March 7, 2023, one of Plaintiff's doctors submitted an updated Health Care Provider Accommodation Assessment Form explaining her need to work remotely, as had been (unnecessarily) requested.

316.     Aspromatis never communicated with Plaintiff about the status of her subsequent accommodation requests and otherwise failed to engage in an interactive dialogue with her.

317.     When Plaintiff followed up with Aspromatis, on or about May 5, 2023, Aspromatis informed Plaintiff that her accommodation paperwork was never processed because she was unable to speak to Plaintiff's doctor.

318.     Aspromatis' insistence on a medical inquiry involving speaking directly with Plaintiff's medical provider, despite a completed and sufficient reasonable accommodation certification, on top of the many provided previously in prior semesters, was a retaliatory interference with disability rights that was not job-related or consistent with business necessity.

### Defendants Retaliate, Harass, and/or Discriminate against Plaintiff by Subjecting her to Retaliatory Observations of Her Teaching

319.     In furtherance of the disability discrimination and retaliation against Plaintiff, during approximately early March 2023, among other discriminatory and/or retaliatory action taken by Chair Edlin, Chair Edlin informed Plaintiff that her teaching would be observed.

320.     Since becoming a tenured associate professor no Chair had required Plaintiff's teaching to be observed.

321.     The observation was sprung on Plaintiff with little notice.

322.     On or about March 8, 2023, Plaintiff's class was observed.

323.     The observer, however, attended less than half the required class time.

324.     Upon information and belief, the observer did not look at the online portion of the course on Blackboard.

325.     When Plaintiff raised concerns, NYC, CUNY, and/or QCC continued their retaliatory actions by scheduling observations with little notice and then blaming Plaintiff for raising complaints and/or objections regarding the same.

326.     On or about April 19, 2023, NYC, CUNY, and/or QCC further retaliated against Plaintiff by placing another document in her personnel file -- an email exchange relating to communications about the retaliatory observations of her teaching.

*Defendants Bring Pretextual, False, and/or Bad Faith Disciplinary Charges Against Plaintiff, Causing Plaintiff's Health to Deteriorate Further*

327.     On July 17, 2023, Plaintiff was blindsided when QCC, CUNY, and/or NYC escalated their discriminatory and retaliatory behavior by bringing pretextual, false, and/or bad faith disciplinary charges against her, including charges that disparaged her character and integrity.

328.     The proposed result was termination of Plaintiff -- a tenured member of faculty.

329.     Specifically, on July 17, 2023, at approximately 4:57 pm, Noel (Interim Executive Director of Human Resources of QCC) emailed Plaintiff the notice of disciplinary charges on behalf of President Christine Mangino.

330.     QCC, CUNY, and/or the City brought these disciplinary charges against Plaintiff because of (or in part because of) her disabilities, requests for a disability-related accommodations, and/or protected complaints/opposition to their disability discriminatory and/or retaliation.

331.     For example, one of the false and pretextual charges in the disciplinary charges (Charge 1) alleges that Plaintiff submitted three falsified and/or altered medical accommodation forms: (1) form signed by Dr. C.S. dated 12/9/2021; (2) form signed by Dr. C.S. dated 7/14/22; and (3) form signed by Dr. C.S. dated 12/22/22.

332.    These three medical accommodation forms were not falsified and/or altered by Plaintiff.

333.    Had NYC, CUNY, and/or QCC in good faith directly raised the allegation of falsification and/or alteration of medical documentation with Plaintiff, she could have easily addressed the concern at the time by directly authenticating the documents and/or authorizing direct contact with her medical provider for purposes of authentication only.

334.    Upon information and belief, for what appears to have been at least several months, NYC, CUNY, and/or QCC instead, focused on retaliating against Plaintiff with developing a completely *factually incorrect* disciplinary action concerning alleged falsification and/or alteration of medical documentation, pursuant to, and/or as the result of, a retaliatory investigation of her and/or her accommodation request.

335.    In addition, in another part of the disciplinary charge, QCC penalized Plaintiff for taking *protected leave* when she was suffering illnesses on certain days and during a period where QCC dragged its feet and/or placed insurmountable hurdles on Plaintiff regarding her additional reasonable accommodations requests (following the original unlawful denial of her fully remote request for the accommodation in the first instance).

336.    President Mangino, Noel, Macea, Aspromatis, NYC, CUNY, and/or QCC brought (or assisted in bringing) these retaliatory, pretextual, unwarranted, bad faith, and/or false disciplinary charges against Plaintiff to further their: (1) interference with her rights; and (2) discriminatory and/or retaliatory purpose to terminate her from her job because of her disabilities, her requests for reasonable accommodations, and/or her protected complaints/opposition to the discrimination.

337.     President Mangino, Noel, Aspromatis, Macea, NYC, CUNY, and/or QCC's actions are, and were, discriminatory and/or retaliatory under the FMLA, Rehabilitation Act, and/or NYCHRL.

338.     President Mangino, Noel, Aspromatis, Macea, NYC, CUNY, and QCC also interfered with Plaintiff's rights under the FMLA, Rehabilitation Act, and/or NYCHRL.

339.     President Mangino, Noel, Aspromatis, Macea, NYC, CUNY, and QCC's actions have had dire consequences on Plaintiff's health and well-being, including her mental health, and have also negatively impacted her reputation as a tenured professor.

### *Defendants Strip Plaintiff of Her Teaching Duties and Assign Her to Administrative Duties to be Conducted 70% In-Person*

340.     In furtherance of their discrimination, interference with rights, and/or retaliation, on or about July 20, 2023, approximately three days after sending Plaintiff the notice of disciplinary charges, President Mangino, Noel, Aspromatis, NYC, CUNY, and/or QCC -- via a letter sent by Palmer to Plaintiff copying Chair Edlin, Sangeeta Noel, Aspromatis, Florman, and Personal File -- stripped Plaintiff of all of her teaching responsibilities as a professor for the Fall 2023 semester and assigned her to administrative duties: "This is to advise you that you have been relieved of your teaching responsibilities for the Fall 2023 semester and have been assigned to administrative duties."

341.     Consistent with the overall CUNY Central mandate, and despite Plaintiff's known disabilities for which she had requested a remote work accommodation, the July 20, 2023 letter also stated, in part: "Please meet with your chair in person on Friday, August 25, 2023, the first day of the Fall semester, to discuss the assignment. *Please also be aware that you will be expected to follow the administrative schedule, which requires that you work a five-day work week, seven hours a day, and that you work in person 70% of the time*. Your Chair will advise

83

you of your administrative assignment and you can discuss your exact schedule when you meet with her on August 25." (emphasis added).

342.    Again, in furtherance of NYC, CUNY, and/or QCC's ongoing disability discrimination and retaliation, NYC, CUNY, and/or QCC not only stripped her of her teaching duties but also reasserted the requirement that she work in-person -- the very *in-person* work requirement she could not comply with that was the cause of her punitive reassignment to administrative work in the first place.

343.    This was both an additional and a continuing denial of her original disability-based remote work accommodation request.

344.    By assigning Plaintiff to administrative duties -- effectively demoting her -- NYC, CUNY, and/or QCC also sought to humiliate and demean Plaintiff given her stature as a tenured professor in the English Department at QCC.

345.    The punitive administrative duties could have been done fully remotely.

***Defendants Proceed with Pretextual, False, and/or Bad Faith Disciplinary Charges Against Plaintiff***

346.    On or about August 3, 2023, in furtherance of NYC, CUNY, and/or QCC's ongoing disability discrimination, retaliation, and disability rights interference, President Mangino informed Plaintiff she was "proceeding with disciplinary charges against [her]" and that "[t]he penalty she recommended [was] termination."

***Defendants Continue to Subject Plaintiff to Ongoing Discrimination, Retaliation, and/or Interference with Her Rights***

347.    On or about August 9, 2023, Plaintiff requested a reasonable accommodation of fully remote work for the punitive administrative assignment that she was given:

Hi Martha,

I have been reassigned to Administrative Duties for the Fall 23 semester beginning 1/25/23 with 70% onsite and 30% remote work. *As the college is <u>aware I require 100% remote work and request the new position be fully remote</u>.* If this is approved I may require additional accommodations based on the specific tasks I would be expected to perform in the new position so that I and my doctors can evaluate my ability to successfully perform them.

<u>*If required accommodations are denied, I will consider applying for an FMLA leave*</u>. I will supply the medical documentation you require. Please let me know my options at this time.

Jan Ramjerdi

(emphasis added)

348.    On or about August 14, 2023, having not received a received a response from Aspromatis, Plaintiff followed up on her protected disability accommodation request.

349.    In response, on or about August 14, 2023, Aspromatis claimed that she was working on a "job description" for Plaintiff to provide to her doctors regarding evaluation of the (retaliatory) administrative position: "I have received your request. We are preparing a job description of your administrative assignment for your doctor to review for when he completes the medical form. We will get that to you this week."

350.    Aspromatis, Noel, NYC, CUNY, and/or QCC, despite knowing of Plaintiff's disabilities, yet again, required her to submit *additional* medical documentation even though they had sufficient medical documentation about the existence of her disabilities and need for a remote work accommodation.

351.    On August 21, 2023, Plaintiff complied with Aspromatis's request and emailed

her:

> Hi Martha,
>
> The Reasonable Accomodation [sic] Request Form for fully remote accommodation for the new administrative position beginning 8/25 is arriving to your office today by UPS Overnight.
>
> The Health Care Provider Accommodation Assessment form is being mailed to you today by Dr. [M.C.]'s office by regular mail and should arrive by Wednesday. Dr [M.C.] has been my primary care doctor since 2017.
>
> I am still in treatment with *Dr [C.S.] but have asked Dr [M.C.] to fill out the form as Dr [C.S.] is not willing to talk to you and you have indicated that as the reason for never processing my outstanding ADA request for fully remote accommodation for Spring 2023 from March 2023*. Perhaps Dr [M.C.'s] office is better able to supply you with the information you require to process my new accommodation request.
>
> Please process my request for fully remote accommodation for the new position in a timely fashion. My onsite responsibilities begin 8/25 and *my doctors agree I cannot perform the duties in person*. *I expect to be able to fully perform them online though the job description gives no detail on exact tasks and is quite vague*, so I may need to request additional accommodations going forward if a fully remote accommodation is granted.
>
> *If you are unable to process the request before 8/25, I request an accommodation to begin my duties fully online until you are able to process my accommodation request*.
>
> Please *inform me immediately* if you require more information or if there is any problem with Dr [M.C.]'s documentation.
>
> Thank you.
> Jan Ramjerdi

(emphasis added).

352.    Upon information belief, on or about, or as of, approximately August 21, 2023,

NYC, CUNY, and/or QCC received a Healthcare Provider Accommodation Assessment Form

from Dr. M.C. disclosing Plaintiff's "Untreated Bipolar Disorder."

353.    Consistent with NYC, CUNY, and/or QCC's ongoing discrimination, retaliation,

and disability rights interference, on or about August 22, 2023, Aspromatis responded to

Plaintiff's email:

> Good morning, Dr. Ramjerdi,
>
> We are in receipt of your application for a reasonable accommodation. As you have previously been advised, requests for reasonable accommodations are reviewed after the application is complete, including *the original* medical assessment form signed by your health care provider. We have not yet received the medical assessment form.
>
> You are reminded that you are expected to be present on campus to start your administrative assignment on Friday, August 25, 2023. *You will continue to work in person* according to the schedule assigned to you by your Chair unless your request for a reasonable accommodation is granted.
>
> Your Chair will contact you separately to advise you of the time and location where you will be meeting on Friday.
>
> Thank you,
> Martha

(emphasis added)

354.    On or about August 23, 2023, Aspromatis, Noel, NYC, CUNY, and/or QCC

unlawfully denied Plaintiff's reasonable accommodation request because they claimed her

"documentation was insufficient to establish that [Plaintiff] has a disability that requires a remote

accommodation."

355.    NYC, CUNY, and/or QCC dismissed her doctor's opinion because he was not a psychiatrist, and because his report was dated on July 14, 2023 (approximately a month prior), before Plaintiff was stripped her of all her teaching responsibilities and assigned her to in-person administrative duties.

356.    In addition to the denial itself, Aspromatis, Noel, NYC, CUNY, and/or QCC's insistence on this additional medical documentation constituted retaliation, interference with rights, a failure to engage fully in the interactive process and/or cooperative dialogue, and a medical inquiry violation.

357.    Contrary to Aspromatis's denial, Plaintiff's primary care physician was an appropriate health care professional to have provided a medical opinion on Plaintiff's need for a reasonable accommodation.

358.    Aspromatis pretextually asserted that Plaintiff's "administrative" role somehow changed the nature of her need for in-person and/or remote work accommodations.

359.    Upon information and belief, Aspromatis's email also misreported information provided by Dr. M.C. to Aspromatis:

360.    The email read:

> Good afternoon, Dr. Ramjerdi,
>
> I reviewed your application for an accommodation permitting you to perform your administrative assignment remotely, including the medical assessment form written by [M.C.], D.O. dated July 14, 2023. I also spoke with Dr. [M.C.] this morning.
>
> *Your request for a remote accommodation is denied.* The documentation you provided is ***insufficient*** *to establish that you have a disability that requires a remote accommodation.* It is also deficient: Dr. [M.C.] advised me that he is not a mental health professional and he has not performed a psychiatric evaluation on you. He

indicated that the diagnosis he gave in the medical assessment form was based on his general understanding of symptoms related to bipolar disorder, which he believed might apply to you. He acknowledged that his statements regarding the impact of untreated bipolar disorder were also based on his general understanding of the illness, and not to you specifically. Dr. [M.C.] also stated that he is unaware if you are currently receiving treatment, including medication, or if you have been prescribed medication by a mental health professional. I also read the job description to him for the administrative assignment which I sent you on August 17, 2023 but you had not provided to him (I noted that his report was dated July 14, 2023). He stated that he was not able to offer an opinion as to your ability to perform this job in person for the previous reasons.

You are welcome to re-submit your request for an accommodation in the future, and to provide additional medical documentation. However, as of this time, you are expected to report to work on Friday, August 25, 2023 at 9:00am. Please report to Margot Edlin in the English office, H-428, and proceed to the Chair's office. Your chair has been advised that *your request for a remote accommodation has been denied*. If you have any questions regarding your assignment, please contact her directly.

Thank you,

Martha

(emphasis added).

361.    In response, Plaintiff contested the decision based on the fact that there was, "ample documentation of [her] psychiatric disability and need for fully remote accommodation from [her] psychiatrist Dr. [C.S.] from whom [they] have received documentation for [her] *prior 3 fully remote accommodation requests* including the form he sent from his office 3/7/23[ ]," and that "her condition was *unchanged*." (emphasis added).

362.    Aspromatis responded only that Plaintiff could reapply for an accommodation and submit new documentation.

363.     Aspromatis then threateningly informed Plaintiff that she was expected to be at work the next day.

364.     On or about August 24, 2023, Plaintiff told Aspromatis that she was reapplying for an accommodation to conduct her administrative duties remotely for fall 2023 and/or FMLA leave, including by having a doctor (psychiatrist) submit additional medical documentation.

365.     On or about August 25, 2023, Dr. A.L., a psychiatrist, submitted CUNY's FMLA Certification of Health Care Provider for Employee's Serious Health Condition, on Plaintiff's behalf.  In it, Dr. A.L. stated what NYC, CUNY, and/or QCC already knew: "She is inable [sic] to physically be on the premises consistently."

366.     Dr. A.L., also provided the following information to NYC, CUNY, and/or QCC on or about August 25, 2023:

> Dr. Ramjerdi has a history of Bipolar II disorder, PTSD, and severe anxiety. Despite a severe past mental health history inc[l]uding the need for hospitalization, she had been largely stable for nearly 20 years and functioning well in her empl[o]y[m]ent. However, in recently years she has experienced *an exacerbation of somatic symptoms related to mold and other environmental agents, with a corresponding worsening of anxiety, obsessions, and compulsions around contamination*. Her severe physical and emotional anxiety reactions have rendered her unable to maintain a consistent home location or to travel consistently to any physical work location. Despite her sincere efforts and motivation to manage and control her condition, her symptoms have been blocking her from adequate treatment, including development of *hypersensitivity to medications which used to be helpful*, and difficulty engaging in sustained treatment due to her need to physically relocate frequently due to her symptoms. *Dr. Ramjerdi can successfully perform her job functions if her need for remote work can be accommodated.*

> . . . .
>
> *She can continue to perform her job remotely during symptom flares but is unable to be physically on the premises*
>
> . . . .
>
> Dr. Ramjerdi is applying for FMLA at this time *because she has not been granted accommodations to work remotely*. Due to the nature of her psychiatric condition, Dr. Ramjerdi *could continue to work remotely without impairment - therefore if she could be granted accommodations to work remotely, that could be instituted instead of this leave*. However, in the event that Dr. Ramjerdi cannot be granted accommodations to work remotely, she is in such a condition *that she cannot perform her job on-site and must therefore seek a temporary leave.*

(emphasis added).

367.    NYC, CUNY, and/or QCC responded to Plaintiff's reapplication for an accommodation and/or FMLA leave by further discriminating, retaliating, and interfering with her rights under the Rehabilitation Act, NYCHRL, and FMLA.

368.    For example, by failing to grant Plaintiff a temporary accommodation while her requests were pending, Plaintiff called in sick because she was too ill to work in person. In retaliation, on or about September 1, 2023, Aspromatis informed Plaintiff that those days (six days) were treated as unauthorized absences, and that her pay would be docked as a result.

369.    On September 4, 2023, Plaintiff submitted a protected discrimination and retaliation complaint to Aspromatis, which stated:

> Hi Martha,
>
> My referenced absences are a result of the failure to accommodate my disability in response to my pending request for remote work.

> You have *already received my fully remote ADA accommodation reapplication for the new administrative* position and the medical assessment from Dr. [A.L.]
>
> You have *also already received my alternative FMLA leave request and Dr [A.L.]'s medical documentation which documentation also supports the reason for my absence on the days you reference in your email*.
>
> It is my understanding that, *under the FMLA, your office is required under the statute to provide a response to my FMLA certification document request for protected FMLA leave <u>within five business days</u>*.
>
> My FMLA certification was sent to you on August 25, 2023, and it has *now been more than five business days*.
>
> It is my understanding that a failure to provide me with a designation notice within five business days constitutes an *interference with my FMLA rights*.
>
> It is also my understanding that *<u>requesting additional information, when I have submitted a complete and sufficient certification signed by my health care provider, may also constitute a violation of the FMLA</u>*.
>
> Please tell me the status of the accommodation request and of the alternative FMLA leave.
>
> Jan Ramjerdi
> Associate Prof

(emphasis added).

370.    Moreover, upon information and belief, on or about September 6, 2023, in an effort to discriminate, retaliate, and/or interfere with Plaintiff's rights, Aspromatis, NYC, CUNY, and/or QCC intentionally made inaccurate or misleading statements about her disability accommodation and/or FMLA paperwork.

371.    Aspromatis also asked for unnecessary additional documentation relating to Plaintiff's accommodation request despite already having sufficient documentation.

372.     Upon information and belief, prior to and during August 2023, including in a call by Aspromatis to one of Plaintiff's doctors on or about August 23, 2023, Aspromatis, NYC, CUNY, and/or QCC, in further retaliation, interference, and discrimination: (1) unnecessarily sought to speak directly with Plaintiff's healthcare providers; and (2) asked her healthcare providers for information beyond that required to evaluate her reasonable accommodation disability.

373.     NYC, CUNY, and/or QCC further intentionally harassed, and attempted to intimidate, Plaintiff's healthcare providers and/or otherwise attempted to coerce, intimidate, interfere with, and threaten them, and Plaintiff, with harassing inquires and communications with these medical providers.

374.     On or about September 6, 2023, Aspromatis, in a facial violation of the FMLA, and/or in further retaliation for Plaintiff's leave request, denied the request for FMLA leave, *because of* the simultaneous request for a reasonable accommodation of remote work: "Your request for FMLA leave is denied while your application for a reasonable accommodation is under review.  If the accommodation is not granted you may reapply for FMLA leave at that time."

375.     Upon information and belief, NYC, CUNY, and/or QCC have a policy, practice, custom, procedure, and/or standard operating procedure of denying FMLA leave that is requested at the same time, and/or as an alternative to, a reasonable accommodation request for remote work and/or a reasonable accommodation request generally.

376.     This policy, practice, custom, procedure, and/or standard operating procedure was a facial violation of the FMLA.[20]

---

[20]     *See* 29 C.F.R. § 825.702(a) ([T]he leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers . . . . An employer must . . . provide leave under

377.    This policy, practice, custom, procedure, and/or standard operating procedure of FMLA denial was a policy, practice, custom, procedure, and/or standard operating procedure of retaliation and/or interference *because of* a protected request or a disability accommodation -- itself in turn a facial retaliation violation of the Rehabilitation Act and the NYCHRL.

378.    Aspromatis and/or Noel aided and abetted QCC, CUNY, and/or NYC's violations of the NYCHRL.

379.    On or about September 7, 2023, Plaintiff made a protected complaint and/or opposed NYC, CUNY, and/or QCC's accommodation and leave rights.

380.    Plaintiff, *inter alia*: (1) reiterated the basis for her disability-based reasonable accommodation request; (2) objected to the request for unnecessary additional documentation; (3) noted that disability-based accommodation requests and FMLA requests were required to be considered concurrently; (4) asked Defendants to consider an unpaid leave request for three months under the ADA, NYCHRL, and/or FMLA; and (5) cited several of the relevant statutes and guidance in support of the above.

---

whichever statutory provision provides the greater rights to employees. When an employer violates both FMLA and a discrimination law, an employee may be able to recover under either or both statutes."); 29 C.F.R. § 825.702(b) ("If an employee is a qualified individual with a disability within the meaning of the ADA, the employer must make reasonable accommodations, etc., barring undue hardship, in accordance with the ADA. At the same time, the employer must afford an employee his or her FMLA rights. ADA's "disability" and FMLA's "serious health condition" are different concepts, and must be analyzed separately."); 29 C.F.R. § 825.702(b)-(e); *EEOC*: *The Family and Medical Leave Act, the ADA, and Title VII of the Civil Rights Act of 1964*, Nov. 1 1995 ("No. 16.  Q: If an individual requests time off for medical treatment, should the employer treat this as a request for FMLA leave and ADA reasonable accommodation? A: If an employee requests time off for a reason related or possibly related to a disability (e.g., 'I need six weeks off to get treatment for a back problem'), the employer should consider this a request for ADA reasonable accommodation as well as FMLA leave . . . . No. 17 Q: When both the ADA and the FMLA apply, how should the  employer determine which terms and conditions govern the employee's initial 12 weeks of medical leave? A: Under the FMLA rule, an employer must provide leave under whichever statutory provision provides the greater rights to employees . . . . . For examples of how this principle is applied, see the FMLA rule at §§ 825.702(b)-(e)."), https://www.eeoc.gov/laws/guidance/family-and-medical-leave-act-ada-and-title-vii-civil-rights-act-1964.

381.     NYC, CUNY, and/or QCC never responded to Plaintiff's request for protected unpaid leave under either the ADA, FMLA, or NYCHRL.

382.     On or about September 8, 2023, only *after* Plaintiff *specifically* cited the relevant applicable accommodation and leave statutes, was her prior request to conduct her administrative assignments remotely for the fall 2023 semester granted.

383.     At the same time, Aspromatis asserted: "[T]he decision to grant your request *does not constitute a finding regarding your eligibility for this accommodation*, nor can it be cited as precedent should you make a similar request in the future." (emphasis added).

384.     Upon information and belief, this assertion reflected the policy, practice, custom, procedure, and/or standard operating procedure of NYC, CUNY, and/or QCC of only approving protected requests for protected disability-based accommodations as "general accommodation[s]."

385.     This policy, practice, custom, procedure, and/or standard operating procedure violated the Rehabilitation Act because it was a failure to *ever* actually approve or grant an *actual* protected disability-based accommodation -- and otherwise interfered with employees' reasonable accommodation rights.

386.     This policy, practice, custom, procedure, and/or standard operating procedure violated the NYCHRL for the same reasons, as well as because of the violation of the obligation to provide a final written determination and failure to sufficiently engage in the required cooperative dialogue.

387.     This policy, practice, custom, procedure, and/or standard operating procedure was, itself further retaliation, interference, and/or failure to fully offer an accommodation of Plaintiff's disability, as well as a violation of the NYCHRL cooperative dialogue requirement,

including, but not limited to, by failing to provide a final written determination granting or denying her reasonable accommodation request.

### Plaintiff Files a Notice of Claim against QCC, CUNY, the City, and Aspromatis

388.    On or about October 13, 2023, Plaintiff filed a Notice of Claim against NYC, QCC, CUNY, and Aspromatis.

389.    The Notice of Claim states that QCC, CUNY, the City, and/or Aspromatis have continued to, *inter alia*, engage in unlawful conduct against Plaintiff, including, without limitation, by engaging in ongoing discrimination and retaliation against Plaintiff, subjecting her to a disability-based and/or retaliation based hostile work environment.

### Plaintiff Requests a Twelve-Week FMLA Leave

390.    Because of President Mangino, Aspromatis, Noel, NYC, CUNY, and/or QCC's ongoing unlawful conduct, including, without limitation, pursuit of the pretextual disciplinary charges against Plaintiff, and their assigning Plaintiff to administrative work duties, all of which caused her significant stress, her disabilities were exacerbated and her health began to further decline.

391.    As a result, on or about October 18, 2023, Plaintiff -- again -- began the process of seeking a twelve-week FMLA leave based on her serious health conditions:

> Hi Martha,
>
> I have been *too ill to work since 10/13/23*.  I am experiencing *a severe flare-up in symptoms of my mental health disability due to added stress*, including from the new administrative work assignment.
>
> I am requesting a twelve-week leave under the FMLA based on my serious health condition, as well as disability-based leave under the New York City Human Rights Law and New York State Human Rights Law as a

reasonable accommodation of my disability.

Please confirm receipt of these requests. Please provide whatever additional forms you believe are required for you to timely evaluate these requests.

Thank you,
Jan Ramjerdi

(emphasis added).

### Defendants -- Again -- Unlawfully Deny Plaintiff FMLA Leave

392.    On or about November 7, 2023, Macea, Noel, NYC, CUNY, and/or QCC unlawfully denied Plaintiff's request for FMLA leave, based on her disabilities being "permanent":

Dear Prof. Ramjerdi:

I have reviewed your request for leave under the Family Medical Leave Act ("FMLA"), including the medical assessment form that you submitted, which I received on November 1, 2023. I am writing to inform you that your request *has been denied*. Attached please find a Designation Notice for the FMLA request.

*Eligibility for FMLA requires that you have a temporary medical condition*. The Certification of Health Care Provider form signed by Dr. [C.S.] states that you have a medical condition that prevents you from attending in-person meetings, *and that the condition is expected to continue for at least six to ten years*. Given the nature of your medical condition *as it relates to your essential job functions*, *it cannot be deemed temporary*.

Additionally, on October 13 you advised your Chair that you were too ill to perform your remote work assignment. Since then, you have written to her on a daily basis stating that you are too ill to work. To date we have received no medical documentation to substantiate your claim that you are too ill to work. The certification of Health care Provider form that you submitted does not provide any information regarding your current inability to work. It only states that you are unable to attend in-person

meetings. *Consequently, the days you have not worked since October 13, 2023, are deemed unauthorized leave, for which pay will be deducted*.

If you have any questions, please let me know.

Ysabel

(emphasis added)

393.    It was a *facial* violation of the FMLA to deny a request for FMLA leave based simply -- as reflected above -- on a condition being "permanent," long-term, and/or recurring.[21]

394.    In addition, the cited denial, based on the permanent nature of Plaintiff's mental health condition, was *directly at odds* with NYC, CUNY, and/or QCC's prior stated pretextual insistence that Plaintiff submit, each semester, new medical documentation substantiating her mental health disability and/or need for an accommodation for that semester.

395.    Upon information and belief, Aspromatis, Macea, Noel, NYC, CUNY, and/or QCC failed to simultaneously consider and/or approve Plaintiff for unpaid leave as a disability accommodation for the same requested time-period, pursuant to the Rehabilitation Act and/or NYCHRL, as required by those statutes.

396.    The categorization of Plaintiff's absences "not worked since October 13, 2023" as unauthorized leave" was an additional violation of the FMLA.  Plaintiff's absences during this time-period were the result of her chronic serious mental health condition for which she was

---

[21]    *See* 29 C.F.R. § 825.115(c) (emphasis added) ("*Chronic conditions*. Any period of incapacity or treatment for such incapacity due to a *chronic serious health condition*. A chronic serious health condition is one which: (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) *Continues over an extended period of time* (including *recurring episodes* of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.); 29 C.F.R. § 825.115 (emphasis added") ("(d) *Permanent or long-term conditions*. *A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective*. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.").

entitled to protected FMLA leave under 29 C.F.R. § 825.115(c)-(d) (as well as protected Rehabilitation Act and NYCHRL protected leave) -- but for which she had been illegally denied leave.

397.    The penalization of Plaintiff for her absences during this time-period was retaliation and interference with FMLA rights.

398.    The penalization of Plaintiff for her absences during this time-period was the result of an illegal denial of leave as a disability-based accommodation of leave under the Rehabilitation Act and the NYCHRL.

399.    Aspromatis's assertion that the medical documentation did not "provide any information regarding [Plaintiff's] current inability to work" disingenuously ignored Plaintiff's myriad prior medical submissions detailing her serious mental health diagnosis and related flareups caused by stress (being caused by Aspromatis).

400.    In addition, or in the alternative, this facially illegal denial was also because of, or in part because of, one or more of Plaintiff's protected activities of: (1) requesting accommodations;  (2) requesting leave; and/or (3) complaints of and/or opposition discrimination and/or retaliation including, but not limited to, Plaintiff's service of a notice of claim filed approximately three weeks prior on or about October 13, 2023.

401.    In furtherance of President Mangino, Aspromatis, Macea, Noel, NYC, CUNY, and/or QCC's discriminatory and/or retaliatory actions, including their efforts to terminate Plaintiff, they also penalized Plaintiff by deeming her leave since October 13, 2023, unauthorized leave for which her pay was deducted.

***Defendants Continue to Retaliate and/or Discriminate Against Plaintiff by Changing Course and Seeking to Terminate Plaintiff by Medical Separation When Defendants Learned Their Forged Records Claim Was Meritless***

402.    Plaintiff's first day of her disciplinary arbitration proceeding was scheduled for November 21, 2023.

403.    On or about October 27, 2023, Plaintiff's union counsel made QCC aware that Plaintiff's doctor had substantiated that Plaintiff had not forged the medical records (as Plaintiff had been wrongly accused by Defendants of doing in the disciplinary proceeding) -- thereby destroying the primary stated basis for Plaintiff's disciplinary proceeding.

404.    In response, on November 8, 2023, approximately two weeks later, NYC, CUNY, and/or QCC, desperate to continue their relentless campaign of retaliation, interference, and discrimination against Plaintiff, abruptly changed strategies to pursue Plaintiff's termination by other means.

405.    QCC notified Plaintiff's union attorney that, instead of pursuing her termination through a disciplinary arbitration proceeding, QCC was invoking a medical separation leave procedure against her to separate her from her position because of a "physical or mental incapacity."

406.    The continued effort to terminate Plaintiff, even in the face of the demonstrated *falsity* of Defendants' allegations of medical records forgery, is further evidence of Defendants' retaliatory and/or discriminatory animus. Indeed, the invocation of the medical separation leave procedure *was* itself retaliatory

407.    The NYC, CUNY, and/or QCC medical separation policy is discriminatory because it does not provide for, or include consideration of, the statutory right to protected reasonable disability accommodations.

408.    The NYC, CUNY, and/or QCC medical separation policy results in employees

who, *without an accommodation* would have an incapacity, but *with the benefit of a reasonable*

*accommodation would be able to perform the essential functions of their job*, being nonetheless

subject to medical separation under the medical separation policy.

409.    NYC, CUNY, and/or QCC were willing to terminate Plaintiff because of her

protected conduct and/or disabilities, by any means necessary, or potentially available to them.

**Plaintiff Contests Defendants' FMLA Denial & Asks for Her Leave Request to be Considered a Request for a Reasonable Accommodation**

410.    On or about November 10, 2023, Plaintiff emailed Defendants an explicit request

to consider her leave request as a reasonable accommodation of leave under the ADA, NYSHRL,

and NYCHRL, and explained that their denial of her FMLA leave request was a violation of the

FMLA:

> Hi Ysabel,
>
> A permanent condition does not support the denial of an initial three months of FMLA leave.
>
> I ask that given your denial of my FMLA leave, you consider my request for three months of medical leave as an accommodation of my disabilities under the ADA, NYSHRL, and NYCHRL.
>
> Thank you for considering my request.
>
> Jan Ramjerdi

411.    Even though Plaintiff followed up on her request, including by email on or about

November 15, 2023, Macea did not respond to her accommodation request.

**Plaintiff Files EEOC Charge Against QCC, CUNY, and the City**

412.    On or about November 11, 2023, Plaintiff filed a class EEOC Charge against QCC, CUNY, and the City for discrimination, hostile work environment, failure to receive a reasonable accommodation and/or an effective reasonable accommodation, interference, and retaliation.

### Defendants Continue to Retaliate Against Plaintiff by Converting Her Sick Leave to Unauthorized Absences

413.    Instead of NYC, CUNY, and/or QCC initiating medical separation leave, in further retaliation against Plaintiff, NYC, CUNY, and/or QCC held Plaintiff's arbitration and medical separation in limbo for over one month, leaving her without pay or a clear legal status with respect to her employment.

414.    NYC, CUNY, and/or QCC also took additional retaliatory actions.

415.    For example, on or about November 15, 2023, NYC, CUNY, and/or QCC engaged in further retaliation and/or discrimination against Plaintiff by informing her that her sick leave was being converted to unauthorized absences and that her pay was being docked.

416.    This designation of unauthorized absences further violated the FMLA because these absences were protected FMLA leave absences.

417.    Specifically, QCC's HR Manager for Operations, Sunny Ahn ("Ahn"), wrote to Plaintiff:

> Dr. Ramjerdi,
>
> This is to advise you that the following dates reported on the Biweekly Absence reports as sick leave have been converted to unauthorized absences:
>
> *October 13, 16, 17, 18, 19, 20, 23, 24, 25, and 26 (10 days)*
>
> Unauthorized absences result in a pay deduction. Payment that you already received for these days in

> the amount of *$4,506.20 will be deducted from
> your November 24 paycheck*.
>
> If you any questions related to deduction amount,
> please contact Cynthia Rodriguez in Payroll.
>
> Sunny Ahn

(emphasis added).

418.    On November 28, 2023, in furtherance of NYC, CUNY, and/or QCC's

discrimination and retaliation, HR Manager Ahn again threatened Plaintiff by informing her that

her sick leave was being converted to unauthorized absences and that her pay would be docked.

Ahn wrote:

> Dr. Ramjerdi,
>
> This is to advise you that the following dates
> reported on the Biweekly Absence reports as sick
> leave have been converted to unauthorized
> absences:
>
> *10/27, 10/30, 10/31, 11/1, 11/2, 11/3, 11/6, 11/7,
> 11/8 and 11/9 (10 days)*
>
> Unauthorized absences result in a pay deduction.
> Payment that you already received for these days
> in the amount of *$4,506.20 will be deducted from
> your December 8th paycheck*.
>
> If you any questions related to deduction amount,
> please contact Cynthia Rodriguez in Payroll.
>
> *Sunny Ahn*

(emphasis added).

419.    In furtherance of the retaliation and/or discrimination against Plaintiff, NYC,

CUNY, and/or QCC sought to justify terminating (or assist in terminating) Plaintiff for pretextual

reasons (*i.e.*, "unauthorized absences").

420. Upon information and belief, on or around November 30, 2023, Plaintiff's union, PSC, began demanding an explanation from senior level employees at QCC and/or CUNY as to why Plaintiff was being removed from payroll, despite Defendants' representation that they would be pursuing medical separation leave.

421. NYC, CUNY, and/or QCC, however, continued to retaliate against Plaintiff by not paying her for several additional weeks.

422. Upon information and belief, because Plaintiff's union (PSC) advocated for Plaintiff to be placed back on payroll, on or about December 21, 2023, NYC, CUNY, and/or QCC agreed to implement the medical separation leave retroactive to October 14, 2023, so that Plaintiff would be paid for the period of docked pay.

423. Yet, by this time, over one month after NYC, CUNY, and/or QCC had informed Plaintiff's union attorney that they would be pursuing medical separation leave, NYC, CUNY, and/or QCC had still not provided Plaintiff with any formal notice of invocation of forced medical leave.

424. Nonetheless, on or about December 27, 2023, Plaintiff received yet another retaliatory email from Ahn asserting additional unauthorized absences for which pay would be deducted.

***Defendants Discriminate and/or Retaliate Against Plaintiff by Sending Her a Notice of Medical Separation Leave***

425. Upon information and belief, after NYC, CUNY, and/or QCC knew that they would not be successful in pursuing their false medical document forgery disciplinary charges against Plaintiff, in furtherance of their ongoing discrimination and/or retaliation, switched gears to pursue a retaliatory medical separation leave against Plaintiff.

426.    On or about December 28, 2023, Counsel Florman emailed Plaintiff a retaliatory Notice of Medical Separation.  After being notified that the document was missing its attachment, Counsel Florman sent a new Notice of Medical Separation on December 29, 2023 containing, *inter alia*: (1) an attachment describing the stated basis for the asserted applicability of a medical separation; and (2) a job description for a "Job Title: Asst Professor – Black, Race and Ethnic Studies (BRES)".

427.    The Notice of Medical Separation, which *circularly* relied primarily on Plaintiff's medical documents submitted to request a reasonable accommodation that indicated Plaintiff *would be incapacitated* and unable to perform her teaching job, *without the requested* reasonable accommodation, to argue that she had an "incapacity" under the medical separation policy that made her eligible to be medically separated.

428.    Thus, NYC, CUNY, and/or QCC, cynically, disingenuously, and circularly, used Plaintiff's illegally rejected requests for reasonable accommodations for remote work (and alternatively a non-mold room assignment), *as the very basis* for claiming that she was incapacitated under, and subject to, medical separation, under NYC, CUNY, and/or QCC's medical separation policy.

429.    Specifically, the medical separation notice stated in part:

> Dear Professor Ramjerdi:
>
> Pursuant to Article 21A of the Collective Bargaining Agreement between the City University of New York and the Professional Staff Congress dated December 1, 2017 – February 28, 2023 ("The CBA"), an employee may be placed on a one-year medical leave of absence in lieu of commencing Article 21 disciplinary proceedings when, *in the judgment of the College, they are not fit to perform the duties of their position by reason of a physical and/or mental incapacity.* I hereby write to inform you that in accordance with Article 21A.10, the College has placed the pending

disciplinary proceedings pending against you in abeyance. You are hereby placed on a one-year medical leave of absence effective fourteen (14) calendar days from the date of this letter. The College has agreed to implement the medical leave retroactive to October 14, 2023 on a one-time/non-precedential basis. *The basis for the College's determination that you are unable to perform your job as an Associate Professor is set forth in the enclosed Attachment A* as well as a recent job description for an associate professor at the College. You will remain on medical leave with pay until April 13, 2024. Thereafter you may utilize any remaining temporary disability leave and/or annual leave accruals. To the extent that you are eligible, you may also apply for long-term disability through the Welfare Fund or to use the Catastrophic Sick Leave Bank or the Dedicated Sick Leave Program, in accordance with the terms of those policies. Should you exhaust available accruals and other sources of funding prior to the expiration of the medical leave, the remainder of the medical leave shall be unpaid.

If you wish to contest placement on leave, you may do so by submitting a written request for an
independent medical examination to the Welfare Fund, with copies to the PSC and to CUNY's Office of the General Counsel, within fourteen (14) days of the date of this notice. You must also sign all required waivers, release forms and other documents specified by the Welfare Fund as a condition for receiving an independent medical examination. Failure to do so will result in the forfeiture of the opportunity to receive an independent medical examination pursuant to Article 21A(4).

The CBA provides that an employee placed on medical leave may seek to return to duty by making a written application to the Welfare Fund, with copies to the PSC and to CUNY's Office of the General Counsel, for an examination by a medical practitioner to determine if the employee is medically fit and able to perform the duties of his/her position. Such application may be made no earlier than 120 days from the commencement of the medical leave and no later than one year from the commencement of the leave. The medical practitioner shall be selected by the provider and should be different from the medical practitioner who conducted the initial medical examination if a different practitioner is available.

Note that *if you contest your placement on medical leave or apply to return to duty while you are on medical leave, and it is determined that you are not fit to perform the duties of your position, you may not then apply for funds from the Sick Leave Bank or Dedicated Sick Leave Program*. The reason for this is that both programs require an acknowledgement from the employee that he or she is catastrophically ill (for the Sick Leave Bank) or seriously ill (for the Dedicated Sick Leave Program), which is inconsistent with the employee's claim that they are able to carry out their job responsibilities.

The CBA further provides that after an employee has *been on medical leave for one year, he or she shall be separated from employment at CUNY*.

Please also note that should you be found fit to perform the duties of your position and you return to work, *the abeyance of the disciplinary proceeding will end and the <u>proceedings will resume</u>*.

If you have any questions, please contact me at (718) 631-6237.

Sincerely,
Lois Florman, Esq.

. . . .

(emphasis added).

430.    The attachment stating the asserted the basis for the finding of "incapacity" relied,

almost exclusively, on Plaintiff's medical certifications and documentation submitted in support

of her *<u>illegally</u> rejected* reasonable accommodation and FMLA leave requests:

Employee's Name: Jan Ramjerdi
Title: Associate Professor

OVERVIEW

Jan Ramjerdi has been employed by Queensborough Community College of The City University of New York (the "College") since September 1, 2003, when she was initially hired as an Assistant Professor in the English

Department (the "Department"). She was awarded tenure effective September 2008 and was promoted to Associate Professor effective September 2009. Respondent has served continuously in this title to date.

In the full-time title of Associate Professor at the College, Professor Ramjerdi is required to carry out the responsibilities *identified in the University bylaws*, which includes in-person teaching, research and guidance, as well as committee and departmental assignments. She is also required to perform "administrative, supervisory and other functions as may be assigned by the appropriate college or university authorities."[22] She is expected to be present on campus to teach, meet with and advise her students, as well as attend departmental meetings and work collaboratively with members of her department on projects and assignments.

In accordance with the CUNY/PSC Collective Bargaining Agreement, as an Associate Professor she is required to be assigned an annual undergraduate teaching contact hour workload of 24 hours.

These are the *essential functions of her job as Associate Professor*.

It is the College's belief that Professor Ramjerdi is unable to fulfill the essential duties of her position as Associate Professor due to a physical and/or mental incapacity.

Professor Ramjerdi has not worked since October 12, 2023. She was assigned administrative responsibilities, commencing August 27, 2023, pending the outcome of a disciplinary hearing which was scheduled to take place in November 2023. In accordance with *CUNY policy*, she was required to carry out some of her responsibilities in person each week.[23] On or around the time that she was assigned administrative responsibilities, Professor Ramjerdi filed a request for an ADA accommodation permitting her to carry out her administrative assignments fully remotely. She also submitted an alternate request

---

[22]     "*Office of Human Resources Management Code of Practice Regarding Instructional Staff Titles, Section 11(1)1.2.3.*" (footnote 1 in document).

[23]     "*In accordance with CUNY policy*, all non-teaching employees were expected to work a minimum of 70% of the time in person and 30% remotely." (footnote 2 in document) (emphasis added).

for FMLA leave. *Review of the FMLA request was deferred while the ADA request was under consideration. No decision was made on the ADA request*, as the College subsequently agreed to permit her to work remotely until a decision was rendered in the disciplinary proceedings. Professor Ramjerdi commenced her remote assignment, but on October 13 Professor Ramjerdi notified the College that she was unable to work at all, due to "severe flare-up in symptoms of my mental health disability due to added stress, including from the new administrative work assignment." She been sending a daily email to her Chair stating that she is too ill to work since October 13, 2023.

Professor Ramjerdi has submitted the following forms related to her medical condition:

1. Reasonable Accommodation form (8/18/23)

Professor Ramjerdi submitted a request for a reasonable accommodation permitting her to carry out her administrative assignments fully remotely on 8/18/23. In her form she stated:

> I have well-documented *chronic medical issues that prevent me from working in person, onsite*. The symptoms of my psychiatric and environmental illnesses severely limit my ability to function in most public and private places. I cannot take any public transportation or drive in traffic to commute to work…

She described her current limitations as:

> *Cannot function in most public and private spaces*. Inability to work, speak, concentrate, write, interact with people, read. Severe flare-ups require immediate help in basic self-care, walking, sitting – basic living functions.

She stated that the accommodation would assist her because:

> Working from home will allow me to control the environment I work in to *reduce the physical*

> *and mental stress which trigger severe symptoms of my disability*.

Professor Ramjerdi described her condition as "Most likely *permanent."*

The Health Care Provider Assessment form signed by [M.C.], D.O. on 7/14/23 stated that Professor Ramjerdi has '*untreated bipolar disorder [sic]*. This permeates all areas of her life, emotional, physical. She also has a heightened allergic reaction to mold/spores/allergens." He indicated the condition is permanent.

Professor Ramjerdi subsequently submitted both an ADA Accommodation form and an FMLA form, both signed by Dr. [A.L.] on 8/25/23. In both forms Dr. [A.L.] stated that Professor Ramjerdi had *Bipolar II disorder, PTSD and severe anxiety*. She also stated that Professor Ramjerdi had recently experienced an *exacerbation of her somatic symptoms pertaining to her fear of mold, that her anxiety was preventing her from receiving treatment*, and that she was "unable to maintain a consistent home location or to travel consistently to any work location." However, Dr. [A.L.] stated that Professor Ramjerdi was able to fully carry out her job functions *as long as they were performed remotely*. She stated that if she was not permitted to *work remotely she should then be granted FMLA*.

2. FMLA Form (10/31/23)

After the College granted Professor Ramjerdi permission to work remotely on a full-time basis pending the outcome of the disciplinary proceedings, she renewed her request for FMLA leave. The Certification of Health Care Provider Form was signed by Dr. [C.S.] on 10/31/23.[24]

The certification stated that Professor Ramjerdi had a medical condition that had begun in 2018 *and its probable duration was '6-10 years.*' He identified the job functions that she is unable to perform as:

---

[24]     "The FMLA form Professor Ramjerdi had previously submitted on 8/25/23 was signed by Dr. [A.L.]. When she renewed her request for FMLA leave in October, Professor Ramjerdi submitted a new FMLA form signed by Dr. [C.S.] M.D. dated 10/31/23." (footnote 3 in document).

> [U]nable to attend in person meetings. As some symptoms are cyclic it is hard to estimate exact frequency of more severe impairment…

He also added:

> Diagnosed with *severe environmental illness* in 2018. *Diagnosed by me with Bipolar Disorder and PTSD, NOS.* Symptoms include incapacitating anxiety, period of depression and agitation c/w hypomania.

> Dr. [C.S.] indicated that Professor Ramjerdi had "partial incapacity at least from 2/4/21 to 10/31/25." He recommended that she work a reduced work schedule of 2 hours per day until 10/31/25. Professor Ramjerdi's application for FMLA leave was denied since her medical condition and resulting limitations were diagnosed as being of long-term duration.

> Based on the above limitations, the College has determined that Professor Ramjerdi is unable to effectively carry out the assigned duties and responsibilities of an Associate Professor at Queensborough Community College mandated by the CUNY Bylaws, Office of Human Resources Management Code of Practice and the CUNY/PSC Collective Bargaining Agreement.

431.    The medical separation document does not identify any specific provision of the CUNY bylaws that *actually require <u>in-person</u>* teaching or that prohibits fully remote teaching.

432.    Upon information and belief, the CUNY bylaws contain no such provisions.

433.    Upon information and belief, contrary to the statement that, "Professor Ramjerdi is required to carry out the responsibilities identified in the University bylaws, which includes in-person teaching, research and guidance, the "University bylaws" contain no such explicit requirement for necessarily in-person "teaching, research and guidance."

434.    Upon information and belief, nothing in the Office of Human Resources Management Code of Practice Regarding Instructional Staff Titles section cited in the medical separation document, contains any actual explicit specified requirement of in-person teaching nor an explicit prohibition against fully remote teaching.

435.    Upon information and belief, there is no explicit written requirement of in-person teaching nor a prohibition against fully remote teaching at NYC, CUNY, or QCC, other than the promulgation of that policy (*i.e.* the 70/30 In-Person/Remote Policy) in and of itself.

436.    In other words, upon information and belief, this stated policy against fully remote teaching is not rooted in any actual pre-existing teaching requirement at CUNY, NYC, and/or QCC.

437.    Upon information and belief, the document, Office of Human Resources Management Code of Practice Regarding Instructional Staff Titles, Section 11(1)1.2.3. does not indicate a requirement of in-person teaching.

438.    The use of the medical separation policy in the manner described above meant that: (1) employees requiring reasonable accommodations were required to submit medical certifications showing they would be incapacitated, have an incapacity, or otherwise unable to do the essential functions of their job without a reasonable accommodation; (2) NYC, CUNY, and/or QCC would illegally reject approval of these requests; and (3) NYC, CUNY, and/or QCC would *cause* the incapacity or inability to do the job, because of the *denial* of the reasonable accommodation required for the employee to continue working; and (4) finally NYC, CUNY, and/or QCC would then rely on the medical certification and documentation, submitted in support of the (illegally denied) original accommodation requests, to medically separate (instead of accommodating as required by law) disabled employees.

439.    The medical separation policy was a policy, practice, custom, procedure, and/or standard operating procedure of NYC, CUNY, and/or QCC of failure to accommodate disabilities, retaliation for requesting a fully remote work accommodations and/or FMLA leave, and interference with disability and/or FMLA rights.

440.    In addition, or in the alternative, this medical separation policy resulted in a disparate impact on disabled employees and/or employees who engaged in protected activity of requesting a reasonable disability-based accommodation.

441.    The medical separation document relied on Plaintiff's medical certifications to justify a medical separation.

442.    Notably, NYC, CUNY, and/or QCC had previously *refused* to consider medical certifications addressing the Associate Professor position, for purposes of the accommodation of the retaliatory administrative role assignment, but did rely on certifications in support of the requested accommodation of the retaliatory administrative, to support a finding of medical separation for the Associate Professor position.

443.    NYC, CUNY, and/or QCC similarly illegally denied FMLA leave requests and then used the original assertion of incapacity supporting the validity of those requests, as the basis for applicability of the medical separation policy, based on the employee's "incapacity" (absent the requested but denied disability-based reasonable accommodation and/or FMLA leave).

444.    This was a policy, practice, custom, procedure, and/or standard operating procedure of NYC, CUNY, and/or QCC of FMLA retaliation and interference with rights.

445.    The job description attached to the medical separation notice, that purported to support its assertion that Plaintiff could not performing her job: (1) does not list *any* job duties

that could not actually be performed remotely; and (2) did not explicitly state that *any* of the

specific job responsibilities were *required* to be done in-person:

> The candidate will share responsibility for committee and department assignments, perform administrative and supervisory work, as well as other functions. . . .
> The successful candidate will teach introductory BRES courses and electives; maintain an active
> research schedule; participate in Departmental and College activities including committees, course and program assessment, and curriculum development; and provide academic support and advisement for students. Some evening or weekend teaching may be required. Position to start in Fall 2023 . . . .
>
> RESPONSIBILITIES:
>
> Coordinate the BRESI Concentration and curriculum design
>
> Collaborate with racial equity programs and initiatives
> Teach courses in the BRES Concentration
>
> Work closely with members of the QCC Equity Institute and the AAC&U Truth, Racial Healing, and Transformation
> Center on QCC's campus in order to align goals, share resources, and coordinate campus-wide outreach and events
>
> Create professional development opportunties for faculty members teaching within the BRES program
>
> Collaborate with the Office of Academic Affairs and the Center for Excellence in Teaching and Learning to facilitate campus conversations and faculty development initiatives
>
> Ensure that students in the BRES degree program are provided with sustained and meaningful faculty mentoring opportunities as well as support in transfer to 4-year schools within CUNY
>
> Maintain an active research agenda

446. Despite this, upon information and belief, only as a result of the CUNY 70% maximum remote policy, the job description simply states, without explanation: "*Until further notice*, work will be performed in a hybrid manner with 70% onsite presence," (emphasis added) (*i.e.*, the 70/30 In-Person/Remote Policy).

447. The medical separation document facially admits to an FMLA violation of deferring consideration of FMLA leave *because of* a pending reasonable accommodation request, a ground for denial of FMLA leave that is explicitly prohibited by the FMLA regulations and is not an available defense under the FMLA.

448. The medical separation document facially admits that the incapacity that supported Plaintiff's legal entitlement to a reasonable accommodation and FMLA leave (that NYC, CUNY, and/or QCC illegally denied) was the reason, and/or a motivating factor, in the application of the medical separation policy to her.

449. The medical separation document admits that absences deemed unauthorized, that were in reality FMLA-protected absences (and/or disability leave accommodation protected absences), were the reason, and/or a motivating factor, for the application of the medical separation policy to her -- a facial violation of the FMLA, Rehabilitation Act, and NYCHRL.

### Defendants Ongoing Unlawful Conduct Has Caused Plaintiff to Suffer

450. Defendants are continuing to subject Plaintiff to ongoing discrimination, retaliation, interference, and/or a hostile work environment based on (or based in part on) her disabilities, requests for accommodations due to her disabilities and/or requests for FMLA leave, including, without limitation by moving forward with their pretextual medical separation procedures against her while holding her disciplinary charges in abeyance.

451.    Plaintiff has suffered, and continues to suffer, damages as a result of Defendants'
unlawful conduct.

452.    In addition, NYC, CUNY, and/or QCC's policies, practices, customs, procedures,
and/or standard operating procedure of the: (1) prohibition (absent undefined "unusual
circumstances") on fully remote teaching (*i.e.*, the 70/30 In-Person/Remote Policy); (2) granting
only remote work accommodation as non-disability-based accommodations; and (3) medical
separation policy that does not provide for or consider the impact of reasonable accommodations
and/or the denial of reasonable accommodations, have had a disparate impact on disabled
employees of QCC, CUNY, and/or NYC, and/or employees of QCC, CUNY, and/or NYC who
requested a fully remote work disability-based reasonable accommodations.

453.    Plaintiff alleges that the above-described pattern or practice, and/or standard
operating procedure, of failure to accommodate, discrimination, retaliation, interference, and
medical inquiry violations, have been, and continue to be, continuing violations.

### Defendants Have a History of Engaging in Discriminatory and/or Retaliatory Conduct Towards Employees with Disabilities Who Require Reasonable Accommodations

454.    Upon information and belief, CUNY has a history of engaging in disability
discrimination and retaliation, including the denial of reasonable accommodations of professors
who have disabilities, like Plaintiff.

455.    For example, in *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 232, 245
(S.D.N.Y. 2020), professor plaintiff, who had multiple sclerosis ("MS"), claimed that in
retaliation "against her in response for the various charges she had made of disability
discrimination and retaliation arising from her complaints that CUNY was failing to reasonably
accommodate her MS, as well as for initiating the [lawsuit] arising from the same," CUNY
"den[ied] her tenure and reappointment in 2018."

456. After years of litigation, the court denied CUNY's motion for summary judgment on the plaintiff's retaliation claim under the Rehabilitation Act. *Id.* at 264, 266. The court also denied summary judgment to three of the individual defendants on the claims plaintiff brought against them, including ADA, NYSHRL, and/or NYCHRL claims. *Id.* at 267, 269-70.

457. Ultimately, the case settled for a total monetary amount of $1.09 million dollars.[25]

*Plaintiff Made a Demand for Settlement*

458. On November 16, 2023, Plaintiff made a demand of settlement of her individual claims.

459. Plaintiff received no response to this settlement offer from CUNY's general counsel.

*Plaintiff Will Provide a Copy of this Complaint to the New York City Commission on Human Rights and the City Law Department*

460. Pursuant to the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502, Plaintiff is serving a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

## CLASS ACTION ALLEGATIONS

461. Plaintiff brings this action, as a class action, on behalf of all similarly situated full-time non-managerial faculty at QCC, employed by NYC, CUNY, and/or QCC, at any time within three years of the filing of the Complaint, through the resolution of this litigation, who made a mental health disability-based fully remote work accommodation request, and submitted a Health Care Provider Accommodation Assessment Form in support of such request, in which

---

[25] Melissa Klein, *CUNY to pay more than $1 million to settle discrimination lawsuits*, NY POST Aug 7, 2021, https://nypost.com/2021/08/07/cuny-to-pay-more-than-1-million-to-settle-discrimination-suits/.

the health care provider checked the "Yes" box for questions #1[26], #3,[27] and #6[28], and indicated remote work for question #7,[29] whose request was denied, approved only as a non-protected general accommodation, and/or never approved (the "QCC Accommodation Class").

462.     Plaintiff brings this action, as a class action, on behalf of all similarly situated full-time non-managerial faculty at any of CUNY's Community Colleges (Queensborough Community College, Bronx Community College, Hostos Community College, Kingsborough Community College, Borough of Manhattan Community College, Guttman Community College, LaGuardia Community College), employed by NYC and/or CUNY, at any time within three years of the filing of the Complaint, through the resolution of this litigation, who made a mental health disability-based fully remote work accommodation request, and submitted a Health Care Provider Accommodation Assessment Form, in which the health care provider checked the

---

[26]     Question #1: "Does your patient have a physical or mental impairment that substantially limits one or more major life activities . . . ."

[27]     Question #3: "Does your patient have a physical, mental or medical impairment, infirmity or condition that is demonstrable by accepted clinical or laboratory diagnostic techniques?"

[28]     Question #6: "Do you believe a job modification or other work accommodation will enable your patient to perform the essential functions of the position?"

[29]     Question #7: "If the answer to Question 6 is YES, please describe the job modifications or work accommodations that you believe would enable your patient to perform the essential functions of the position. . . ."

"Yes" box for questions #1[30], #3,[31] and #6[32], and indicated remote work for question #7,[33] whose request was denied, approved only as a non-protected general accommodation, and/or never approved (the "Community College Accommodation Class").

463.   Plaintiff brings this action, as a class action, on behalf of all similarly situated full-time non-managerial faculty at any CUNY Senior College or Community College, employed by CUNY and/or NYC, at any time within three years of the filing of the Complaint, through the resolution of this litigation, who made a mental health disability-based fully remote work accommodation request, and submitted a Health Care Provider Accommodation Assessment Form, in support of such request, in which the health care provider checked the "Yes" box for questions #1,[34] #3,[35] and #6[36] and indicated remote work for question #7,[37] whose request was

---

[30]   Question #1: "Does your patient have a physical or mental impairment that substantially limits one or more major life activities . . . ."

[31]   Question #3: "Does your patient have a physical, mental or medical impairment, infirmity or condition that is demonstrable by accepted clinical or laboratory diagnostic techniques?"

[32]   Question #6: "Do you believe a job modification or other work accommodation will enable your patient to perform the essential functions of the position?"

[33]   Question #7: "If the answer to Question 6 is YES, please describe the job modifications or work accommodations that you believe would enable your patient to perform the essential functions of the position. . . ."

[34]   Question #1: "Does your patient have a physical or mental impairment that substantially limits one or more major life activities . . . ."

[35]   Question #3: "Does your patient have a physical, mental or medical impairment, infirmity or condition that is demonstrable by accepted clinical or laboratory diagnostic techniques?"

[36]   Question #6: "Do you believe a job modification or other work accommodation will enable your patient to perform the essential functions of the position?"

[37]   Question #7:" If the answer to Question 6 is YES, please describe the job modifications or work accommodations that you believe would enable your patient to perform the essential functions of the position. . . ."

denied, approved only as a non-protected general accommodation, and/or never approved (the "CUNY-Wide Accommodation Class").

464.    The CUNY-Wide Accommodation Class, Community College Accommodation Class, and the QCC Accommodation Class are collectively referred to as the "Accommodation Classes".

465.    Plaintiff seeks class certification of the QCC Accommodation Class, Community College Accommodation Class, and CUNY-Wide Accommodation Class pursuant to Fed. R. Civ P. 23(a), (b)(2), (b)(3), and (c)(4), seeking back pay, front pay, nominal damages, injunctive relief including reinstatement, declaratory relief, attorney's fees and costs against NYC, CUNY, and QCC, pursuant to the Rehabilitation Act.

466.    Plaintiff additionally seeks class certification of the Community College Accommodation Class and the QCC Accommodation Class pursuant to Fed. R. Civ P. 23(a), (b)(2), (b)(3), and (c)(4), seeking back pay, front pay and/or reinstatement, compensatory damages, injunctive relief including reinstatement, declaratory relief, attorney's fees, expert fees, and costs against NYC and QCC, pursuant to the NYCHRL.

467.    Plaintiff brings the First, Second, Third, Fourth, Fifth, and Sixth, Causes of Action as a class action pursuant to Rule 23(b)(2), (b)(3), (c)(4) against NYC, CUNY, and QCC pursuant to the Rehabilitation Act, on behalf of the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class.

468.    Plaintiff additionally brings the Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Causes of Action as a class action pursuant to Rule 23(b)(2), (b)(3), (c)(4) against NYC and QCC, pursuant to the NYCHRL, on behalf of the Community College Accommodation Class and the QCC Accommodation Class.

469.    Plaintiff additionally brings this action, as a class action, on behalf of all similarly situated non-managerial full-time faculty at QCC, employed by NYC and/or QCC, at any time within two years of the filing of the Complaint, through the resolution of this litigation, who were an FMLA-eligible employee pursuant to 29 U.S.C. § 2611(2), with FMLA leave remaining pursuant to 29 C.F.R. § 825.200, who made a request for FMLA self-care leave, and submitted a Certification of Health Care Provider form in support of such request, whose request was denied on the ground that: (1) they made or had a pending request for a disability-based work accommodation; and/or (2) their serious health condition was permanent or semi-permanent, or for whom a denial or approval was delayed beyond five business days of submission of their medical certification (the "QCC FMLA Class").

470.    Plaintiff additionally brings this action, as a class action, on behalf of all similarly situated non-managerial full-time faculty at any of CUNY's Community Colleges (Queensborough Community College, Bronx Community College, Hostos Community College, Kingsborough Community College, Borough of Manhattan Community College, Guttman Community College, LaGuardia Community College), employed by NYC, at any time within two years of the filing of the Complaint, through the resolution of this litigation, who were an FMLA-eligible employee pursuant to 29 U.S.C. § 2611(2), with FMLA leave remaining pursuant to 29 C.F.R. § 825.200, who made a request for FMLA self-care leave, and submitted a Certification of Health Care Provider form in support of such request, whose request was denied on the ground that: (1) they had made or had a pending request for a disability-based work accommodation; and/or (2) their serious health condition was permanent or semi-permanent, or for whom a denial or approval was delayed beyond five business days of submission of their medical certification (the "Community College FMLA Class").

471.    Plaintiff additionally brings this action as a class action on behalf of all similarly situated non-managerial full-time faculty at any of CUNY's Senior Colleges or Community Colleges, employed by NYC and/or CUNY, at any time within two years of the filing of the Complaint, through the resolution of this litigation, who were an FMLA-eligible employee pursuant to 29 U.S.C. § 2611(2), with FMLA leave remaining pursuant to 29 C.F.R. § 825.200, who made a request for FMLA self-care leave, and submitted a Certification of Health Care Provider form in support of such request, whose request was denied on the ground that: (1) they had made or had a pending request for a disability-based work accommodation; and/or (2) their serious health condition was permanent or semi-permanent, or for whom a denial or approval was delayed beyond five business days of submission of their medical certification (the "CUNY-Wide FMLA Class").

472.    The CUNY-Wide FMLA Class, Community College FMLA Class, and the QCC FMLA Class are collectively referred to as the "FMLA Classes."

473.    Accordingly, Plaintiff brings the Seventh and Eighth Causes of Action, as a class action, pursuant to Rule 23(b)(2), (b)(3), (c)(4) against NYC and QCC, pursuant to the FMLA, on behalf of the QCC FMLA Class.

474.    Plaintiff additionally brings the Seventh and Eighth Causes of Action, as a class action, pursuant to Rule 23(b)(2), (b)(3), (c)(4) against NYC, pursuant to the FMLA, on behalf of the Community College FMLA Class.

475.    Plaintiff additionally brings the Seventh and Eighth Causes of Action, as a class action, pursuant to Rule 23(b)(2), (c)(4) against Chancellor Matos Rodríguez in his official capacity, pursuant to the FMLA, on behalf of the CUNY-Wide FMLA Class.

476.    Plaintiff seeks class certification of the Community College FMLA Class and the QCC FMLA Class pursuant to Fed. R. Civ P. 23(a), (b)(2), (b)(3), and (c)(4), for back pay, front pay and/or reinstatement, liquidated damages, injunctive relief including reinstatement, declaratory relief, attorney's fees, and costs against NYC and QCC.

477.    Plaintiff additionally seeks class certification of the CUNY-Wide FMLA Class pursuant to Fed. R. Civ P. 23(a), (b)(2), and (c)(4) for injunctive relief, declaratory relief, attorney's fees, and costs against CUNY Chancellor Matos Rodríguez in his official capacity.

478.    Plaintiff is a member of the Classes she seeks to represent.

479.    The members of the Class(es) identified herein are so numerous that joinder of all members is impracticable. Although Plaintiff does not know the precise number of the members of the Class(es) their number is greater than can be feasibly addressed through joinder.

480.    Upon information and belief, approximately one in four or one in five adults (approximately 20-26%) in the United States experience mental health disabilities each year.

481.    Upon information and belief, in each of the three years within the statute of limitations for the QCC Accommodation Class, at least approximately 80 full-time members of the QCC faculty experienced a mental health disability.

482.    Upon information and belief, in each of the three years within the statute of limitations for the Community College Accommodation Class, at least approximately 400 members of full-time faculty experienced a mental health disability.

483.    Overall, upon information and belief, in each of the three years within the statute of limitations for the CUNY-Wide Accommodation Class, at least approximately 1,300 full-time faculty experienced a mental health disability.

484.    The members of the Classes are ascertainable.

485.    A class action is superior to other available means for the fair and efficient adjudication of the Classes' claims.

486.    Plaintiff has retained counsel competent and experienced in employment class actions.

487.    Plaintiff's claims are typical of the claims of the QCC Accommodation Class, Community College Accommodation Class, CUNY-Wide Accommodation Class, QCC FMLA Class, Community College FMLA Class, and CUNY FMLA Class.

488.    Excluded from the Classes are: (1) Defendants; (2) current or former managerial employees; (3) cabinet-level employees; (4) current or former Department Chairs; (5) Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or at any time during the class period has had, a controlling interest in Defendants; (6) the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; (7) all persons who submit timely and otherwise proper requests for exclusion from the Class; and (8) persons who have previously filed individual actions in state or federal court asserting FMLA, Rehabilitation Act, and/or NYCHRL claims against any of the Defendants.

489.    There are questions of law and fact common to the QCC Accommodation Class, CUNY Accommodation Class, QCC FMLA Class, and/or CUNY FMLA Class including, but not limited to, whether:

>    a.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of illegally denying disability-based fully remote work accommodation requests despite the absence of an undue hardship;

124

b.   NYC, CUNY, and/or QCC had a facially illegal and discriminatory medical separation policy because it provided for the failure to accommodate and/or termination of disabled persons who could fulfill the essential functions of their positions with the benefit of a fully remote disability-based work accommodation;

c.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of denying disability-based fully remote work accommodation requests because of, or in part because of, protected requests for disability-based fully remote work accommodations;

d.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of only granting fully remote work accommodation requests on an unprotected basis as a general work accommodation without actually approving or denying disability-based fully remote work accommodations, and if so, if such practice violated the NYCHRL requirement to provide a final denial or approval of accommodation requests within a reasonable time-period;

e.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of denying FMLA requests because of a pending disability-based work accommodation requests, in violation of the FMLA;

f.     NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of denying FMLA requests because such requests were based on "permanent" or semi-permanent serious health conditions in violation of the FMLA;

g.     NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of failing to engage, or engage fully in the cooperative dialogue required by the NYCHRL, including by declining to fully consider disability-based remote work accommodations, failing to consider or discuss alternative accommodations, and/or offering only ineffective alternative accommodations in response to fully remote work accommodation requests;

h.     to what extent, NYC, CUNY, and/or QCC's prior adoption of fully remote teaching for all faculty impacts their ability to meet their affirmative defense that fully remote work for faculty would constitute a defensible under hardship under the Rehabilitation Act and/or NYCHRL;

i.     and to what extent, NYC, CUNY, and/or QCC's prior adoption of fully remote teaching for all faculty impacts their obligations regarding the interactive process required by the Rehabilitation Act;

j.     and to what extent, NYC, CUNY, and/or QCC's prior adoption of fully remote teaching for all faculty impacts their obligations regarding the cooperative dialogue required by the NYCHRL;

k.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of engaging in pro forma, pre-determined, bad faith remote work accommodation evaluations designed to pretextually justify denials, in retaliation for disability-based fully remote work requests;

l.    NYC, CUNY, and/or QCC's policies, customs, practices, procedures, and/or standard operating procedure of: (1) 70% maximum remote teaching; (2) granting of unprotected "general accommodations" in response to disability-based fully remote work; and/or (3) medical separation policy that does not provide for, or consider, the impact of reasonable accommodations and/or the denial of reasonable accommodations, has had a disparate impact on disabled had a disparate impact on disabled persons and/or persons who made disability-based fully remote work requests, including but not limited to through increased discipline, retaliatory administrative assignments (*e.g.*, administrative reassignments for faculty), resignations, medical separations, and/or terminations;

m.    NYC, CUNY, and/or QCC's above-described policies, practices, procedures, and/or standard operating procedure that had a disparate impact on the Classes, was justified by business necessity;

n.    NYC, CUNY, and/or QCC's had available any other alternative less discriminatory above-described policies, practices, procedures, and/or standard operating procedure that would have had less of a disparate

impact on disabled persons and/or persons who made protected disability-based requests for fully remote work;

o.   NYC, CUNY, and/or QCC's continued use and implementation of policies, practices, customs, procedures, and/or a standard operating procedure that it knew had a disparate impact on the QCC Accommodation Class and/or CUNY Accommodation Class because of their disabled status and/or because of their protected requests for fully remote work accommodations, despite such impact on these protected classifications and/or by otherwise taking no action to remedy this impact;

p.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory discipline for employees who made protected requests for disability-based fully remote work accommodations;

q.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory discipline for class members who made protected requests for FMLA leave;

r.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory medical separation for Class members who made protected requests for disability-based work accommodations;

s.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory medical separation for class members who made protected requests for FMLA leave;

t.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of failing to comply with by 29 C.F.R. § 825.300(d), by failing to reject or approve FMLA leave requests within five business days;

u.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of violating of 29 C.F.R. § 825.306(e) by requiring signature of a complete medical release, including to speak directly with medical providers for evaluation of FMLA requests;

v.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory, unnecessary, and/or pretextual requests for additional medical documentation to evaluate disability accommodations beyond the information actually required to evaluate and approve fully remote work disability-based accommodation requests;

w.   NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliatory, bad faith, and/or pretextual demands for additional medical documentation and/or requirements to speak directly with -- and/or the harassment and/or

intimidation of -- medical providers that was not necessary to evaluate and approve disability-based fully remote work accommodations;

x.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of refusal or failure to engage fully in the Rehabilitation Act required interactive process and NYCHRL required cooperative dialogue through unnecessary, retaliatory, bad faith, and/or pretextual requests for additional medical documentation and/or requests to speak directly with medical providers

y.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of unnecessary, retaliatory and/or rights interfering requests to recertify applicability of a fully remote work disability-based accommodation for a permanent or semi-permanent disability, with additional medical documents, each semester, in violation of the Rehabilitation Act and NYCHRL;

z.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of unnecessary, retaliatory and/or rights interfering requests for unnecessary additional medical information to support FMLA requests for permanent and/or semi-permanent conditions;

aa.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of retaliation and/or interference with rights by requiring an authorization, release, or waiver allowing

the employer to communicate directly with the health care provider in violation of 29 C.F.R. § 825.306(e) in support of an FMLA request;

bb.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of failing to consider leave as a reasonable accommodation because of a simultaneous request for FMLA leave;

cc.    NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of failing to offer or consider non-FMLA leave (*i.e.*, reasonable accommodation leave) as a leave as a reasonable accommodation under the NYCHRL and/or Rehabilitation Act;

dd.    the CUNY-Wide FMLA Class may proceed against Chancellor Matos Rodríguez in his official capacity;

ee.    an award of FMLA liquidated damages to the QCC FMLA Class is warranted because NYC and/or QCC cannot satisfy their affirmative defense of good faith compliance with the FMLA;

ff.    NYC and/or QCC are directly liable for their NYCHRL violations based on their policies, practices, and/or procedure pursuant to N.Y.C. Admin. Code §§ 8-107(7), 8-107(17) ;

gg.    NYC and/or QCC are strictly liable pursuant to N.Y.C. Admin. Code §§ 8-107(7), 8-107(13)(a), 8-107(17) for the NYCHRL violations of Noel, Aspromatis, Amaris, and/or Macea;

hh. NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the Rehabilitation Act;

ii. NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the FMLA;

jj. NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the NYCHRL;

kk. Class members were employees within the meaning of the Rehabilitation Act;

ll. Class members were employees within the meaning of the FMLA;

mm. Class members were employees within the meaning of the NYCHRL;

nn. requests for fully remote work disability accommodations constituted protected activity under the Rehabilitation Act and/or NYCHRL;

oo. requests for FMLA leave constituted protected activity under the FMLA;

pp. class-wide declaratory relief is warranted, and if so, the appropriate scope of such relief;

qq. NYC, CUNY, and/or QCC could establish; (i) the nature and cost of fully remote teaching accommodations; (ii) the overall financial resources of NYC, CUNY, and/or QCC; (iii) the number of persons employed at NYC, CUNY, and/or QCC; (iv) the effect on expenses and resources of permitting fully remote teaching at NYC, CUNY, and/or QCC; (v) the type of operation of NYC, CUNY, and/or QCC; and/or the (vi) the impact of permitting fully remote teaching

accommodations on NYC, CUNY, and/or QCC, in support of their affirmative defense of an undue hardship, with respect to the accommodation claims under the  Rehabilitation Act and/or NYCHRL;

rr.     the Accommodation Classes were disabled within the meaning of the Rehabilitation Act;

ss.     the Accommodation Classes were disabled within the meaning of the NYCHRL;

tt.     the Accommodation Classes could perform the essential functions of teaching working fully remotely;

uu.     the impact of NYC, CUNY, and/or QCC's prior adoption of fully remote teaching for the period approximately March 2020 to spring 2021, on the analysis of the undue hardship analysis for permitting disability-based fully remote teaching accommodations;

vv.     the impact of NYC, CUNY, and/or QCC's prior adoption of fully remote teaching for the period approximately March 2020 to spring 2021, on the analysis of whether in-person instruction was an essential function of teaching at NYC, CUNY, and/or QCC;

ww.     CUNY's by-laws or personnel documents actually prohibited, or did not actually prohibit, teaching fully remotely;

xx.     class-wide injunctive relief is warranted, and if so, the appropriate scope of relief;

yy. NYC and/or QCC aided and abetted CUNY's NYCHRL violations by implementing CUNY's discriminatory policies without adjustment(s);

zz. NYC and/or QCC had a policy or practice of systematically aiding, abetting, and/or attempting to aid and abet CUNY's NYCHRL violations, including but not limited to by assisting and/or attempting to assist with the implementation of CUNY's discriminatory, retaliatory and/or rights interfering polic(ies), practice(s), procedure(s), and/or standard operating procedure(s); and

aaa. NYC and/or QCC were agents of employer CUNY with respect to NYCHRL violations;

490.   Class certification of the Class(es) is appropriate pursuant to Fed. R. Civ. P.

491.   23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class(es) as a whole. The Class members are entitled to declaratory and injunctive relief concerning Defendants' discriminatory and/or retaliatory policies, practices, customs, and/or procedures.

492.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because the above-described common questions also predominate over questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The members of the Classes have been injured and are entitled to recovery as a result of common illegal practices.

493.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(c)(4)  because

494.   the resolution of additional common issues, would reduce the range of issues in

dispute and promote judicial economy.

495.    Similarly, resolution of any one of the above-described common questions, even where such issue(s) are not appropriate for resolution pursuant to Fed. R. Civ. P. 23(b)(3), would nonetheless reduce the range of issues in dispute and promote judicial economy if resolved as an issues class pursuant to Fed. R. Civ. P. 23(c)(4).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Rehabilitation Act – Failure to Accommodate

### (Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)

496.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

497.    CUNY and QCC have received, and currently receive, federal financial assistance.

498.    Upon information and belief, NYC has received, and currently receives, federal financial assistance.

499.    Plaintiff had, and continues to have, disabilities within the meaning of the Rehabilitation Act.

500.    Plaintiff had, and continues to have, mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

501.    Plaintiff had, and continues to have, a mental health disability that substantially limited one or more of her major life activities including, but not limited to, concentrating,

thinking, and/or brain function.

502.    At all times during her employment, Plaintiff was a qualified individual with a disability, and was able to carry out the essential functions of her position as an Associate Professor, with or without a reasonable accommodation of her disabilities.

503.    Upon information and belief, at all times relevant to the Complaint, the Accommodation Classes had one or more mental health disabilities within the meaning of the Rehabilitation Act, were qualified individuals with disabilities, and were able to carry out the essential functions of their teaching positions, with or without a reasonable accommodation of their disabilities.

504.    Plaintiff made numerous requests for accommodations because of her disabilities, including requests to work fully remotely, which NYC, CUNY, and/or QCC denied, failed to accommodate, approved only as a non-protected general accommodation, and/or never approved.

505.    The Accommodation Classes made disability-based accommodation requests to work fully remotely.

506.    Plaintiff disclosed that she had disabilities to NYC, CUNY, and/or QCC when requesting disability accommodations.

507.    Upon information and belief, the Accommodation Classes disclosed that they had mental health disabilities when requesting disability-based accommodations.

508.    NYC, CUNY, and QCC knew, or should have known, that Plaintiff and the Accommodation Classes had mental health disabilities based on their submission of information in support of their requests for a mental disability-based fully remote work accommodation.

509.    NYC, CUNY, and QCC failed to engage, or fully engage, in the required interactive process with Plaintiff, and upon information and belief, the Accommodation Classes.

510.    NYC, CUNY, and/or QCC failed to engage, or fully engage, in the required interactive process with Plaintiff concerning her disabilities, prior to punitively reassigning her to administrative duty, bringing disciplinary charges, launching an investigation of her, and/or medically separating her.

511.    NYC, CUNY, and/or QCC failed to accommodate Plaintiff's, and upon information and belief the Accommodation Class's, disabilities with fully remote work, despite such accommodation not resulting in an undue hardship.

512.    NYC, CUNY, and/ QCC failed to accommodate Plaintiff's disabilities with an assignment to a non-mold impacted classroom and/or a classroom without air quality issues.

513.    NYC, CUNY, and QCC never engaged fully in an interactive process regarding a potential reasonable accommodation of Plaintiff's disabilities, including, but not limited to, by: (1) repeatedly denying her requests for fully remote work as an Associate Professor; (2) failing to provide accommodation alternatives and/or to reasonably accommodate her disabilities with an alternative room assignment in a classroom and/or building that did not have mold that enflamed and exacerbated her disabilities; (3) initially denying and delaying her request for a fully remote work accommodation in her retaliatory reassigned administrative role; and (4) failing to reasonably accommodate her disabilities with unpaid leave as a reasonable accommodation of her disabilities, including by failing to simultaneously evaluate her request for FMLA leave as a request for leave as an accommodation under the Rehabilitation Act.

514.    NYC, CUNY, QCC discriminated against Plaintiff, and upon information and belief the Accommodation Classes, by failing to reasonably accommodate their disabilities with fully remote work accommodations.

515.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, practice,

custom, procedure, and/or standard operating procedure of failing to provide reasonable disability-based accommodations of fully remote work to faculty with mental health disabilities.

516.    Upon information and belief, NYC, CUNY, and/or QCC, had a policy, practice, custom, procedure, and/or standard operating procedure of failing to provide reasonable accommodations of unpaid leave as an alternative to, or in addition to FMLA leave requests.

517.    This policy, practice, custom, procedure, and/or standard operating procedure was a facial violation of the Rehabilitation Act, which requires simultaneous review and consideration of requests for disability accommodation based-leave at the same time as requests for FMLA leave.

518.    Upon information and belief, NYC, CUNY, and/or QCC's failure to accommodate Plaintiff, and upon information and belief the Accommodation Classes, was because of negative stereotyping regarding persons with mental and/or psychological disabilities.

519.    NYC, CUNY, and/or QCC engaged in disability discrimination against Plaintiff, and upon information and belief the Accommodation Classes, because of the discriminatory generalized sense that mental and/or psychological  disabilities could rarely be accommodated, and/or that they were unlikely to be able to satisfy the essential functions of their jobs, with or without a reasonable accommodation, because of their mental and/or psychological disabilities.

520.    NYC, CUNY, and/or QCC engaged in a policy, pattern, practice, custom, and/or standard operating procedure of denial of disability-based fully remote work accommodation requests, including but not limited to, based on CUNY's 70/30 In-Person/Remote Policy prohibiting fully remote teaching for faculty.

521.    NYC, CUNY, and/or QCC engaged in a pattern, practice, custom, and/or standard operating procedure of failure to accommodate disability discrimination, by conducting bad faith,

pre-determined, and/or inadequate interactive processes and/or accommodation evaluations regarding disability-based requests for fully remote work.

522. At all times during her employment with NYC, CUNY, and/or QCC, Plaintiff was qualified for her position.

523. At all times during her employment with NYC, CUNY, and/or QCC, Plaintiff, and upon information and belief the Accommodation Class were qualified to perform, and could perform, the essential functions of their teaching jobs with and/or without a reasonable accommodation.

524. Upon information and belief, the faculty members of the CUNY-Wide Accommodation Class, Community College Accommodation Class, and QCC Accommodation Class that NYC, CUNY, and/or QCC required to work fully remotely during the COVID pandemic for the period approximately March 2020 to spring 2021, performed the essential functions of their jobs.

525. Upon information and belief, the faculty of the Accommodation Classes required to work fully remotely during the COVID pandemic, performed the essential functions of their teaching positions during each semester of required fully remote teaching.

526. Upon information and belief, the Accommodation Classes that NYC, CUNY, and/or QCC required to work fully remotely during the COVID pandemic did not create an undue hardship on NYC, CUNY, and/or QCC.

527. Upon information and belief, NYC, CUNY, and/or QCC engaged in a pattern, practice, custom, and/or standard operating procedure of non-accommodation of disabled persons through the creation, implementation, and enforcement of a medical separation policy designed to circumvent reasonable accommodation disability protections, in order to terminate disabled

139

employees.

528.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of non-accommodation of faculty with mental health disabilities, through the creation, implementation, and enforcement of a medical separation policy, which provided for the termination of employment of disabled persons, without consideration of, or provision for the use of, mental health disability-based reasonable accommodations, to permit disabled persons to be able to satisfy the essential functions of their teaching roles with a reasonable accommodation of their mental health disability.

529.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of non-accommodation of disabled faculty members who requested mental health disability-based fully remote work accommodations, by creating, implementing, and/or enforcing the medical separation policy in the following manner designed to remove persons with mental health disabilities from the faculty: (1) an initial illegal denial of a request for a mental health disability-based fully remote work accommodation that would have, if granted, allowed the faculty member to be able to satisfy the essential functions of their teaching responsibilities; (2) disciplinary reassignment of the faculty member from their teaching role to administrative work; and (3) medical separation of the faculty member, based on their original asserted "incapacity" (absent a fully remote work disability-based accommodation) that was the original basis for their disability-based fully remote work accommodation request.

530.    At all times during Plaintiff's employment and/or joint employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were covered employers and/or joint employers under the Rehabilitation Act.

531.    At all times during Plaintiff's employment and/or joint employment with NYC,

CUNY, and/or QCC, Plaintiff and the Accommodation Classes were employees within the meaning of the Rehabilitation Act.

532.    At all times during Plaintiff and the Accommodation Classes' employment and/or joint employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC each had more than fifteen employees.

533.    Plaintiff, and upon information and belief, the Accommodation Classes suffered damages as a result of NYC, CUNY, and/or QCC's failure to accommodate their disabilities with a disability-based fully remote accommodation.

534.    As a result of NYC, CUNY, and/or QCC's failure to accommodate, Plaintiff, and upon information and belief the Accommodation Classes, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## SECOND CAUSE OF ACTION

### Rehabilitation Act – Retaliation

**(Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)**

535.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

536.    CUNY and QCC have, received, and currently receive, federal financial assistance.

537.    Upon information and belief, NYC has received, and currently receives, federal financial assistance.

538.    CUNY and QCC have received, and currently receive, federal financial assistance.

539.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

540.    Plaintiff had, and continues to have, mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

541.    Plaintiff had, and has, a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

542.    Plaintiff, and upon information and belief, the Accommodation Classes, had mental health disabilities, were regarded as having mental health disabilities, and/or had a record of mental health disabilities within the meaning of the Rehabilitation Act.

543.    Plaintiff and the Accommodation Classes made disability-based requests for a fully remote work reasonable accommodations via submission of medical certifications supporting their request.

544.    Plaintiff engaged in protected activity with respect to NYC, CUNY, and/or QCC when she requested disability-based reasonable accommodations including, but not limited to, fully remote work, room reassignment, and scheduling accommodations.

545.    Plaintiff and the Accommodation Classes engaged in protected activity with respect to NYC, CUNY, and/or QCC when they requested disability-based fully remote work accommodations.

546.    Plaintiff and the Accommodation Classes engaged in protected activity, known to NYC, CUNY, and/or QCC, through their requests for a disability-based fully remote work accommodations, via submission of their medical certifications.

547. NYC, CUNY, and/or QCC's took materially adverse actions against Plaintiff, because of her protected activity of requesting and/or utilizing reasonable accommodations of her disabilities, including but not limited to, by: (1) delay of consideration of her reasonable accommodation requests; (2) demands for additional unnecessary medical documentation; (3) unnecessary demands for direct contact with her medical providers; (4) harassment and intimidation of Plaintiff's medical provider(s); (5) bad faith accommodation evaluations; (6) provision of pretextual grounds for denials of accommodations; (7) denials of Plaintiff's accommodation requests; (8) demands and threats of short deadlines to return to work and/or to teach-in person; (9) categorization of protected disability-based leave as an unauthorized absence; (10) delayed payment of salary; (12) docking of pay; (13) retaliatory disciplinary charges; (14) a retaliatory investigation; and (15) a retaliatory medical separation, constructive discharge, and/or termination.

548. Upon information and belief NYC, CUNY, and/or QCC, had a policy, pattern, practice, custom, and/or standard operating procedure of taking materially adverse actions against Plaintiff and the Accommodation Classes, because of their protected activity of requesting a disability-based reasonable accommodation of fully remote work.

549. Upon information and belief, NYC, CUNY, and/or QCC took materially adverse actions against Plaintiff and the Accommodation Classes because of their disability-based requests for fully remote work accommodations, included, but were not limited to: (1) denying their accommodation requests on bad faith, pretextual, and/or fabricated grounds; (2) taking disciplinary action against them; (3) initiating a bad faith, pretextual, and/or fabricated investigation of them; (4) bringing bad faith, untrue, pretextual, and/or fabricated disciplinary charges against them; (5) only approving remote work reasonable accommodations as non-

143

protected general accommodations; (6) making bad faith, pretextual, and/or unnecessary requests for additional medical information and/or direct contact with medical providers, not required or necessary to have approved the remote work accommodation.

550.    NYC, CUNY, and/or QCC's took materially adverse actions against Plaintiff because of her protected activities of opposing and/or complaining about disability discrimination, retaliation, and/or interference, including, but not limited to, because of her: (1) opposition to the denials of her accommodation and leave requests; (2) her opposition to disability discrimination at a department meeting; (3) statement that she would be filing with the New York City Commission on Human Rights; (4) statement that she would be filing a complaint with the Mayor's Office of People with Disabilities; (5) service of a notice of claim containing allegations of disability discrimination and retaliation; and (6) filing an EEOC administrative charge containing allegations of disability discrimination, retaliation, and interference.

551.    NYC, CUNY, and/or QCC took materially adverse actions against Plaintiff because of her protected activities of opposing and/or complaining about disability discrimination, retaliation, and/or interference including, but not limited to, by: (1) delaying consideration of her reasonable accommodation requests; (2) requesting additional unnecessary medical documentation beyond that required to evaluate her accommodation request; (3) retaliatory harassment and/or intimidation of Plaintiff's medical providers contacted concerning her disability; (4) provision of pretextual basis for denials and/or requirements of additional medical documentation; (5) denials of Plaintiff's accommodation requests; (6) demands and threats of short deadlines to return to work and/or to teach-in person; (7) categorization of protected leave as an unauthorized absence; (8) delayed payment of salary; (9) docking of salary;

(10) retaliatory discipline and disciplinary charges; and (11) and the retaliatory medical separation of, constructive discharge, and/or termination of Plaintiff from her employment.

552. NYC, CUNY, and/or QCC took materially adverse actions against Plaintiff by denying her request for FMLA leave because of her protected activity of requesting a reasonable accommodation of fully remote work, unpaid leave, and/or room reassignment.

553. Upon information and belief, NYC, CUNY, and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of denying FMLA leave requests by Plaintiff and the Accommodation Classes because of their protected activity of requesting disability-based fully remote work accommodations.

554. NYC, CUNY, and/or QCC engaged in a policy, pattern, practice, custom, and/or standard operating procedure of retaliation against Plaintiff and the Accommodation Classes because they requested disability-based fully remote work accommodations, including, but not limited to, in connection with NYC, CUNY, and/or QCC's efforts to enforce and implement remote work policies seeking to limit or prohibit fully remote work accommodations.

555. NYC, CUNY, and/or QCC engaged in a pattern, practice, custom, and/or standard operating procedure of retaliation against Plaintiff and the Accommodation Classes, by conducting bad faith, pre-determined, and/or inadequate interactive processes and/or accommodation evaluations, regarding requests for remote work, that were designed to find a pretextual basis for denial of a disability-based remote work accommodation.

556. Upon information and belief, NYC, CUNY, and/or QCC retaliated against the Accommodation Classes because of their disability-based fully remote work accommodation requests, through the creation, implementation, and application to them of their medical separation policy, including, but not limited to, by: (1) relying on their accommodation requests

145

as the support for their medical separation; and (2) application of the medical separation policy without consideration of, or provision for, or the incorporation of a disability-based reasonable accommodation analysis.

557. Upon information and belief, NYC, CUNY, and/or QCC retaliated against Plaintiff and the Accommodation Classes for requesting disability-based reasonable accommodations, by creating, implementing, and/or enforcing the medical separation policy in the following manner designed to remove disabled persons from the faculty: (1) an initial illegal denial of a request for a disability-based remote work accommodation that would have, if granted, have allowed the faculty member to be able to perform the essential functions of their job ; (2) disciplinary reassignment of the faculty member from their teaching role, to administrative work; and (3) medical separation of the faculty member based on "incapacity," without consideration of: (i) the original failure to accommodate having caused or contributed to the incapacity; and/or (ii) the ability of the grant of the requested accommodation to remove or ameliorate the incapacity relied upon for the medical separation.

558. NYC, CUNY, and/or QCC retaliated against Plaintiff for opposing disability discrimination in a department meeting by placing a disciplinary note in her personnel file.

559. NYC, CUNY, and/or QCC retaliated against Plaintiff by utilizing her request for a reasonable accommodation and/or FMLA leave and/or submission of a medical certifications requesting the same, as a basis for her medical separation. This included, but was not limited to, through the incorporation of quotes from her reasonable accommodation medical certification forms (in response to which she was illegally never granted a reasonable accommodation to perform in her role as an Associate Professor), as the justification for a finding that she had an "incapacity" under the medical separation policy.

560.    In addition, NYC, CUNY, and/or QCC retaliated against Plaintiff and the Accommodation Classes through the continued maintenance of their medical separation policy, despite knowledge of its disparate impact on employees who engaged in the protected activity of requesting disability-based fully remote work accommodations.

561.    At all times during Plaintiff's and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, they were employees within the meaning of the Rehabilitation Act.

562.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, they each had more than fifteen employees.

563.    At all times during Plaintiff's employment and/or joint employment with NYC, CUNY, and/or QCC, they were employers and/or joint employers of Plaintiff, and upon information and belief the Accommodation Classes, within the meaning of the Rehabilitation Act

564.    A reasonable employee would have found NYC, CUNY, and/or QCC's above-described retaliatory conduct materially adverse.

565.    NYC, CUNY, and/or QCC's above-described retaliatory conduct might have dissuaded, and/or was likely to dissuade, a reasonable worker from engaging in protected activity.

566.    Plaintiff and, upon information and belief the Accommodation Classes, have suffered damages as a result of NYC, CUNY, and/or QCC's retaliation.

567.    As a result of NYC, CUNY, and/or QCC's retaliation, Plaintiff, and upon information and belief, the Accommodation Classes, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## THIRD CAUSE OF ACTION

### Rehabilitation Act – Interference, Coercion, and Intimidation

### (Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)

568.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

569.    CUNY and QCC have received, and currently receive, federal financial assistance.

570.    Upon information and belief, NYC has received, and currently receives federal financial assistance.

571.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

572.    Plaintiff had, and continues to have, mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

573.    Plaintiff has a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

574.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

575.    Plaintiff had, and has, a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

576.    Plaintiff, and upon information and belief, the Accommodation Classes, had mental health disabilities, were regarded as having mental health disabilities, and/or had a record

148

of mental health disabilities within the meaning of the Rehabilitation Act.

577. Plaintiff and the Accommodation Classes made disability-based requests for a fully remote work reasonable accommodations via submission of medical certifications supporting their request.

578. NYC, CUNY, and/or QCC coerced, intimidated, threatened, and/or interfered with Plaintiff, and upon information and belief, the Accommodation Classes' exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their Rehabilitation Act rights, including by failing to engage in the required interactive process, by: (1) delaying consideration of reasonable accommodation requests; (2) requesting additional unnecessary medical documentation beyond that required; (3) requiring that their medical providers be contacted concerning their disability; (4) provision of pretextual basis for denials and/or requirements of additional medical documentation; (5) denials of Plaintiff's accommodation requests; (6) demands and threats of short deadlines to return to work and/or to teach-in person; (7) categorization of protected leave as an unauthorized absence; (8) delayed payment of salary; (9) retaliatory harassment of Plaintiff and/or creation of a retaliatory hostile work environment; (10) retaliatory disciplinary charges; and/or (11) the retaliatory medical separation, constructive discharge, and/or termination of employment.

579. In addition, upon information and belief, NYC, CUNY, and/or QCC had a policy, practice, custom, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering with the Accommodation Classes' exercise or enjoyment of their disability rights, including, but not limited to: (1) coercing them to forego remote work accommodations including by pressuring or directing them to take a leave of absence or apply for disability benefits instead of seeking a remote work accommodation and/or suggesting remote work

accommodations were not available; (2) coercing and intimidating them by demanding additional unnecessary medical information; (3) intimidating them by demanding unnecessary direct contact with their medical provider;(4) intimidating them by harassing their medical providers when in direct contact; and (5) making illegal medical inquiries beyond what was job-related and based on business necessity.

580.    In addition, upon information and belief, NYC, CUNY, and/or QCC had a policy, practice, custom, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering with the Accommodation Classes' exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their disability rights, by: (1) denying their accommodation requests on bad faith, pretextual, and/or fabricated grounds; (2) taking disciplinary action against them; (3) initiating a bad faith, pretextual, and/or fabricated investigation of them; (4) bringing bad faith, untrue, pretextual, and/or fabricated disciplinary charges against them; (5) only approving remote work reasonable accommodations as non-protected general accommodations; and (6) making bad faith, pretextual, and/or unnecessary requests for additional medical information and/or direct contact with medical providers that were not job-related or based on business necessity.

581.    Upon information and belief NYC, CUNY, and/or QCC, had a policy, practice, custom, procedure, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering the Accommodation Classes' exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their disability rights by: (1) denying mental health disability-based accommodation requests for fully remote work; (2) denying or declining to evaluate FMLA leave requests made simultaneously with remote work accommodation requests; (3) declining to consider unpaid leave as an alternative disability accommodation to fully remote

work accommodations if the remote accommodation was denied; and (4) granting only unprotected general accommodations of fully remote leave in response to disability-based fully remote work accommodation requests.

582. NYC, CUNY, and/or QCC engaged in a policy, pattern, practice, custom, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering with the Accommodation Classes' exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their disability rights by conducting bad faith, pre-determined, and/or inadequate interactive processes and/or accommodation evaluations regarding requests for remote work that were designed to find a basis for denial.

583. NYC, CUNY, and/or QCC engaged in a policy, pattern, practice, custom, and/or standard operating procedure of coercing, intimidating, threatening, and/or interfering with Plaintiff and the Accommodation Classes' exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their disability rights through the creation, implementation, and enforcement of a medical separation policy: (1) designed to circumvent reasonable accommodation disability protections to terminate disabled employees (particularly those with mental health disabilities) who requested disability-based reasonable accommodations; and (2) that provided for the termination of employment of disabled persons, without consideration of, or provision for, the use of reasonable disability accommodations to permit disabled persons to perform the essential function of their teaching positions (particularly with respect to mental health disabilities that would create an incapacity absent the grant of a reasonable accommodation of fully remote work).

584. NYC, CUNY, and/or QCC's above-described conduct had a reasonable tendency to intimidate, threaten, interfere with, and/or coerce an employee.

151

585.    NYC, CUNY, and/or QCC's above-described conduct was reasonably likely to interfere with the exercise or enjoyment of disability rights.

586.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, she and the Accommodation Classes were employees within the meaning of the Rehabilitation Act.

587.    At all times during Plaintiff's and the Accommodation Classes' employment and/or joint employment with NYC, CUNY, and/or QCC, each had more than fifteen employees.

588.    At all times during Plaintiff and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the Rehabilitation Act.

589.    Plaintiff, and upon information and belief, the Accommodation Classes, suffered damages as a result of NYC, CUNY, and/or QCC's coercion, intimidation, threats, and interference.

590.    As a result of NYC, CUNY, and/or QCC's coercion, threats, and/or interference Plaintiff, and upon information and belief the Accommodation Classes, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## FOURTH CAUSE OF ACTION

### Rehabilitation Act – Disparate Impact

**(Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)**

591.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

592.    CUNY and QCC have received, and currently receive, federal financial assistance.

593.    Upon information and belief, NYC has received, and currently receives federal financial assistance.

594.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

595.    Plaintiff had, and continues to have, mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

596.    Plaintiff has a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

597.    At all times during her employment, Plaintiff was a qualified individual with a disability, and was able to carry out the essential functions of her faculty position, with or without a reasonable accommodation of her disabilities.

598.    Upon information and belief, at all times relevant to the Complaint, the Accommodation Classes had one or more mental health disabilities within the meaning of the Rehabilitation Act, were qualified individuals with disabilities, and were able to carry out the essential functions of their teaching positions, with or without a reasonable accommodation of their disabilities.

599.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

600.    Plaintiff had, and has, a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

601.    Plaintiff, and upon information and belief, the Accommodation Classes, had

mental health disabilities, were regarded as having mental health disabilities, and/or had a record of mental health disabilities within the meaning of the Rehabilitation Act.

602.    Plaintiff and the Accommodation Classes made disability-based requests for a fully remote work accommodation via submission of a medical certification supporting their request.

603.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were covered employers within the meaning of the Rehabilitation Act.

604.    Upon information and belief, at all times relevant to the Complaint, the Accommodation Classes had one or more disabilities within the meaning of the Rehabilitation Act.

605.    At all times relevant to the Complaint, Plaintiff and the Accommodation Classes, were employees within the meaning of the Rehabilitation Act.

606.    Upon information and belief, NYC, CUNY, and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of one-size-fits-all Planning Guidelines for spring 2022 70/30 on-campus presence policy: (1) aiming "for 70% in-person/HyFlex courses and 30% hybrid and online courses;" and (2) requiring "[a]side from unusual circumstances, all full-time faculty members should teach at least one in-person course on campus" (*i.e.*, the 70/30 In-Person/Remote Policy).

607.    The 70/30 In-Person/Remote Policy: (1) mandated, encouraged, and/or pressured CUNY colleges to limit, cap, and/or provide maximum quotas for disability-based fully remote work accommodations; (2) contained no specific provision specifically allowing or excluding remote work request based on disability-based fully remote work accommodations; and/or (3) failed to require engagement in an interactive process to evaluate potential disability-based fully

remote work accommodations.  Upon information and belief, this policy has had a statistically significant disparate impact of increased and/or disproportionate discipline, bad faith and/or pretextual investigations, disciplinary charges, unauthorized absences, medical separations, and/or terminations on Plaintiff and the Accommodation Classes, because they were disabled.

608.    Upon information and belief, NYC, CUNY, and/or QCC's 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching, failed to provide clear or objective standards concerning the evaluation of disability-based fully remote work accommodation requests.  Upon information and belief, this policy has resulted in the application of subjective, biased, inadequate, self-serving, pretextual, false, and/or unvalidated criteria, justifications, and/or rationales in evaluating protected requests for disability-based fully remote work accommodations.  This has had a statistically significant disparate impact, of disproportionate and/or statistically significant increased discipline, bad faith and/or pretextual investigations, unauthorized absences, medical separations, and/or terminations on Plaintiff and the Accommodation Classes, because they were disabled.

609.    Upon information and belief, NYC, CUNY, and/or QCC's policy of issuance of only non-protected non-disability-based fully remote "general accommodations," in response to disability-based fully remote work accommodation requests, has had a statistically significant disparate impact, of disproportionate and/or statistically significant increased discipline, bad faith and/or pretextual investigations, unauthorized absences, medical separations, and/or terminations on Plaintiff and the Accommodation Classes, because they were disabled.

610.    Upon information and belief, none of these policies were consistent with business necessity.

611.    Upon information and belief, the 70/30 In-Person/Remote Policy's prohibition

(absent undefined "unusual circumstances") of fully remote teaching did not have a legitimate significant relationship to a significant business objective of NYC, CUNY, and/or QCC because: (1) NYC, CUNY, and/or QCC had previously successfully functioned with effective fully remote teaching for all faculty; (2) the prior fully remote teaching policy from approximately March 2020 to spring 2021, had already indicated that the institutions could provide high quality teaching in a fully remote learning environments; and (3) there was no legitimate business purpose in evading application of federal disability accommodation law and/or failing to provide disabled employees with the accommodation that would permit them to continue teaching.

612.    Upon information and belief, the failure of the 70/30 In-Person/Remote Policy's failure to provide clear standards concerning the evaluation of disability-based fully remote work accommodation requests for "unusual circumstances," did not have a legitimate significant relationship to a significant business objective of NYC, CUNY, and/or QCC, because: (1) reaching arbitrary or contradictory determinations or designations of whether employees were able to effectively work remotely was not a significant business objective of NYC, CUNY, and/or QCC; and (2) failure to correctly evaluate and approve legally required remote work accommodation, that exposed the institutions to legal liability for non-compliance with the Rehabilitation Act, did not serve a significant (or any) business interest of the institutions.

613.    In fact, to the contrary, NYC, CUNY, and/or QCC, had a legitimate significant relationship to a significant business objective of providing accommodations *that would permit* as many faculty *as possible to* continue teaching with the benefit of a disability-based fully remote work accommodation.

614.    In addition, or in the alternative, NYC, CUNY and/or QCC could have used less discriminatory measures, instead of the 70/30 In-Person/Remote Policy's prohibition (absent

undefined "unusual circumstances") on fully remote teaching, including, but not limited to: (1) specifically exempting application of the policy to employees seeking a fully remote disability-based work accommodation; (2) incorporating the requirements of compliance with and consideration of the Rehabilitation Act accommodation requirements into the policies; (3) mandating in-person teaching requirements only with respect to a total necessary number of in-person classes for each department, and/or providing department heads discretion in how to meet minimum in-person class numbers (*i.e.*, instead of applying the mandate to individual faculty as an individual requirement); (4) explicitly requiring evaluation and consideration of whether the employee had previously successfully worked remotely as a primary or significant factor to consider in evaluating a disability-based work accommodation; (5) explicitly requiring evaluation of the undue hardship factors required to be considered when evaluating disability-based reasonable accommodation requests into the application of the policy;[38] and (6) correctly applying the Rehabilitation Act accommodation requirements, and by doing so, avoid the loss of funds to litigation, which loss of funds did not serve a significant (or any) business interest of the institutions.

615.    Upon information and belief, the policy of the issuance of only non-protected general accommodations in response to disability-based fully remote work accommodation requests did not have a legitimate significant relationship to a significant business objective of NYC, CUNY, and/or QCC because: (1) evasion of the requirements of the Rehabilitation Act

---

[38]    *See* 42 U.S.C. § 12111(10)(B); 29 C.F.R. § 1630.2(p)(2).  Indeed, all or the majority of undue hardship factors would favor the grant of remote work given the organization(s)' financial resources, the nominal cost (or potential cost savings of remote teaching), the large number of employees at NYC, CUNY, and/or QCC, and prior fully remote work arrangement for all faculty, during which time, upon information and belief, NYC, CUNY, and/or QCC continued to provide high quality instruction to students.

was not a legitimate significant business interest; (2) no significant business interest was served by incorrect application of accommodation approvals; and (3) approval, on only a temporary basis, of legally required disability-based fully remote work accommodations that exposed the institutions to legal liability for non-compliance with the Rehabilitation Act, and the loss of funds to litigation, which loss of funds did not serve a significant (or any) business interest of the institutions.

616.    In addition, or in the alternative, NYC, CUNY and/or QCC could have used less discriminatory measures other than only issuing non-protected general accommodations in response to disability-based fully remote work accommodation requests, including, but not limited to, correctly applying the Rehabilitation Act accommodation requirements, and by doing so, avoiding the loss of funds to litigation, which loss of funds did not serve a significant (or any) business interest.

617.    Upon information and belief, NYC, CUNY, and/or QCC's medical separation policy, pattern, practice, and/or standard operating procedure has had a disparate impact of statistically significant disproportionate increased medical separations, and/or terminations on Plaintiff and the Accommodation Classes, because the policy makes no provision for, nor required consideration of: (1) the denial of disability-based fully remote work accommodations that would have permitted disabled faculty to continue teaching *with* an accommodation; and/or (2) the availability and impact of disability-based fully remote work accommodations, that would have if approved, permitted disabled faculty to continue teaching *with* an accommodation.

618.    Upon information and belief, this policy, pattern, practice, custom, and/or standard operating procedure resulted in a disparate impact on Plaintiff and the Accommodation Classes, by way of statistically significant and/or disproportionate increased medical separations,

constructive discharges, and/or terminations of the Accommodation Classes because of their disabilities.

619.    Upon information and belief, the medical separation policy, pattern, practice, custom, and/or standard operating procedure did not have a legitimate significant relationship to a significant business objective of NYC, CUNY, and/or QCC because it was not a legitimate significant business objective to: (1) circumvent or neutralize the accommodation protections of federal, state, and city applicable disability accommodation laws; or (2) eliminate or remove capable faculty who could have continued to teach and/or would not have been subject to separation, with a disability-based remote work accommodation.

620.    In addition, or in the alternative, NYC, CUNY and/or QCC could have used less discriminatory measures than the medical separation policy by incorporating federal disability accommodation law standards into the medical separation policy.

621.    The medical separation policy makes no provision for disability reasonable accommodation rights, factors, or requirements to be considered when evaluating whether an employee has a physical or mental incapacity under the medical separation policy.

622.    The medical separation policy does not include the consideration of disability reasonable accommodation rights, and evaluated the existence of an incapacity, in vacuum without considering the impact of a reasonable accommodation of disabilities.

623.    NYC, CUNY, and/or QCC's medical separation policy necessarily results in disabled employees, including the Accommodation Classes requiring and requesting a fully remote work accommodation to satisfy their employment responsibilities, who were illegally denied such accommodation, being subjected to medical separation *because of* the illegal denial of a disability-based reasonable accommodation (under the 70/30 In-Person/Remote Policy) to

which they were legally entitled.

624.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screen out or tended to screen out individuals with a disability that were not be job-related, by applying the medical separation policy to Plaintiff and the Accommodation Classes, resulting in their medial separations.

625.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screen out or tended to screen out individuals with a disability that were not be job-related, by applying the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching.

626.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screen out or tended to screen out individuals with a disability or a class of individuals with disabilities that were not be job-related, by providing only unprotected general accommodations instead of protected disability-based fully remote work accommodations to Plaintiff and the Accommodation Classes.

627.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, she was an employee within the meaning of the Rehabilitation Act.

628.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC each had more than fifteen employees.

629.    At all times relevant to the Complaint, Plaintiff and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were employers and/or

joint employers within the meaning of the Rehabilitation Act.

630.    Plaintiff, and upon information and belief, the Accommodation Classes have

suffered damages as a result of NYC, CUNY, and/or QCC's disparate impact discrimination.

631.    As a result of NYC, CUNY, and/or QCC's disparate impact discrimination

Plaintiff, and upon information and belief the Accommodation Classes, are entitled to back pay,

front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's

fees, and costs.

## FIFTH CAUSE OF ACTION

### Rehabilitation Act – Disparate Treatment

**(Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)**

632.    Plaintiff hereby realleges and incorporates by reference all allegations in the

preceding paragraphs.

633.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were covered

employers within the meaning of the Rehabilitation Act.

634.    CUNY and QCC have received, and currently receive, federal financial assistance.

635.    Upon information and belief, NYC has received, and currently receives, federal

financial assistance.

636.    Plaintiff had, and continues to have, a disability within the meaning of the

Rehabilitation Act.

637.    Plaintiff had, and continues to have, mental health disorders and/or impairments,

including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and

depression, as well as illness(es) due to exposure to environmental toxins such as severe

response to mold and other toxins.

638. Plaintiff has a disability that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, and/or brain function.

639. Upon information and belief, at all times relevant to the Complaint, the Accommodation Classes had one or more disabilities within the meaning of the Rehabilitation Act.

640. At all times relevant to the Complaint, Plaintiff and upon information and belief the Accommodation Classes, had a disability that substantially limited one or more of major life activities, including, but not limited to, concentrating, thinking, and/or brain function.

641. NYC, CUNY, and/or QCC discriminated against Plaintiff and the Accommodation Classes, because of their disabilities, through the continued maintenance of the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching, despite knowledge of its disparate impact on disabled employees.

642. The 70/30 Remote/In-Person Policy is a CUNY-wide policy.

643. NYC, CUNY, and/or QCC discriminated against Plaintiff and the Accommodation Classes, because of their disabilities, through the continued maintenance of their medical separation policy, despite knowledge of its disparate impact on disabled employees.

644. Upon information and belief, NYC, CUNY, and/or QCC discriminated against disabled persons through the creation, implementation, and enforcement of a medical separation policy, designed to circumvent reasonable accommodation disability protections, in order to terminate employees with mental health disabilities.

645. Upon information and belief, NYC, CUNY, and/or QCC discriminated against

disabled persons through the creation, implementation, and enforcement of a medical separation policy, that provided for the termination of employment of disabled persons, without consideration of, or provision for the use of, disability-based reasonable accommodations – including mental health disability-based fully remote work accommodations that would have permitted disabled faculty to perform the essential functions of their teaching positions.

646.    The medical separation policy is a CUNY-wide policy.

647.    NYC, CUNY, and/or QCC discriminated against Plaintiff, and upon information and belief the Accommodation Classes, by subjecting them to materially adverse personnel actions because of her mental health disabilities.

648.    Upon information and belief, NYC, CUNY, and QCC, treated Plaintiff and the Accommodation Class disparately, based on the discriminatory generalized sense that mental and/or psychological disabilities could rarely be accommodated and/or that they were unlikely to be able to perform the essential functions of their teaching positions with a reasonable accommodation, because of their mental and/or psychological disabilities.

649.    Upon information and belief, NYC, CUNY, and/or QCC discriminated against disabled faculty by creating, implementing, and/or enforcing the medical separation policy in the following manner, designed to remove disabled faculty: (1) an initial illegal denial of a request for a disability-based remote work accommodation, that would have, if granted, allowed the faculty member to perform the essential function of their teaching position with a reasonable accommodation; (2) disciplinary reassignment of the faculty member from their teaching role to administrative work; (3) medical separation of the faculty member based on their "incapacity" without consideration of their ability to satisfy their employment responsibilities with *the benefit of* the illegally rejected fully remote work accommodation and/or *if provided* with a disability-

based fully remote work accommodation; (4) reliance on the conceded incapacity (without an accommodation), that was the original *basis* of the disability-based fully remote work accommodation request, as the *basis* for a finding of incapacity under the medical separation policy; and (5) reliance on the medical submissions provided in support *of* the *illegally* rejected disability-based fully remote work accommodation as the basis and/or support for a finding of incapacity under the medical separation policy.

650.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screened out, or tended to screen out, individuals with a disability, that were not job-related, by applying the medical separation policy to Plaintiff and the Accommodation Classes, resulting in their medial separations.

651.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screened, out or tended to screen out, individuals with a disability, that were not job-related, by applying the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching.

652.    In addition, or in the alternative, NYC, CUNY, and/or QCC screened out Plaintiff and the Accommodation Classes, by utilizing qualification standards and/or selection criteria that screened out, or tended to screen out, individuals with a disability that were not job-related, by providing only unprotected general accommodations instead of the requested protected disability-based fully remote work accommodations.

653.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, Plaintiff and the Accommodation Classes were employees within the meaning of the

Rehabilitation Act.

654.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC each had more than fifteen employees.

655.    At all times relevant to the Complaint, Plaintiff's and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the Rehabilitation Act.

656.    Plaintiff, and upon information and belief the Accommodation Classes, suffered damages as a result of NYC, CUNY, and/or QCC's disability discrimination.

657.    As a result of NYC, CUNY, and/or QCC's disability discrimination, Plaintiff and upon information and belief the Accommodation Classes, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## SIXTH CAUSE OF ACTION

### Rehabilitation Act – Medical Inquiry Violation

**(Brought on Behalf of Plaintiff, the CUNY-Wide Accommodation Class, the Community College Accommodation Class, and the QCC Accommodation Class Against CUNY, NYC, and QCC)**

658.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

659.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were covered employers within the meaning of the Rehabilitation Act.

660.    CUNY and QCC have received, and currently receive, federal financial assistance.

661.    Upon information and belief, NYC has received, and currently receives federal financial assistance.

662.    Plaintiff had, and continues to have, a disability within the meaning of the Rehabilitation Act.

663.    Plaintiff had, and continues to have, mental health disorders and/or impairments, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

664.    Plaintiff has a disability that substantially limited one or more of her major life activities including brain function, including, but not limited to, concentrating, thinking, and/or brain function.

665.    Upon information and belief, at all times relevant to the Complaint, the Accommodation Classes had a disability, were regarded as having a disability, and/or had a prior record of disability within the meaning of the Rehabilitation Act.

666.    At all times relevant to the Complaint, Plaintiff and the Accommodation Classes were employees within the meaning of the Rehabilitation Act

667.    NYC, CUNY, and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of violating the medical inquiry provisions of the Rehabilitation Act, by requiring signature of a medical release prior to consideration of any and all reasonable accommodation requests, which resulted in the Accommodation Classes being denied requested accommodations, based on refusal to sign and/or revocation of general medical releases. As a result, upon information and belief, they were subjected to discipline, termination and/or medical separations because of the failure to accommodate their disabilities.

668.    Specifically, NYC, CUNY, and/or QCC's reasonable disability accommodation form required signature of the following language in conjunction with all initial reasonable

accommodation requests:

> I hereby authorize my health care provider to release or discuss records and information *regarding* my physical or mental health to The City University of New York (CUNY) for evaluation of my request for employment-related reasonable accommodations. In addition, by my signature, I hold harmless any and all parties providing information to the University as a result of this authorization.

(emphasis added).

669.    The release, while stated to be utilized *for* "evaluation of . . . request for employment-related reasonable accommodations, was *general* as to the information that could be *disclosed*: "release or discuss records and information *regarding my* physical or mental health to The City University of New York (CUNY)."  (emphasis added).

670.    The only *explicit* exception to the general release of medical information to be provided was:

> Your patient has signed the above authorization for you to release this information to us. Please DO NOT provide any *Genetic Information* about the individual or the individual's family members.

(emphasis added).

671.    The use of this *general* release was not job-related and based on business necessity.

672.    NYC, CUNY, and/or QCC illegally required a general release of medical information and documents, as a *prerequisite*, for consideration of any and all reasonable accommodation requests from Plaintiff and the Accommodation Classes.

673.    Upon information and belief, the same or similar language providing for a *general* medical release is incorporated into all accommodation request forms for NYC, CUNY, and/or QCC.

674. Concerning employees initially requesting disability-based accommodations, NYC, CUNY, and/or QCC were not permitted to make a medical inquiry, requesting disability-based accommodations, with respect to the disclosure of the employee's entire medical file.

675. NYC, CUNY, and/or QCC's required medical release does not explicitly limit the scope of the authorized medical disclosures to medical records related to the alleged impairments and/or the ability of the employee to perform the essential function of the job with a reasonable accommodation of fully-remote work.

676. NYC, CUNY, and/or QCC's *general* medical release requirement for all reasonable accommodation requests, and/or as a prerequisite to, consideration of all accommodation requests, was not job-related and consistent with business necessity.

677. This resulted in Plaintiff and the Accommodation Classes being denied requested accommodations based on refusal to sign and/or revocation of a *general* medical release, and as a result, being subjected to discipline, termination and/or medical separations because of the failure to accommodate in response to a disability-based remote work accommodation request.

678. NYC, CUNY, and/or QCC's general release was not clear and unambiguous as to what medical information was being released.

679. NYC, CUNY, and/or QCC's general medical release was not limited to a release allowing NYC, CUNY, and/or QCC to submit a list of specific questions to the health care professional or vocational professional.

680. In addition, or in the alternative, NYC, CUNY, and/or QCC's requirement of a signature of *general* medical release, for employees requesting accommodation requests, violated the Rehabilitation Act for employees whose disability was long-term or obvious, which resulted in Plaintiff and the Accommodation Classes being denied requested accommodations, based on

168

their failure or refusal to provide, requested unnecessary general medical releases.

681.    In addition, or in the alternative, NYC, CUNY, and/or QCC had a policy, practice, custom, procedure, and/or standard operating procedure of requesting unnecessary additional medical information and/or resubmission of medical information, beyond that necessary to evaluate and approve the requested disability-based remote work accommodation.

682.    The requirement for Plaintiff and the Accommodation Classes, to recertify their chronic, permanent and/or semi-permanent disabilities and/or need for a disability-based accommodation on a *semester-by-semester* basis, violated the Rehabilitation Act as it was not job-related and/or based on business necessity. This resulted in the illegal denial of accommodations for Plaintiff and the Accommodation Classes on the ground of refusal or failure to resubmit and/or resubmit in the provided deadline.

683.    NYC, CUNY, and/or QCC's requirement of a signature of a *general* medical release, from employees who had already provided sufficient medical information within the previous year to substantiate their disability and/or need for a disability accommodation, violated the Rehabilitation Act as it was not job-related and/or based on business necessity. This resulted in the illegal denial of accommodations denied on the ground of refusal or failure to sign an unnecessary prohibited general release.

684.    NYC, CUNY, and/or QCC violated the Rehabilitation Act by requiring submission of original copies of medical forms as a condition of final approval of all disability-based fully remote work accommodation requests.

685.    At all times during Plaintiff's and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, they were employees within the meaning of the Rehabilitation Act.

686.    At all times during Plaintiff's and the Accommodation Classes' employment with

NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC each had more than fifteen employees.

687.    At all times during Plaintiff and the Accommodation Classes' employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were employers and/or joint employers within the meaning of the Rehabilitation Act

688.    Plaintiff, and upon information and belief, the Accommodation Classes have suffered damages as a result of NYC, CUNY, and/or QCC's medical inquiry violations.

689.    As a result of NYC, CUNY, and/or QCC's medical inquiry violations, Plaintiff, and upon information and belief the Accommodation Classes, are entitled to back pay, front pay and/or reinstatement, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## SEVENTH CAUSE OF ACTION

### FMLA – Interference, Restraint, and Denial

### (Brought on Behalf of Plaintiff, the CUNY-Wide FMLA Class, the Community College FMLA Class, and the QCC FMLA Class Against Chancellor Matos Rodríguez (in his official capacity), NYC, and QCC)

### (Brought on Behalf of Plaintiff Against Noel, Aspromatis, and Macea)

690.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

691.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were enterprises engaged in commerce and/or in the production of goods for commerce within the meaning of the FMLA.

692.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were institutions of higher education and/or engaged in the activity of a public agency.

693.    At all times during her employment Plaintiff was qualified for her position.

694.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes were appointed faculty at CUNY, NYC, and/or QCC, who were qualified for their faculty positions.

695.    NYC, QCC, Noel, Aspromatis, and/or Macea, and upon information and belief Matos Rodríguez (in his official capacity), interfered with and/or restrained Plaintiff's exercise of and/or attempt to exercise her FMLA rights.

696.    Upon information and belief, NYC, CUNY, QCC, Noel, Aspromatis, and/or Macea, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with and/or restrained the FMLA Classes' exercise of and/or attempt to exercise their FMLA rights.

697.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC, and Chancellor Matos Rodríguez (in his official capacity), were employers and/or joint employers within the meaning of the FMLA.

698.    NYC and/or QCC, and Chancellor Matos Rodríguez (in his official capacity), had the power to hire and fire Plaintiff and have effectively fired and/or constructively discharged Plaintiff by medically separating her.

699.    NYC and/or QCC, and Chancellor Matos Rodríguez (in his official capacity), had the power to hire and fire and/or medically separate the FMLA Classes.

700.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC, controlled Plaintiff's and the FMLA Classes' work schedules and conditions of employment, including by determining their class assignments and/or schedule and the terms and conditions of those assignments.

701.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC set the method and frequency of payment for Plaintiff and the FMLA Classes, including by controlling

171

payroll and payroll deductions, including control over deductions of pay for absences deemed unauthorized.

702. NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC maintained employment records for Plaintiff and the FMLA Classes including their personnel, disciplinary file, and medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

703. NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC possessed the power to control Plaintiff and the FMLA Classes, and controlled them, including but not limited to, through control over class assignments and scheduling, reassignments, initiation of disciplinary proceedings, initiations of investigations, classification of absences as unauthorized and related docking of pay, terminations, and medical separations.

704. Upon information and belief, Chancellor Matos Rodríguez (in his official capacity) had ultimate authority over Plaintiff's and the FMLA Classes FMLA rights and ability to take FMLA leave.

705. Chancellor Matos Rodríguez, as Chancellor of CUNY, had operational control over CUNY, QCC, Plaintiff, and the FMLA Classes.

706. Upon information and belief, Noel, Aspromatis, and/or Macea controlled Plaintiff's rights under the FMLA.

707. Upon information and belief, Noel, Aspromatis, and/or Macea exercised their authority in relation to Plaintiff's FMLA rights, including, but not limited to, by denying, authorizing the denial, ordering the denial, failing to deny or approve, and/or being involved in the denial and/or delay of, her FMLA leave request.

708. Upon information and belief, Noel, Aspromatis, and/or Macea exercised control

over Plaintiff's schedule and conditions of employment, at least with respect to her ability to take leave through approval or denial of her requests for FMLA leave.

709.    Aspromatis, Macea, and upon information and belief, Noel, possessed the power to control and controlled Plaintiff, by classification of her absences as unauthorized and related docking of pay.

710.    Aspromatis, Macea, and/or information and belief, Noel, set the method and frequency of payment for Plaintiff, by controlling classification of absences as unauthorized and related pay docking.

711.    Upon information and belief, Noel, Aspromatis, and/or Macea supervised and controlled Plaintiff's work schedule and/or conditions of employment by exercising and/or having the power to determine, the approval of her requests for FMLA leave, schedule modifications, requests for temporary remote work while her remote work accommodation requests were pending, requests for remote work accommodations, and whether her absences from work were authorized or unauthorized.

712.    Upon information and belief, Noel, Aspromatis, and/or Macea reviewed Plaintiff's FMLA paperwork, determined its adequacy, and controlled Plaintiff's ability to be approved for FMLA leave.

713.    Upon information and belief, Noel, Aspromatis, and/or Macea had the final authority to approve or deny FMLA leave requests for Plaintiff and/or faculty.

714.    Aspromatis and/or Macea sent Plaintiff nearly every communication regarding her FMLA leave request during 2023.

715.    Macea directly communicated the denial of FMLA leave to Plaintiff in written correspondence explaining the asserted reasons for the denial.

716.    Upon information and belief, Noel, Aspromatis, and/or Macea were personally involved in the management, decision-making, and/or determinations concerning Plaintiff's FMLA leave.

717.    Upon information and belief, Noel, Aspromatis, and/or Macea decided, and/or played an important role in deciding, to bring disciplinary charges against Plaintiff.

718.    Upon information and belief, Noel, Aspromatis, and/or Macea decided, and/or played an important role in deciding, to medically separate Plaintiff.

719.    Noel, Aspromatis, and Macea maintained employment records for Plaintiff, including, but not limited to, medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

720.    Noel, Aspromatis, and Macea were persons who acted directly or indirectly in the interest of employers NYC, CUNY, and/or QCC.

721.    Noel, Aspromatis and Macea possessed the power to control Plaintiff.

722.    Noel, Aspromatis, and Macea exercised control over Plaintiff through the denial and/or refusal to consider her FMLA request.

723.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC she depended on NYC, CUNY, and/or QCC for the opportunity to render educational instruction services.

724.    Upon information and belief, at all times relevant to the Complaint, Plaintiff and the FMLA Classes were employees within the meaning of the FMLA and employed and/or jointly employed by NYC, CUNY, and/or QCC within the meaning of the FMLA.

725.    At all times during Plaintiff and the FMLA Classes' employment with NYC, CUNY, and/or QCC, they depended on NYC, CUNY, and/or QCC for the opportunity to render

educational instruction services.

726.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes were each an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2).

727.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes, had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of NYC, CUNY, and/or QCC was fifty or more employees within seventy-five miles of the location to which they reported, and/or the location from which their assignments were made.

728.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes, had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, the total number of employees of NYC, CUNY, and/or QCC was fifty or more employees within seventy-five miles of the NYC, CUNY, and/or QCC location to which they reported, and/or the location from which their assignments were made at NYC, CUNY, and/or QCC.

729.    Plaintiff, and upon information and belief the FMLA Classes, provided NYC, CUNY, and/or QCC with adequate notice of their intent to take FMLA leave, and/or the lack of sufficient notice was not sufficient to completely deny the requested FMLA leave.

730.    At the time of their requests for leave, Plaintiff, and upon information and belief the FMLA Classes, were receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c) and/or were otherwise entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and/or 29 C.F.R. § 825.123 because of their serious health conditions.

731.    At all times relevant to the Complaint, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c) and/or

was otherwise entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and/or 29 C.F.R. § 825.123, because of her Bipolar II Disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

732.    At all times relevant to the Complaint, Plaintiff had twelve weeks of available FMLA leave remaining, under any calculation of FMLA leave entitlement permitted by 29 C.F.R. § 825.200.

733.    At all times relevant to the Complaint, the FMLA Classes had FMLA leave remaining, pursuant to 29 C.F.R. § 825.200.

734.    At the time of her August 24, 2023 and October 18, 2023 requests for FMLA leave and/or submission of her related medical certification, Plaintiff was entitled to FMLA leave pursuant to 29 C.F.R. §general (a)(4), 825.113, 825.115(c), 825.123, because of her Bipolar II Disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins and her health provider(s) had determined that she needed to be absent from work to receive medical treatment for her serious health condition(s).

735.    Upon information and belief, at the time of their request for leave and/or submission of their medical certification, the FMLA Classes were entitled to FMLA leave pursuant to 29 C.F.R. §§ 825.112(a)(4), 825.113, 825.115(c), 825.123, because of their serious health conditions.

736.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes', exercise and/or attempt to

exercise their FMLA rights, including, but not limited to, by, illegally denying and/or delaying the approval of their FMLA leave by illegally denying their FMLA leave requests based on: (1) simultaneous and/or alternative request for a reasonable accommodation of a disability under the ADA, NYSHRL, and/or NYCHRL; and/or (2) the serious health condition that was the basis for leave being, or being deemed to be, "permanent" or "semi-permanent."

737.    The policy, pattern, practice, custom, and/or standard operating procedure of illegally denying Plaintiff and the FMLA Classes FMLA leave, based on their simultaneous or alternative request for a reasonable accommodation of a disability under the ADA, NYSHRL, and/or NYCHRL, was a facial violation of the FMLA.[39]

738.    The policy, pattern, practice, custom, and/or standard operating procedure of illegally denying Plaintiff and the FMLA Classes FMLA leave, based on a condition being "permanent," long-term, and/or recurring, was a facial violation of the FMLA.[40]

739.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity),  interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes', exercise and/or attempt to exercise their FMLA rights, by rejecting sufficient submitted documentation, unnecessarily requesting additional medical documentation, intentionally delaying and/or failing to provide

---

[39]    *EEOC: The Family and Medical Leave Act, the ADA, and Title VII of the Civil Rights Act of 1964* ("No. 18 . . . . if the individual is 'eligible' for leave under  the FMLA and has a serious health condition that prevents  him/her from performing an essential job function, s/he has  the right to take a leave of absence of up to 12 workweeks in 12 months, even if s/he could continue working with an effective reasonable accommodation. While the FMLA does not prevent an employee from accepting an alternative to  leave, the acceptance must be voluntary and uncoerced.").

[40]    *See, e.g.*, 29 C.F.R. § 825.115(c)-(d).

FMLA leave for which they were eligible.

740. NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), took these actions despite having acquired knowledge that Plaintiff's, and upon information and belief the FMLA Classes', requested leave was for an FMLA-qualifying reason.

741. Upon information and belief, NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes' exercise and/or attempt to exercise their FMLA rights, including through a policy, pattern, practice, custom, and/or standard operating procedure of interference, restraint and/or denial of the FMLA rights, including but not limited to by: (1) illegally denying the FMLA Classes FMLA leave based on their simultaneously or alternatively requesting a reasonable accommodation of a disability under the ADA, NYSHRL, and/or NYCHRL; and/or (2) illegally denying FMLA Classes' FMLA leave based on a serious health condition being permanent or semi-permanent.

742. NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), failed to notify Plaintiff of the designation notice required by 26 C.F.R. § 825.300(d), requiring rejection or approval of the FMLA leave request within five business days. Instead, NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), took eight business days to respond, including, but not limited to, following the August 25, 2023 receipt of her medical certification form.

743. Upon information and belief NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy,

practice, custom, procedure, and/or standard operating procedure of failing to comply with the five-business day designation notice requirement of 26 C.F.R. § 825.300(d), with respect to the CUNY FMLA Class and QCC FMLA Class.

744. Since Plaintiff's August 25, 2023, FMLA leave request and/or October 18, 2023 FMLA leave request, through her disciplinary charges, through her designation as medically separated for "incapacity," through to the filing of the instant Complaint, NYC, QCC, Noel, Macea, and/or Aspromatis have never approved either of Plaintiff's FMLA leave requests.

745. At all times during Plaintiff's employment with NYC, CUNY, and/or QCC Noel, Macea, and/or Aspromatis were employers within the meaning of the FMLA.

746. Upon information and belief, at all times, or some times relevant to the Complaint, Noel, Macea, and/or Aspromatis exercised operational control over QCC and/or Plaintiff with respect to her FMLA rights.

747. At all times, or some times, relevant to the Complaint, Noel, Macea, and/or Aspromatis exercised operational control over Associate Professors at QCC with respect to their FMLA rights.

748. At all times, or some times, relevant to the Complaint, Noel, Macea, and/or Aspromatis exercised operational control over Plaintiff with respect to her FMLA leave rights.

749. At all times relevant to the Complaint, Noel, Macea, and/or Aspromatis knew that Plaintiff had a serious health condition and/or a potentially FMLA-qualifying serious health condition.

750. At all times relevant to the Complaint, Noel, Macea, and/or Aspromatis were aware that Plaintiff had been, and continued to be, an FMLA-eligible employee.

751. NYC, CUNY, QCC, Noel, Macea, and/or Aspromatis interfered with, restrained,

179

and/or denied Plaintiff's exercise and/or attempt to exercise her FMLA rights, by failing to comply with and/or fully comply with the requirements of 29 C.F.R. § 825.300(d).

752.    NYC, QCC, Noel, Macea, and/or Aspromatis interfered with, restrained, and/or denied Plaintiff's exercise of her FMLA rights and/or attempt to exercise her FMLA rights, by failing to provide Plaintiff with the individual FMLA designation notice required by 29 C.F.R. § 825.300(d), within the five business day timeframe required by 29 C.F.R. § 825.300(d).

753.    Upon information and belief, NYC, CUNY, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy, practice, custom, procedure, and/or standard operating procedure of interfering with, restraining, and/or denying the FMLA Classes' exercise of their FMLA rights and/or attempts to exercise their FMLA rights, by failing to provide the FMLA Classes with the individual FMLA designation notice required by 29 C.F.R. § 825.300(d), within the timeframe required by 29 C.F.R. § 825.300(d).

754.    NYC, CUNY, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's exercise of her FMLA rights and/or attempt to exercise her FMLA rights, by requiring and/or requesting additional unnecessary medical documentation beyond that required to approve requested FMLA leave pursuant to 29 C.F.R. 825.300(d); 29 U.S.C. § 2613(a)-(b).

755.    Upon information and belief, NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy, practice, custom, procedure, and/or standard operating procedure of interfering with, restraining, and/or denying the FMLA Classes' exercise of their FMLA rights and/or attempts to exercise their FMLA rights, by requiring and/or requesting additional unnecessary medical

documentation beyond that required to approve requested FMLA leave pursuant to 29 C.F.R. 825.300(d); 29 U.S.C. § 2613(a)-(b).

756.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's exercise of her FMLA rights and/or attempt to exercise her FMLA rights by requiring an authorization, release, or waiver allowing the employer to communicate directly with the health care provider in violation of 29 C.F.R. § 825.306(e), including but not limited to, on or about February 2, 2023.

757.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes', exercise of FMLA rights and/or attempts to exercise FMLA rights, by requiring an authorization, release, or waiver allowing the employer to communicate directly with the health care provider in violation of 29 C.F.R. § 825.306(e).

758.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes, from fully exercising, utilizing, protecting, and/or most effectively structuring their FMLA leave, including but not limited to, by failing to give them timely designation notices as required by 29 C.F.R. § 825.300(d).

759.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and upon information and belief the FMLA Classes' CUNY exercise and/or attempted exercise of FMLA leave rights, by seeking to obtain clarification and

authentication of an FMLA leave certifications, through direct contact with medical providers, prior to providing the employee seven calendar days to cure any such deficiency, after stating in writing what additional information was necessary to make the certification complete and sufficient.[41]

760.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the CUNY Accommodation Class and QCC Accommodation Class's  exercise and/or attempted exercise of FMLA leave rights, by requiring or requesting additional information from the health care providers, despite receipt of a complete and sufficient certification signed by the health care provider.

761.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes', exercise and/or attempted exercise of FMLA leave, by requiring submission of original copies of medical forms as a condition of ultimate approval of leave.[42]

---

[41]    *See* 29 C.F.R. § 825.305(c) ("The employer shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient. . . .The employer must provide the employee with seven calendar days . . . to cure any such deficiency."); 29 C.F.R. § 825.307("Clarification and authentication. If an employee submits a complete and sufficient certification signed by the health care provider, the employer *may not request* additional information from the health care provider. However, the employer may contact the health care provider for purposes of clarification and authentication of the medical certification . . . *after the employer has given the employee an opportunity to cure any deficiencies as set forth in § 825.305(c)*.").

[42]    *See Fact Sheet #28G*: Medical Certification under the Family and Medical Leave Act March 2023 ("Employers must accept a complete and sufficient medical certification, regardless of the format*."); DOL Field Operations Handbook - Chapter 39 THE FAMILY AND MEDICAL LEAVE ACT (FMLA)* ("An employer may not reject a medical certification that otherwise contains the information required by the regulations due to the form of the certification provided.?"), https://www.dol.gov/agencies/whd/fact-sheets/28g-fmla-serious-health-condition; *U.S. Department of Labor: FMLA: Forms* **(**"Do I have to use my employer's certification forms? Employers *must accept a complete and sufficient certification*,

762.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), interfered with, restrained, and/or denied Plaintiff's, and upon information and belief the FMLA Classes' exercise and/or attempted exercise of FMLA leave, by utilizing requests for FMLA leave and/or submissions of medical certifications in support of FMLA leave as a: (1) basis for application of medical separation; (2) negative factor in support of medical separation, including but not limited to, by incorporating quotes from FMLA medical certification forms (for which FMLA leave was never granted) into the justification for an existing incapacity to support medical separation.

763.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy, pattern, practice, custom, and/or standard operating procedure of interference with FMLA rights through the implementation, adoption, and/or enforcement of the medical separation policy, and through its utilization of medically separating employees because of an incapacity, instead of approving their requested FMLA leave because of an incapacity as required by the FMLA.

764.    Plaintiff's August 24, 2023 and October 18, 2023 requests for FMLA leave, additional requests for and/or attempts to request FMLA leave, and/or her statement(s) of an intention, or potential intention to take and/or attempt to take FMLA leave in the future, was an exercise or attempt to exercise FMLA rights that NYC, QCC, Noel, and/or Aspromatis, interfered with, restrained, and/or denied, including but not limited to by denying, delaying,

---

regardless of the format. The employer *cannot reject* a certification that contains all the information needed to determine if the leave is FMLA-qualifying. The employer *cannot refuse: . . . A fax or copy of the certification . . . .*"), https://www.dol.gov/agencies/whd/fmla/forms; *U.S. Department of Labor: The Employers Guide The Family and Medical Leave Act* ("The employer cannot refuse: • A fax or copy of the medical certification, • A medical certification that is not completed on the employer's standard company form, or • Any other record of the medical documentation, such as a communication on the letterhead of the health care provider."), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/employerguide.pdf.

and/or deferring her FMLA leave request, and/or declining to give Plaintiff timely notices required by 29 C.F.R. § 825.300(d).

765. Upon information and belief, NYC QCC, had a policy, pattern, practice, custom, and/or standard operating procedure of failing or declining to give the FMLA Classes timely designation notices as required by 29 C.F.R. § 825.300(d).

766. NYC, QCC, Noel, Macea, and/or Aspromatis interfered with, restrained, and/or denied Plaintiff's, and upon information and belief FMLA Classes', exercise of their FMLA leave rights, by failing to designate correctly leave as protected FMLA leave, classifying these protected absences as unauthorized absences, and/or docking pay for these absences.

767. Plaintiff and the FMLA Classes have relied on NYC, CUNY, and/or QCC for the opportunity to render their educational teaching services.

768. Plaintiff and the FMLA Classes have had no opportunity for profit or loss and have made no investment in the business while working for NYC, CUNY, and/or QCC.

769. Plaintiff, and upon information and belief the FMLA Classes, have suffered damages as a result of NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis's FMLA violations.

770. The CUNY-Wide FMLA Class is currently subject to Chancellor Matos Rodríguez's (in his official capacity) ongoing violations of, failure to ensure compliance with, failure to properly implement, and/or failure to enforce, the FMLA.

771. Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis did not have reasonable grounds for believing that their acts or omissions concerning Plaintiff or the FMLA Classes, complied with the FMLA, or were in good faith, including because the acts were knowing and intentional violations of the

FMLA.

772.    Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official capacity) and/or QCC's violations of the FMLA were carried out, as part of a knowing and intentional policy, pattern, practice, custom, and/or standard operating procedure of intentional non-compliance with the FMLA and/or manipulation to evade FMLA compliance.

773.    Upon information and belief, NYC, Chancellor Matos Rodríguez, and/or QCC's non-compliance with the FMLA was systematic and chronic, to such a significant degree, despite their knowledge of their obligations under the statute, that these violations were therefore willful, intentional, and/or in bad faith.

774.    Similarly, NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC's inaction and failure to remedy or address the knowing continued ongoing widespread failure to comply fully with the FMLA rose to the level of intentional non-compliance.

775.    Upon information and belief, Noel, Macea, and/or Aspromatis were trained human resources staff, with responsibility for ensuring NYC, CUNY, and/or QCC's compliance with federal, state, and city laws regarding employment, including concerning protected leave and leaves of absence.

776.    Upon information and belief, NYC, CUNY, QCC, Noel, Macea, and/or Aspromatis's actions and inactions regarding proper FMLA administration, and failure to remedy or address the knowing continued ongoing widespread failure to comply fully with the FMLA, rose to the level of intentional non-compliance with the FMLA.

777.    Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis did not have reasonable grounds for believing that their acts or omissions concerning Plaintiff or the FMLA Classes complied with the FMLA.

778.    As a result of NYC, QCC, Noel, Macea, and/or Aspromatis's FMLA violations, Plaintiff, and upon information and belief the Community College FMLA Class and QCC FMLA Class, are entitled to recover back pay, front pay and/or reinstatement, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and costs.

779.    As a result of Chancellor Matos Rodríguez's (in his official capacity) violations of the FMLA, Plaintiff, and upon information and belief, the CUNY-Wide FMLA Class, are entitled to recover prospective injunctive relief including reinstatement, declaratory relief, nominal damages, attorney's fees, and costs.

## EIGHTH CAUSE OF ACTION

### FMLA – Retaliation

**(Brought on Behalf of Plaintiff, the CUNY-Wide FMLA Class, the Community College FMLA Class, and the QCC FMLA Class Against Chancellor Matos Rodríguez, NYC, and QCC)**

**(Brought on Behalf of Plaintiff Against Noel, Aspromatis, and Macea)**

780.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

781.    At all times during her employment Plaintiff was qualified for her position.

782.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes were appointed faculty at CUNY, NYC, and/or QCC, who were qualified for their faculty positions.

783.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were enterprises engaged in commerce and/or in the production of goods for commerce within the meaning of the FMLA.

784.    At the time of their requests for leave, Plaintiff, and upon information and belief the FMLA Classes, were receiving continuing treatment for a serious health condition within the

meaning of 29 C.F.R. § 825.115(c) and/or were otherwise entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and/or 29 C.F.R. § 825.123 because of their serious health condition.

785.    At all times relevant to the Complaint, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c) and/or was otherwise entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and/or 29 C.F.R. § 825.123, because of her Bipolar II Disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

786.    At all times relevant to the Complaint, NYC, CUNY, and/or QCC were institutions of higher education and/or engaged in the activity of a public agency.

787.    At all times during her employment Plaintiff was qualified for her position.

788.    NYC, QCC, Noel, Aspromatis, and/or Macea, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), retaliated against Plaintiff because of her requests for FMLA leave, including but not limited to by subjecting her to: (1) designation of having taken unauthorized leaves and related pay docking; (2) a retaliatory investigation; (3) a retaliatory disciplinary charges; (4) retaliatory medical separation.

789.    At all times during Plaintiff's employment NYC, CUNY, and/or QCC, NYC, CUNY, and/or QCC were employers and/or joint employer within the meaning of the FMLA.

790.    NYC and/or QCC, and Chancellor Matos Rodríguez (in his official capacity), had the power to hire and fire Plaintiff and have effectively fired and/or constructively discharged Plaintiff by medically separating her.

791.    NYC and/or QCC, and Chancellor Matos Rodríguez (in his official capacity), had the power to hire and fire and/or medically separate the FMLA Classes.

792.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC, controlled Plaintiff's and the FMLA Classes' work schedules and conditions of employment, including by determining their class assignments and/or schedule and the terms and conditions of those assignments.

793.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC set the method and frequency of payment for Plaintiff and the FMLA Classes, including by controlling payroll and payroll deductions – including control over deductions of pay for absences deemed to be unauthorized absences.

794.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC determined the method and frequency of payment for Plaintiff and the FMLA Classes, including by controlling payroll and payroll deductions including for absences deemed unauthorized.

795.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC maintained employment records for Plaintiff and the FMLA Class including their personnel, disciplinary file, and medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

796.    NYC, Chancellor Matos Rodríguez (in his official capacity), and/or QCC possessed the power to control Plaintiff and the FMLA Classes, and controlled them, including but not limited to, through control over class assignments and scheduling, reassignments, initiation of disciplinary proceedings, initiations of investigations, classification of absences as unauthorized and related docking of pay, terminations, and medical separations.

797.    Upon information and belief, Chancellor Matos Rodríguez (in his official capacity) had ultimate authority over Plaintiff's and the FMLA Classes' FMLA rights and ability to take FMLA leave.

798.     Chancellor Matos Rodríguez, as Chancellor of CUNY, had operational control over CUNY, QCC, Plaintiff, and the FMLA Classes.

799.     Upon information and belief, Noel, Aspromatis, and/or Macea controlled Plaintiff's rights under the FMLA.

800.     Upon information and belief, Noel, Aspromatis, and/or Macea exercised their authority in relation to Plaintiff's FMLA rights, including but not limited to, by denying, authorizing the denial, ordering the denial, failing to deny or approve, and/or being involved in the denial and/or delay of, her FMLA leave request.

801.     Upon information and belief, Noel, Aspromatis, and/or Macea exercised control over Plaintiff's schedule and conditions of employment, at least with respect to her ability to take leave through approval or denial of her requests for FMLA leave.

802.     Aspromatis, and Macea, and upon information and belief, Noel, possessed the power to control and controlled Plaintiff, by classifying her absences as unauthorized and related docking of pay.

803.     Aspromatis, and/or Macea, and upon information and belief, Noel, set the method and frequency of payment for Plaintiff, by controlling classification of absences as unauthorized and related pay docking.

804.     Upon information and belief, Noel, Aspromatis, and/or Macea supervised and controlled Plaintiff's work schedule and/or conditions of employment by exercising and/or having the power to determine, the approval of her requests for FMLA leave, schedule modifications, requests for temporary remote work while her remote work accommodation requests were pending, requests for remote work accommodations, and whether her absences from work were authorized or unauthorized.

805. Upon information and belief, Noel, Aspromatis, and/or Macea reviewed Plaintiff's FMLA paperwork, determined its adequacy, and controlled Plaintiff's ability to be approved for FMLA leave.

806. Upon information and belief, Noel, Aspromatis, and/or Macea had the final authority to approve or deny FMLA leave requests for Plaintiff and/or Associate Professors.

807. Aspromatis and/or Macea sent Plaintiff nearly every communication regarding her FMLA leave request during 2023.

808. Macea directly communicated the denial of FMLA leave to Plaintiff in written correspondence explaining the asserted reasons for the denial.

809. Upon information and belief, Noel, Aspromatis, and/or Macea were personally involved in the management, decision-making, and/or determinations concerning Plaintiff's FMLA leave.

810. Upon information and belief, Noel, Aspromatis, and/or Macea decided, and/or played an important role in deciding, to bring disciplinary charges against Plaintiff.

811. Upon information and belief, Noel, Aspromatis, and/or Macea decided, and/or played an important role in deciding, to medically separate Plaintiff.

812. Noel, Aspromatis, and Macea maintained employment records for Plaintiff, including, but not limited to, medical records and certifications submitted in support of FMLA leave requests and/or disability-based accommodation requests.

813. Noel, Aspromatis, and Macea were persons who acted directly or indirectly in the interest of employers NYC, CUNY, and/or QCC.

814. Noel, Aspromatis and Macea possessed the power to control Plaintiff.

815. Noel, Aspromatis, and Macea exercised control over Plaintiff through the denial

and/or refusal to consider her FMLA request.

816.    At all times during Plaintiff's employment with NYC, CUNY, and/or QCC she depended on NYC, CUNY, and/or QCC for the opportunity to render educational instruction services.

817.    Upon information and belief, at all times relevant to the Complaint, Plaintiff and the FMLA Classes were employees within the meaning of the FMLA and employed and/or jointly employed by NYC, CUNY, and/or QCC within the meaning of the FMLA.

818.    At all times during Plaintiff and the FMLA Classes' employment with NYC, CUNY, and/or QCC, they depended on NYC, CUNY, and/or QCC for the opportunity to render educational instruction services.

819.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes were each an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2).

820.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes, had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of NYC, CUNY, and/or QCC was fifty or more employees within seventy-five miles of the location to which they reported, and/or the location from which their assignments were made.

821.    At all times relevant to the Complaint, Plaintiff and the FMLA Classes, had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, the total number of employees of NYC, CUNY, and/or QCC was fifty or more employees within seventy-five miles of the NYC, CUNY, and/or QCC location to which they reported, and/or the location from which their assignments were made at NYC, CUNY, and/or QCC.

822.    At all times relevant to the Complaint, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c), for illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

823.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy, pattern, practice, custom, and/or standard operating procedure of retaliating against Plaintiff and the FMLA Classes because of, or in part because of, their requests for FMLA leave by: (1) rejecting sufficient submitted medical documentation; (2) unnecessarily requesting additional medical documentation beyond that required to approve requested FMLA leave pursuant to 29 C.F.R. § 825.300(d) and  29 U.S.C. § 2613(a)-(b); (3) unnecessarily requesting direct contact with medical providers; (4) intentionally violating 29 C.F.R. § 825.306(e) and/or 29 C.F.R. § 825.305(c); (5) initiating retaliatory investigations; (6) initiating retaliatory disciplinary proceedings; (7) designating protected leave as unauthorized and docking pay; (8) initiating retaliatory medical separations; and (9) requiring submission of original copies of medical forms as a condition of ultimate approval of FMLA leave

824.    NYC, QCC, Noel, Macea, Aspromatis, and/or upon information and belief, Chancellor Matos Rodríguez (in his official capacity), retaliated against Plaintiff and upon information and belief the FMLA Classes because of, or in part because of, their requests for FMLA leave by utilizing requests for FMLA leave and/or submissions of medical certifications in support of FMLA leave as a: (1) basis for application of medical separation; (2) negative factor in support of medical separation, including, but not limited to, by incorporating quotes from FMLA medical certification forms (for which FMLA leave was never granted) into the

justification for an existing incapacity to support medical separation.

825.    NYC, QCC, Noel, Macea, and/or Aspromatis, and upon information and belief Chancellor Matos Rodríguez (in his official capacity), had a policy, pattern, practice, custom, and/or standard operating procedure of retaliation because of FMLA requests through the implementation, adoption, and/or enforcement of the medical separation policy.  Under the medical separation policy employees were medically separated *because of* an incapacity, instead of their request for FMLA being approved *because of* their incapacity as required by the FMLA.

826.    Plaintiff and the FMLA Classes have relied on NYC, CUNY, and/or QCC for the opportunity to render their educational teaching services.

827.    Plaintiff and the FMLA Classes have had no opportunity for profit or loss and have made no investment in the business while working for NYC, CUNY, and/or QCC.

828.    Plaintiff, and upon information and belief the FMLA Classes, have suffered damages as a result of NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis's FMLA violations.

829.    Upon information and belief, the CUNY-Wide FMLA Class is currently subject to Chancellor Matos Rodríguez's (in his official capacity) ongoing policy, pattern, practice, custom and/or standard operating procedure of FMLA retaliation against the FMLA Classes.

830.    Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis did not have reasonable grounds for believing that their acts or omissions concerning Plaintiff or the FMLA Classes, complied with the FMLA, or were in good faith, including because the acts were knowing and intentional violations of the FMLA.

831.    Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official

capacity) and/or QCC's violations of the FMLA were carried out, as part of a knowing and intentional policy, pattern, practice, custom, and/or standard operating procedure of intentional non-compliance with the FMLA and/or manipulation to evade FMLA compliance.

832.    Upon information and belief, NYC, Chancellor Matos Rodríguez, and/or QCC's non-compliance with the FMLA was systematic and chronic, to such a significant degree, despite their knowledge of their obligations under the statute, that these violations were therefore willful, intentional, and/or in bad faith.

833.    In addition, or in the alternative, Chancellor Matos Rodríguez's (in his official capacity) knowing inaction and failure to remedy or address the standard operating procedure of FMLA retaliation by NYC and/or QCC, rose to the level of intentional retaliation.

834.    Upon information and belief, Noel, Macea, and/or Aspromatis were trained human resources staff, with responsibility for ensuring NYC, CUNY, and/or QCC's compliance with federal, state, and city laws regarding employment, including concerning protected leave and leaves of absence.

835.    Upon information and belief, NYC, CUNY, QCC, Noel, Macea, and/or Aspromatis's actions and inactions were in retaliation for Plaintiff's FMLA leave requests.

836.    Upon information and belief, NYC, Chancellor Matos Rodríguez (in his official capacity), QCC, Noel, Macea, and/or Aspromatis did not have reasonable grounds for believing that their acts or omissions concerning Plaintiff or the FMLA Classes complied with the FMLA.

837.    As a result of NYC, QCC, Noel, Macea, and/or Aspromatis's FMLA violations, Plaintiff, and upon information and belief the Community College FMLA Class and QCC FMLA Class, are entitled to recover back pay, front pay and/or reinstatement, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and costs.

838.     As a result of Chancellor Matos Rodríguez's (in his official capacity) violations of the FMLA, Plaintiff, and upon information and belief, the CUNY-Wide FMLA Class, are entitled to recover from him prospective injunctive relief including reinstatement, declaratory relief, nominal damages, attorney's fees, and costs.

839.     As a result of NYC, QCC, Noel, Aspromatis, and/or Macea's retaliation, Plaintiff is entitled to recover from them, back pay, front pay and/or reinstatement, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## NINTH CAUSE OF ACTION

### New York City Human Rights Law – Failure to Accommodate

### (Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)

### (Brought on Behalf of Plaintiff Against President Mangino, Noel, Aspromatis, and Amaris)

840.     Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

841.     Plaintiff had, and continues to have, disabilities within the meaning of the NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

842.     Plaintiff has, and continues to have, a mental or psychological impairment within the meaning of the NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression.

843.     The Community College Accommodation Class and the QCC Accommodation Class had mental or psychological impairments within the meaning of the NYCHRL.

844.     The Community College Accommodation Class and the QCC Accommodation

Class had mental and/or psychological impairments.

845. Plaintiff and the Community College Accommodation Class and the QCC Accommodation Class had disabilities within the meaning of the NYCHRL.

846. Plaintiff's mental and/or psychological impairments (including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression) and illness(es) due to exposure to environmental toxins (such as severe response to mold and other toxins) are also physical, medical, mental or psychological impairments, impacting, without limitation, the neurological system, the special sense organs and respiratory organs, the immunological systems, and/or the skin.

847. Plaintiff disclosed her disabilities to NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris when requesting disability-based fully remote work accommodations and/or FMLA leaves.

848. The Community College Class and the QCC Accommodation Class disclosed their disabilities when requesting disability-based fully remote work accommodations.

849. NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris knew, or should have known, that Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class had disabilities based on their requests for disability-based accommodations.

850. Plaintiff asked NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris for reasonable accommodations in her faculty position and reassigned administrative role, including a remote work accommodation and classroom reassignment, among others -- which were denied.

851. NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris failed to engage

with Plaintiff in the required interactive process and/or cooperative dialogue regarding a reasonable accommodation of Plaintiff's disabilities, including, but not limited to, prior to denying her an accommodation to conduct her faculty duties remotely, denying her a classroom reassignment, initially denying her request to conduct her administrative reassignment position remotely, or prior to bringing retaliatory disciplinary charges against her, launching a retaliatory investigation of her, and/or medically separating her in retaliation for her protected activity.

852.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris failed to engage, or fully engage, in the required interactive and/or cooperative dialogue with Plaintiff, the Community College Accommodation Class, and/or the QCC Accommodation Class.

853.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris failed to accommodate Plaintiff's, the Community College Accommodation Class, and the QCC Accommodation Class' disabilities, with disability-based fully remote work accommodations, despite such accommodations not creating an undue hardship.

854.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis had (and have) a policy, practice, custom, and/or procedure of denying fully remote work accommodation requests from the Community College Accommodation Class and the QCC Accommodation Class, including, but not limited to, based on CUNY's 70/30 In-Person/Remote Policy, despite the absence of an undue hardship in granting such remote work accommodations.

855.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris also denied Plaintiff the reasonable accommodation of unpaid leave as an alternative to, or in addition to FMLA leave.

856.    Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris had a policy, pattern practice, custom, and/or standard operating procedure of

failing to provide reasonable accommodations of unpaid leave to Plaintiff, the Community College Accommodation Class and/or the QCC Accommodation Class, as an alternative to, or in addition to FMLA leave.

857.    Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris had a policy, pattern practice, custom, and/or standard operating procedure of failing to provide reasonable accommodations of unpaid leave to Plaintiff, the Community College Accommodation Class and/or the QCC Accommodation Class, as an alternative to a denied fully remote work accommodation.

858.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis discriminated against Plaintiff, and upon information and belief the Community College Accommodation Class and the QCC Accommodation Class, by failing to reasonably accommodate their disabilities with fully remote work, or in the alternative, protected unpaid leave.

859.    At all times during her employment with NYC and/or QCC, Plaintiff was qualified for and could perform the essential functions of her job with and/or without a reasonable accommodation.

860.    Upon information and belief, at all times relevant, the Community College Accommodation Class and QCC Accommodation Class were qualified for and could perform the essential functions of their jobs with and/or without a reasonable accommodation.

861.    At all times during Plaintiff's employment, including in the year preceding such relevant times, NYC and/or QCC has had more than four employees and/or independent contractors in their employ.

862.    At all times during Plaintiff's employment with NYC and/or QCC, Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class were covered

employees within the meaning of the NYCHRL.

863. At all times during Plaintiff's employment with NYC and/or QCC, NYC and/or QCC were covered employers and/or joint employers within the meaning of the NYCHRL.

864. NYC and/or QCC are vicariously liable for Defendant President Mangino, Noel, Aspromatis, and/or Amaris's failure to accommodate pursuant to N.Y.C. Admin. Code § 8-107(13)(a), (15).

865. President Mangino, Noel, Aspromatis, and upon information and belief Amaris, exercised managerial and/or supervisory responsibility at NYC and/or QCC and/or over Plaintiff.

866. President Mangino, Noel, Aspromatis, and Amaris participated in the conduct giving rise to the failure to accommodate Plaintiff's disabilities.

867. President Mangino, Noel, Aspromatis, and Amaris had power to do more than carry out personnel decisions made by others, and upon information and belief, each encouraged, condoned, and/or approved the failure to accommodate Plaintiff's disabilities.

868. Upon information and belief, Amaris had power to do more than carry out personnel decisions made by others, and each encouraged, condoned, and/or approved the disability discrimination against Plaintiff.

869. As employees, supervisors, and/or managers of NYC and/or QCC, and as participants in the discrimination against Plaintiff, President Mangino, Noel, Amaris, and Aspromatis, are individually liable to Plaintiff for their NYCHRL violations pursuant to N.Y.C. Admin. Code §§ 8-107(15).

870. NYC and QCC are directly liable for their failures to accommodate, including but not limited to, because of their policies and/or practices, pursuant to NYCHRL § 8-107(15).

871. NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis knew of some

or all of each other's discriminatory conduct, and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

872.    NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis's conduct violated the NYCHRL.

873.    At all times relevant to the Complaint, Plaintiff was a covered employee within the meaning of the NYCHRL.

874.    At all times relevant to the Complaint, Plaintiff was a "person" and/or "employee" within the meaning of the NYCHRL.

875.    At all times relevant to the Complaint, Defendants President Mangino, Noel, Amaris, and/or Aspromatis' were each an employee and/or "agent" of employers NYC and/or QCC.

876.    NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis proximately caused Plaintiff, and upon information and belief the Community College Accommodation Class and the QCC Accommodation Class's injuries.

877.    President Mangino, Noel, Amaris, and Aspromatis's conduct constituted willful wanton negligence, recklessness, and/or conscious disregard of the NYCHRL rights of others, or conduct so reckless as to amount to such disregard.

878.    Plaintiff, and upon information and belief, the Community College Accommodation and the QCC Accommodation Class, suffered damages as a result of NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis' failure to accommodate.

879.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis's failure to accommodate had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

880.    As a result of NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis's failure to accommodate, including their policies, practices, customs, and/or procedures of unlawful employment practices, Plaintiff, the Community College Accommodation, and the QCC Accommodation Class are entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to NYC Admin. Code § 8-502(a).

881.    As a result of President Mangino, Noel, Amaris, and/or Aspromatis's discrimination, Plaintiff is entitled to punitive damages against these Defendants, pursuant to NYC Admin. Code § 8-502(a).

## TENTH CAUSE OF ACTION

**New York City Human Rights Law – Failure to Engage in Cooperative Dialogue**

**(Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)**

**(Brought on Behalf of Plaintiff Against President Mangino, Noel, Aspromatis, and Amaris)**

882.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

883.    Plaintiff had, and continues to have, disabilities within the meaning of the NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as severe response to mold and other toxins.

884.    Plaintiff has, and continues to have, a mental or psychological impairment within the meaning of the NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression.

885.    The Community College Accommodation Class and the QCC Accommodation Class had mental or psychological impairments within the meaning of the NYCHRL.

886.    Plaintiff and the Community College Accommodation Class and the QCC Accommodation Class had disabilities within the meaning of the NYCHRL.

887.    Plaintiff's mental and/or psychological impairments (including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder,  anxiety, and depression) and illness(es) due to exposure to environmental toxins (such as severe response to mold and other toxins) are also physical, medical, mental or psychological impairments, impacting, without limitation, the neurological system, the special sense organs and respiratory organs, the immunological systems, and/or the skin.

888.    Plaintiff disclosed her disabilities to NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris when requesting disability-based fully remote work accommodations and/or FMLA leaves.

889.    The QCC Accommodation Class disclosed their disabilities when requesting disability-based fully remote work accommodations.

890.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris knew, or should have known, that Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class had disabilities based on their requests for disability-based accommodations.

891.    Plaintiff asked NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris for reasonable accommodations in her faculty position and reassigned administrative role, including a remote work accommodation and classroom reassignment, among others -- which were denied and/or in response to which she was served with disciplinary charges.

892.    NYC, QCC, Defendant President Mangino, Noel, Aspromatis, and/or Amaris failed to engage with Plaintiff in the required interactive process and/or cooperative dialogue regarding a reasonable accommodation of Plaintiff's disabilities, including, but not limited to, prior to denying her an accommodation to conduct her faculty duties remotely, denying her a classroom reassignment, initially denying her request to conduct her administrative reassignment position remotely, or prior to bringing retaliatory disciplinary charges against her, launching a retaliatory investigation of her, and/or medically separating her in retaliation for her protected activity.

893.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris failed to engage, or fully engage, in the required interactive and/or cooperative dialogue with Plaintiff, the Community College Accommodation Class, and/or the QCC Accommodation Class.

894.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris failed to provide Plaintiff with a written final determination identifying any reasonable disability accommodation granted or denied for several of her accommodation requests, and, in some instances, issued non-disability-based approvals without ever rejecting or approving their disability-based accommodation requests.

895.    Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris had, and have, a policy, practice, and/or procedure of frequently failing to provide Plaintiff, the Community College Accommodation Class, and/or QCC Accommodation Class with a written final determination identifying any reasonable disability accommodation granted or denied for remote work disability-based accommodation requests -- and instead frequently issued non-disability based general accommodation approvals, without ever rejecting or approving her disability-based accommodation request.

896.     NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris refused and/or failed to "engage in good faith in a written or oral dialogue [with her] concerning" Plaintiff's "accommodation needs," "within a reasonable time," regarding several of her requests for and/or need for a reasonable accommodation of her disabilities, including, but not limited to: (1) repeatedly denying her requests for fully remote teaching; (2) failing to reasonably accommodate her disabilities with an alternative classroom assignment in a building that did not have mold or other toxins that enflamed and/or exacerbated her disabilities; (3) initially denying and/or delaying a response to her request for a remote work accommodation in her retaliatory reassigned administrative role; (4) failing to reasonably accommodate her disabilities with unpaid leave as a reasonable accommodation of her disability, including, by failing to evaluate her request for FMLA leave under both the FMLA and NYCHRL; and (5) failing to grant a temporary disability-based fully remote work accommodation to transition to in-person instruction, all in violation of NYCHRL 8-107(28).

897.     Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris have had a policy, practice, and/or procedure of failing to: (1) provide employees who requested an accommodation who participated in the cooperative dialogue with a written final determination identifying any accommodation granted or denied by granting only general accommodations in response to disability-based fully remote work accommodations; and (2) failing to engage in a cooperative dialogue within a reasonable time.

898.     Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris have had a policy, practice, and/or procedure of failing to engage in the cooperative dialogue with Plaintiff, the Community College Accommodation Class, and/or the QCC Accommodation Class, in good faith and in a transparent and expeditious manner,

regarding their requests for and/or need for a disability-based fully remote work accommodation, or alternatively, protected unpaid leave.

899.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris violated the NYCHRL by failing to initiate and/or engage with Plaintiff, and upon information and belief the Community College Accommodation Class and the QCC Accommodation Class, in the cooperative dialogue process required by NYCHRL § 8-107(28)(a),(d) after notice that they required, or may have required, a reasonable accommodation of their disabilities.

900.    NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris engaged in a pattern, practice, and/or custom of failure to engage in the cooperative dialogue by conducting bad faith, predetermined, and/or inadequate cooperative dialogue processes and/or accommodations evaluations regarding disability-based requests for fully remote work.

901.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis have had a policy, practice, custom, and/or procedure of failing to engage in, or fully engage in, the cooperative dialogue required by the NYCHRL, by failing to: (1) offer or discuss alternative accommodations after denial of disability-based fully remote work accommodations; (2) offer or discuss temporary and/or transition fully remote work accommodation; and/or (3) offer or discuss unpaid leave as an alternative to fully remote accommodations.

902.    Plaintiff asked NYC, QCC, President Mangino, Noel, Aspromatis, and/or Amaris for reasonable accommodations in her faculty position, including a remote work accommodation and classroom reassignment, which were denied.

903.    At all times during her employment with NYC and/or QCC, Plaintiff was qualified for and could perform the essential functions of her job with and/or without a reasonable accommodation.

904. Upon information and belief, the Community College Accommodation Class and the QCC Accommodation Class could perform the essential functions of their jobs with and/or without a reasonable accommodation.

905. At all times during Plaintiff's employment, including in the year preceding such relevant times, NYC and/or QCC had more than four employees and/or independent contractors in their employ.

906. At all times during Plaintiff's employment with NYC and/or QCC, Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class were covered employees within the meaning of the NYCHRL.

907. At all times during Plaintiff's employment with NYC and/or QCC, NYC and/or QCC were covered employers and/or joint employers within the meaning of the NYCHRL.

908. NYC and/or QCC are vicariously liable for President Mangino, Noel, Aspromatis, and/or Amaris's failure to engage in the cooperative dialogue pursuant to N.Y.C. Admin. Code § 8-107(13)(a), (28).

909. President Mangino, Noel, Aspromatis, and upon information and belief, Amaris exercised managerial and/or supervisory responsibility at NYC and/or QCC, and/or over Plaintiff.

910. President Mangino, Noel, Aspromatis, and Amaris participated in the conduct giving rise to the failure to engage in the cooperative dialogue.

911. President Mangino, Noel, Aspromatis, and upon information and belief, Amaris, had power to do more than carry out personnel decisions made by others, and upon information and belief, each encouraged, condoned, and/or approved the failure to engage in the cooperative dialogue with Plaintiff.

912. NYC and QCC are strictly liable for, President Mangino, Noel, Amaris, and/or

Aspromatis's discrimination pursuant to N.Y.C. Admin. Code §§ 8-107(28), 8-107(13)(a).

913. NYC and QCC are directly liable for their discrimination, including, but not limited to, because of their policies and/or practices, pursuant to NYCHRL § 8-107(28).

914. At all times relevant to the Complaint, Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class were covered employees within the meaning of the NYCHRL.

915. At all times relevant to the Complaint, Defendants President Mangino, Noel, Amaris, and/or Aspromatis were each an employee and/or agent of employer(s) NYC and/or QCC.

916. NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis proximately caused Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class' injuries.

917. President Mangino, Noel, Amaris, and Aspromatis's conduct constituted willful wanton negligence, recklessness, and/or conscious disregard of the NYCHRL rights of others, or conduct so reckless as to amount to such disregard.

918. Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class suffered damages as a result of NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis' failure to engage in the cooperative dialogue.

919. NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis's failure to engage in the cooperative dialogue had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

920. As a result of NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis's failure to engage in the cooperative dialogue, Plaintiff, the Community College Accommodation

Class and the QCC Accommodation Class are entitled to back pay, front pay and/or

reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert

fees, costs, and other compensation pursuant to NYC Admin. Code § 8-502(a).

921.    Plaintiff is entitled to punitive damages from President Mangino, Noel, Amaris,

and Aspromatis pursuant to NYC Admin. Code § 8-502(a).

## ELEVENTH CAUSE OF ACTION

### New York City Human Rights Law – Retaliation

### (Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)

### (Brought on Behalf of Plaintiff Against President Mangino, Noel, and Aspromatis)

922.    Plaintiff realleges and incorporates by reference all allegations in the preceding

paragraphs.

923.    Plaintiff had, and continues to have, disabilities within the meaning of the

NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic Stress Disorder,

anxiety, and depression, as well as illness(es) due to exposure to environmental toxins such as

severe response to mold and other toxins.

924.    Plaintiff has, and continues to have, a mental or psychological impairment within

the meaning of the NYCHRL, including, without limitation, Bipolar II disorder, Post-Traumatic

Stress Disorder, anxiety, and depression.

925.    The Community College Accommodation Class and the QCC Accommodation

Class had mental or psychological impairments within the meaning of the NYCHRL.

926.    The Community College Accommodation Class and the QCC Accommodation

Class had mental and/or psychological impairments.

927.    Plaintiff's mental and/or psychological impairments (including, without

limitation, Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, and depression) and illness(es) due to exposure to environmental toxins (such as severe response to mold and other toxins) are also physical, medical, mental or psychological impairments, impacting, without limitation, the neurological system, the special sense organs and respiratory organs, the immunological systems, and/or the skin.

928.    Plaintiff engaged in protected activity with respect to NYC, and/or QCC when she requested disability-based reasonable accommodations including, but not limited to, a fully remote work, a temporary remote work accommodation, room reassignment, and scheduling accommodations.

929.    Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class engaged in protected activity with respect to NYC, and/or QCC when they requested disability-based fully remote work accommodation.

930.    Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class engaged in protected activity, known to NYC, and/or QCC, through their requests for a disability-based fully remote work accommodation, and via submission of their medical certifications.

931.    NYC and/or QCC took adverse actions against Plaintiff, because of her protected activity of requesting and/or utilizing reasonable accommodations of her disabilities, including, but not limited to, by: (1) delaying consideration of her reasonable accommodation requests; (2) demanding additional unnecessary medical documentation; (3) unnecessarily demanding direct contact with her medical providers; (4) harassment and intimidation of Plaintiff's medical provider(s); (5) bad faith accommodation evaluations; (6) provision of pretextual grounds for denials of accommodations; (7) denials of Plaintiff's accommodation requests; (8) demands and

threats of short deadlines to return to work and/or to teach-in person; (9) categorization of protected disability-based leave as an unauthorized absence; (10) delayed payment of salary; (12) docking pay ; (13) retaliatory disciplinary charges; (14) retaliatory investigation; and (15) a retaliatory medical separation, constructive discharge, and/or termination.

932.    Upon information and belief, NYC, and/or QCC, had a policy, pattern, practice, custom, and/or standard operating procedure of taking adverse actions against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, because of their protected activity of requesting a disability-based reasonable accommodation of fully remote work.

933.    Upon information and belief, NYC, and/or QCC took adverse actions against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, because of, or in part because of, their disability-based requests for fully remote work accommodations, including but not limited to: (1) denying their accommodation requests on bad faith, pretextual, and/or fabricated grounds; (2) taking disciplinary action against them; (3) initiating a bad faith, pretextual, and/or fabricated investigation of them; (4) bringing bad faith, untrue, pretextual, and/or fabricated disciplinary charges against them; (5) only approving remote work reasonable accommodations as non-protected general accommodations; and (6) making bad faith, pretextual, and/or unnecessary requests for additional medical information and/or direct contact with medical providers, not required or necessary to have approved the remote work accommodation.

934.    NYC and/or QCC took adverse actions against Plaintiff because of her protected activities of opposing and/or complaining about disability discrimination, retaliation, and/or interference, including, but not limited to, because of her: (1) opposition to the denials of her

accommodation and leave requests; (2) her opposition to disability discrimination at a department meeting; (3) statement that she would be filing with the New York City Commission on Human Rights; (4) statement that she would be filing a complaint with the Mayor's Office of People with Disabilities; (5) service of a notice of claim containing allegations of disability discrimination and retaliation; and (6) filing an EEOC administrative charge containing allegations of disability discrimination, retaliation, and interference.

935.    NYC and/or QCC took adverse actions against Plaintiff because of her protected activities of opposing and/or complaining about disability discrimination, retaliation, and/or interference including, but not limited to, by: (1) delaying consideration of her reasonable accommodation requests; (2) requesting additional unnecessary medical documentation beyond that required to evaluate her accommodation request; (3) retaliatory harassment and/or intimidation of Plaintiff's medical providers contacted concerning her disability; (4) provision of pretextual basis for denials and/or requirements of additional medical documentation; (5) denials of Plaintiff's accommodation requests; (6) demands and threats of short deadlines to return to work and/or to tech-in person; (7) categorization of protected leave as an unauthorized absence; (8) delayed payment of salary; (9) docking of salary; (10) retaliatory discipline and disciplinary charges; and (11) and the retaliatory medical separation of, constructive discharge, and/or termination of Plaintiff from her employment.

936.    NYC and/or QCC took adverse actions against Plaintiff by denying her request for FMLA leave because of her protected activity of requesting a reasonable accommodation of fully remote work, unpaid leave, and/or room reassignment.

937.    Upon information and belief, NYC and/or QCC had a policy, pattern, practice, custom, and/or standard operating procedure of denying FMLA leave requests by Plaintiff, the

Community College Accommodation Class, and the QCC Accommodation Class because, or in part because, of their protected activity of requesting disability-based fully remote work accommodations.

938. NYC and/or QCC engaged in a policy, pattern, practice, custom, and/or standard operating procedure of retaliation against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, because, or in part because, they requested disability-based fully remote work accommodations, including, but not limited to, in connection with NYC, CUNY, and/or QCC's efforts to enforce and implement remote work policies seeking to prohibit fully remote work disability-based work accommodations.

939. NYC and/or QCC engaged in a pattern, practice, custom, and/or standard operating procedure of retaliation against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, by conducting bad faith, pre-determined, and/or inadequate interactive processes and/or accommodation evaluations, regarding requests for remote work, that were designed to find a pretextual basis for denial of a disability-based remote work accommodation.

940. Upon information and belief, NYC and/or QCC retaliated against the Community College Accommodation Class and the QCC Accommodation Class because of their disability-based fully remote work accommodation requests, through the creation, implementation, and application to them of their medical separation policy, including, but not limited to, by: (1) relying on their accommodation requests as the support for their medical separation; and (2) application of the medical separation policy without consideration of, or provision for, or the incorporation of, a disability-based reasonable accommodation analysis.

941. Upon information and belief, NYC and/or QCC retaliated against Plaintiff, the

Community College Accommodation Class, and the QCC Accommodation Class for requesting disability-based reasonable accommodations, by creating, implementing, and/or enforcing the medical separation policy in the following manner designed to remove disabled persons from the faculty: (1) an initial illegal denial of a request for a disability-based remote work accommodation that would have, if granted, allowed the faculty member to be able to satisfy their employment responsibilities; (2) disciplinary reassignment of the faculty member from their teaching role, to administrative work; and (3) medical separation of the faculty member based on "incapacity," without consideration of: (i) the original failure to accommodate having caused or contributed to the incapacity; and/or (ii) the ability of the grant of the requested accommodation to remove or ameliorate the incapacity relied upon for the medical separation.

942.    NYC and/or QCC retaliated against Plaintiff for opposing disability discrimination in a department meeting by placing a disciplinary note in her personnel file.

943.    NYC and/or QCC retaliated against Plaintiff by utilizing her request for a reasonable accommodation and/or FMLA leave and/or submission of a medical certifications requesting the same, as a basis for her medical separation.  This included, but was not limited to, through the use of quotes about her medical condition from her reasonable accommodation medical certification forms, as the justification for a finding that she had an "incapacity" under the medical separation policy.

944.    In addition, NYC and/or QCC retaliated against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, through the continued maintenance of their medical separation policy, despite knowledge of its disparate impact on employees who engaged in the protected activity of requesting disability-based fully remote work accommodations.

213

945.    NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis took adverse action against Plaintiff because, or in part because, Plaintiff, and the Community College Accommodation Class and the QCC Accommodation Class, engaged in the protected activity of requesting and/or utilizing a disability reasonable accommodation, inclusive of their requests for and/or use of disability-based fully remote work accommodations.

946.    NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis took adverse actions against Plaintiff because, or in part because, Plaintiff engaged in the protected activity of complaining about and/or opposing disability discrimination, retaliation, and/or interference.

947.    NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis took adverse actions against Plaintiff because, or in part because, she filed a notice of claim regarding this action and/or filed an EEOC charge, and/or complained and/or opposed disability discrimination and/or retaliation.

948.    NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis' adverse actions were reasonably likely to deter a person from engaging in protected activity, inclusive of requesting and/or utilizing a reasonable accommodation of a disability, complaining about and/or opposing disability discrimination, retaliation, and/or interference, and/or filing a public lawsuit.

949.    At all times relevant to the Complaint, as well as in the year preceding such relevant times, NYC and/or QCC employed and/or jointly employed more than four persons in their employ as employees and/or independent contractors.

950.    At all times during Plaintiff's employment with NYC and/or QCC, NYC and/or QCC were covered employers and/or joint employers within the meaning of the NYCHRL.

951.    At all times relevant to the Complaint, Plaintiff the Community College Accommodation Class, and the QCC Accommodation Class were covered employees within the

meaning of the NYCHRL.

952. At all times relevant to the Complaint, Plaintiff was a person and/or"employee within the meaning of the NYCHRL.

953. At all times relevant to the Complaint, President Mangino, Noel, Macea, and/or Aspromatis were each a person within the meaning of the NYCHRL.

954. NYC, QCC, President Mangino, Noel, and/or Aspromatis proximately caused Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class's injuries.

955. President Mangino, Noel, and Aspromatis's conduct constituted willful wanton negligence, recklessness, and/or conscious disregard of the NYCHRL rights of others, or conduct so reckless as to amount to such disregard.

956. Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class suffered damages as a result of NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis's retaliation.

957. NYC, QCC, President Mangino, Noel, Macea, and/or Aspromatis's retaliation had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

958. As a result of NYC, QCC, President Mangino, Noel, , and/or Aspromatis's retaliation, Plaintiff, the Community College Accommodation Class and the QCC Accommodation Class are entitled to back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to NYC Admin. Code § 8-502(a).

959. Plaintiff is entitled to punitive damages from President Mangino, Noel, and

Aspromatis pursuant to NYC Admin. Code § 8-502(a).

## TWELFTH CAUSE OF ACTION

**New York City Human Rights Law – Coercion, Intimidation, Threat, And Interference and Attempted Coercion, Intimidation, Threat, and Interference**

**(Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)**

**(Brought on Behalf of Plaintiff Against President Mangino, Noel, Aspromatis, and Amaris)**

960. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

961. Plaintiff had, and continues to have, disabilities within the meaning of the NYCHRL.

962. At all times relevant to the Complaint, the Community College Accommodation Class and the QCC Accommodation Class had disabilities within the meaning of NYCHRL.

963. NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris coerced, intimidated, threatened, and/or interfered with Plaintiff's exercise or enjoyment of, and/or on account of her having exercised or enjoyed, her NYCHRL rights, and/or attempted to coerce, intimidate, threaten, and/or interfere with Plaintiff's exercise and/or enjoyment of her NYCHRL rights, including, but not limited to, by: (1) failing to engage in the required cooperative dialogue process; (2) delaying consideration of her reasonable accommodation requests; (3) requesting additional unnecessary medical documentation beyond that required to evaluate her accommodation request; (4) retaliatory harassment and/or intimidation of Plaintiff's medical providers contacted concerning her disability; (5) provision of pretextual grounds for denials and/or requirements of additional medical documentation; (6) denials of Plaintiff's accommodation requests; (7) demands and threats of short deadlines to return to work and/or to

teach in-person; (8) categorization of protected leave as an unauthorized absence; (9) delayed payment of salary; (10) retaliatory harassment of Plaintiff and/or creation of a retaliatory hostile work environment; (11) retaliatory disciplinary charges; and (12) the retaliatory medical separation of, constructive discharge of, and/or termination of Plaintiff from her employment.

964.    Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris had a policy, practice, procedure, and/or custom of coercing, intimidating, threatening, and/or interfering (and/or attempted to coerce, intimidate, threaten, and/or interfere) with Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their NYCHRL rights, including, but not limited to, by: (1) failing to engage in the required cooperative dialogue process; (2) delaying consideration of their reasonable accommodation requests; (3) requesting additional unnecessary medical documentation beyond that required to evaluate her accommodation request; (4) retaliatory harassment and/or intimidation of their medical providers contacted concerning their disabilities; (5) provision of pretextual bases for denials and/or requirements of additional medical documentation; (6) denials of their accommodation requests; (7) demands and threats of short deadlines to return to work and/or to teach-in person; (8) categorization of protected leave as  unauthorized absences, delayed payment of salary; (9) retaliatory harassment of them and/or creation of a retaliatory hostile work environment; (10) retaliatory disciplinary charges; and (11) the retaliatory medical separation of, constructive discharge of, and/or termination of them from their employment.

965.    Upon information and belief, NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris had a policy, practice, procedure, and/or custom of coercing, intimidating, threatening, and/or interfering (or attempting to do so) with Plaintiff, the Community College

Accommodation Class, and the QCC Accommodation Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their NYCHRL rights, by: (1) denying their accommodation requests on bad faith, pretextual, and/or fabricated grounds; (2) taking disciplinary action against them; (3) initiating a bad faith, pretextual, and/or fabricated investigation of them; (4) bringing bad faith, untrue, pretextual, and/or fabricated disciplinary charges against them; (5) only approving remote work reasonable accommodations as non-protected general accommodations; and (6) making bad faith, pretextual, and/or unnecessary requests for additional medical information and/or direct contact with medical providers, not required or necessary to have approved the remote work accommodation.

966.    Upon information and belief NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris had a policy, practice, and/or custom of coercing, intimidating, threatening, and/or interfering (or attempting to do so) with the Community College Accommodation Class and the QCC Accommodation Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their NYCHRL rights by taking actions (including adverse actions) or engaging in conduct against the QCC Accommodation because of their requests for reasonable disability accommodations or remote work. They did so, including but not limited to, by denying simultaneous FMLA leave requests and/or declining to simultaneously and/or alternatively consider FMLA leave requests after submission of a disability-based accommodation request.

967.    NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris engaged in a pattern, practice, and/or custom of coercing, intimidating, threatening, and/or interfering (or attempting to do so) with the Community College Accommodation Class and the QCC Accommodation Class's exercise or enjoyment of, and/or on account of them having

exercised or enjoyed, their NYCHRL rights by conducting bad faith, predetermined, and/or inadequate cooperative dialogue processes and/or accommodation evaluations regarding requests for fully remote work that were designed to find a basis for denial.

968. NYC, QCC, President Mangino, Noel, Aspromatis, Macea and/or Amaris's above-described conduct had a reasonable tendency to intimidate, threaten, interfere with, and/or coerce an employee.

969. At all times relevant to the Complaint, as well as in the year proceeding such relevant times, QCC and/or NYC had more than four employees and/or independent contractors in their employ.

970. Plaintiff was at all times relevant a covered employee within the meaning of the NYCHRL.

971. At all times during Plaintiff's employment with NYC and/or QCC, NYC and/or QCC were covered employers and/or joint employers within the meaning of the NYCHRL.

972. At all times relevant to the Complaint, Plaintiff was a person and/or employee within the meaning of the NYCHRL.

973. At all times relevant to the Complaint, President Mangino, Noel, Aspromatis, Macea, and/or Amaris were persons within the meaning of the NYCHRL.

974. NYC, QCC, President Mangino, Noel, Aspromatis, Macea, and Amaris proximately caused Plaintiff's injuries.

975. President Mangino, Noel, Aspromatis, Macea, and Amaris's conduct constituted willful and wanton negligence, recklessness, and/or conscious disregard of the NYCHRL rights of others, or conduct so reckless as to amount to such disregard.

976. Plaintiff, and upon information and belief the Community College

219

Accommodation Class and the QCC Accommodation Class, suffered damages as a result of NYC, QCC, President Mangino, Macea, Noel, Aspromatis and/or Amaris's coercing, intimidating, threatening, and/or interfering (or attempts at the same).

977.    NYC, QCC, President Mangino, Noel, Aspromatis, Macea, and/or Amaris' coercing, intimidating, threatening, and/or interfering (or attempts at the same) with Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class's exercise or enjoyment of, and/or account of them having exercised or enjoyed, their NYCHRL rights, had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

978.    As a result of NYC, QCC, President Mangino, Noel, Macea, Aspromatis, and/or Amaris's coercion, intimidation, threats, and/or interference (and/or attempt at the same), Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class are entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to N.Y.C. Admin. Code § 8-502(a).

979.    Plaintiff is entitled to punitive damages from President Mangino, Noel, Aspromatis, Macea, and Amaris pursuant to N.Y.C. Admin. Code § 8-502(a).

## THIRTEENTH CAUSE OF ACTION

**New York City Human Rights Law – Aiding, Abetting, Coercing, and/or Inciting and Attempted Aiding, Abetting, Coercing, and/or Inciting**

**(Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)**

**(Brought on Behalf of Plaintiff Against President Mangino, Noel, Aspromatis, and Amaris)**

980.    Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

981.    NYC and/or QCC aided and abetted CUNY's policy and/or practice of denial of disability-based fully remote work accommodations for Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, by implementing such policy at the Community College level.

982.    In addition, President Mangino, Noel, Amaris, and/or Aspromatis aided and abetted CUNY, NYC, and/or QCC's policy and/or practice of denial of disability-based fully remote work accommodations by implementing such policies.

983.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis each aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel, and/or coerce each other's NYCHRL violations, against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class.

984.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis each provided assistance to each other's NYCHRL violations against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class.

985.    Upon information and belief, NYC, QCC, and/or President Mangino aided, abetted, and/or incited NYCHRL violations by Noel, Amaris, and/or Aspromatis, and/or

attempted to do so, by creating and maintaining policies, practices, and/or procedures that permitted, allowed, condoned, rewarded, and/or encouraged, the illegal denial of legally valid disability-based remote work accommodations by Noel, Amaris, and/or Aspromatis, against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class.

986.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis knew or should have known that the implementation of CUNY, NYC, and/or QCC's policy, pattern, practice, custom, procedure, and/or standard operating procedure of denial of disability-based fully remote work accommodation requests, would aid, abet, and/or incite NYCHRL violations against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class.

987.    NYC, QCC, and/or President Mangino provided assistance and/or attempted to provide assistance to Noel, Amaris, and/or Aspromatis's violations against Plaintiff described herein.

988.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis each aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite and/or coerce each other's NYCHRL violations against Plaintiff.

989.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis each provided assistance to and/or attempted to provide assistance to each other's NYCHRL violations against Plaintiff as described herein.

990.    NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis provided assistance to, and/or attempted to provide assistance to, each other's NYCHRL violations by pretextually denying and/or denying disability-based fully remote work accommodations, for Plaintiff, the Community College Class, and the QCC Accommodation Class, in furtherance of CUNY's in-person teaching mandate and policies -- absent an undue hardship supporting such

222

denial.

991.    Noel, Amaris, and/or Aspromatis provided assistance to and/or attempted to provide assistance to CUNY, NYC, and/or QCC's NYCHRL violations by pretextually denying and/or denying Plaintiff and the QCC Accommodation Class's disability-based remote work accommodation requests, in furtherance of CUNY, NYC, and/or QCC's the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching, despite the absence of any undue hardship arising from such accommodations.

992.    Noel, Amaris, and/or Aspromatis provided assistance to, and/or attempted to provide assistance to, CUNY, NYC, and/or QCC's NYCHRL violations by issuing bad faith, *pro forma*, and/or pre-determined disability-based remote work accommodation denials in furtherance of CUNY's in-person teaching mandate and policies, despite there being no undue hardship supporting such denial.

993.    Noel, Amaris, and/or Aspromatis provided assistance to and/or attempted to provide assistance to CUNY, NYC, and/or QCC's NYCHRL violations by unnecessarily contacting and harassing Plaintiff's medical provider(s) concerning the basis of her disability-based reasonable accommodation requests for remote work, in order to pretextually and/or in bad faith deny Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class's disability-based fully remote work accommodation requests.

994.    NYC and/or QCC are strictly liable for President Mangino, Noel, Amaris, and Aspromatis's aiding, abetting, coercing, inciting, and/or attempted aiding, abetting, coercing, and/or inciting NYCHRL violations pursuant to NYCHRL §§ 8-107(6), 8-107(13)(a).

995.    President Mangino, Noel, Amaris, and Aspromatis each participated in the conduct giving rise to these NYCHRL violations and/or attempted to do so.

996. NYC and QCC each participated in the conduct giving rise to these NYCHRL violations and/or attempted to do so.

997. NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis aided, abetted, and/or incited each other's NYCHRL violations against Plaintiff and the QCC Accommodation Class, by providing and/or attempting to provide, assistance to each other concerning these NYCHRL violations.

998. NYC and/or QCC aided, abetted, and/or incited CUNY's NYCHRL violations against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, by providing and/or attempting to provide, assistance to CUNY, including, but not limited to, through implementation, adoption, and/or enforcement of the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching.

999. President Mangino aided, abetted, and/or incited the NYCHRL violations of Noel, Amaris, and/or Aspromatis by providing, and/or attempting to provide assistance to their bad faith and/or pretextual denials of Plaintiff and the QCC Accommodation Class's disability-based fully remote work accommodation requests, by approving discipline, disciplinary proceedings, and/or medical separations, against Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, in response to and/or following the denials of their disability-based fully remote work accommodation requests.

1000. Upon information and belief, Noel, Amaris, and/or Aspromatis aided and abetted, and attempted to aid and abet, the NYCHRL violations of CUNY, NYC, and/or QCC by issuing incorrect, bad faith, and/or pretextual findings that Plaintiff and the QCC Accommodation Class's disability-based remote work accommodations were unmeritorious and/or knowingly incorrectly denying such requests.

224

1001.   Upon information and belief, President Mangino Noel, Amaris, and/or Aspromatis aided and abetted the NYCHRL violations of CUNY, NYC, and/or QCC by retaliating against and/or interfering with, Plaintiff and the QCC Accommodation Class's disability rights because they requested a disability-based remote work accommodation request.

1002.   NYC, QCC, and/or President Mangino knew or should have known, that continuing to implement these policies without modification would result or likely result in NYCHRL violations, but despite knowledge of their impact, continued such polices practices and/or procedures, thereby aiding, abetting, coercing, inciting NYCHRL violations by CUNY, Noel, Amaris, and/or Aspromatis.

1003.   NYC, QCC, and/or President Mangino knew, or should have known, that CUNY's the 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching was having a disparate impact on disabled members of the Community College Accommodation Class and QCC Accommodation Class because they were disabled and/or because they made protected requests for disability-based fully remote work accommodations.  Nonetheless, NYC, QCC, and/or President Mangino continued to implement these polices despite such impact on these protected classifications and/or by otherwise taking no action to remedy this impact.

1004.   NYC, QCC, and/or President Mangino knew, or should have known, that the lack of an explicit exception for disability-based reasonable accommodations and/or the absence of clear standards for application of the "unusual circumstances" for exceptions to the CUNY 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching, was having a disparate impact on the Community College Accommodation Class and the QCC Accommodation Class because: (1) they made disability-based fully remote work

225

accommodations request; and/or (2) were disabled. Nonetheless, NYC, QCC, and/or President Mangino, continued to implement these polices despite such impact on these protected classifications and/or by otherwise taking no action to remedy this impact.

1005.   NYC, QCC, and/or President Mangino aided and abetted the NYCHRL violations of Noel, Amaris, and/or Aspromatis by failing to provide clarification or guidance, and instead providing unfettered discretion to Noel, Amaris, and/or Aspromatis to illegally deny disability-based fully remote work accommodation requests based on CUNY's policy.

1006.   Noel, Amaris, and/or Aspromatis aided and abetted the NYCHRL violations of CUNY, NYC, and/or QCC by conducting bad faith, pretextual, predetermined, and/or inadequate reasonable accommodation evaluations for disability-based fully remote work accommodation requests, in order to deny these requests, including but not limited to, and enforce or assist NYC, CUNY, and/or QCC's 70/30 In-Person/Remote Policy.

1007.   Noel, Amaris, and/or Aspromatis aided and abetted the NYCHRL violations of CUNY, NYC, and/or QCC by requiring submission of additional unnecessary medical documentation to support remote work accommodation requests.

1008.   Noel, Amaris, and/or Aspromatis aided and abetted the NYCHRL violations of CUNY, NYC, and/or QCC by requiring resubmission of medical documentation to support remote work accommodation requests already known to be permanent, semi-permanent, and/or chronic conditions, including, but not limited to, through a policy of requesting recertification and/or resubmission of medical records for such conditions in each semester.

1009.   President Mangino, Noel, Amaris, and/or Aspromatis's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

226

1010.  NYC, QCC, President Mangino, Noel, Amaris, and/or Aspromatis were each a person within the meaning of 8-107(6).

1011.  NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis's violations of NYCHRL§ 8-107(6) had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

1012.  At all times relevant to the Complaint, as well as in the year preceding such relevant times, NYC and/or QCC employed and/or jointly employed more than four persons in their employ as employees and/or independent contractors.

1013.  NYC and/or QCC are directly liable for their violations of NYCHRL § 8-107(6), including, but not limited to, for their policy, practice, custom, procedure, and/or standard operating procedure of violating § 8-107(6).

1014.  NYC and/or QCC are strictly liable for the violations of N.Y.C. Admin. Code § 8-107(6) by President Mangino, Noel, Amaris, and/or Aspromatis pursuant to N.Y.C. Admin. Code § 8-107(13)(a).

1015.  NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis each participated in the conduct giving rise to these NYCHRL violations against Plaintiff, the Community College Accommodation Class, and/or QCC Accommodation Class, and/or attempted to do so.

1016.  President Mangino, Noel, Amaris, and/or Aspromatis's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard.

1017.  As a direct and proximate result of NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis's aiding, abetting, inciting, and/or attempts to aid, abet, incite, each other's NYCHRL violations described herein, Plaintiff, and upon information and belief the Community

College Accommodation Class and/or QCC Accommodation Class, have suffered and are entitled to damages, as well as declaratory and injunctive relief.

1018.   As a result of NYC, QCC, President Mangino, Noel, Amaris, and Aspromatis's violations of N.Y.C. Admin. Code § 8-107(6), including their policies, practices, customs, and/or procedures of unlawful employment practices, Plaintiff, and upon information and belief the Community College Accommodation Class and QCC Accommodation Class, are entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to NYC Admin. Code § 8-502(a).

1019.   As a result of President Mangino, Noel, Amaris, and Aspromatis's violations of N.Y.C. Admin. Code § 8-107(6), Plaintiff is entitled to punitive damages from these individual Defendants, pursuant to NYC Admin. Code § 8-502(a).

## FOURTEENTH CAUSE OF ACTION

### New York City Human Rights Law – Disparate Impact

### (Brought on Behalf of Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class Against NYC and QCC)

1020.   Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

1021.   Plaintiff, and upon information and belief, the Community College Accommodation Class and QCC Accommodation Class, had a disability within the meaning of the NYCHRL.

1022.   Plaintiff, and upon information and belief, the members of the Community College Accommodation Class and QCC Accommodation Class, had a mental and/or psychological impairment within the meaning of the NYCHRL.

1023.   Plaintiff had mental and/or psychological impairments within the meaning of the NYCHRL, including, without limitation, Bipolar II, Post-Traumatic Stress Disorder, anxiety, and depression, as well as impairments due to exposure to environmental toxins such as severe response to mold and other toxins.

1024.   Upon information and belief, the Community College Class and QCC Accommodation Class had mental and/or psychological impairments within the meaning of the NYCHRL.

1025.   At all times relevant to the Complaint, NYC and QCC were each a person, covered entity, employer, and/or joint employer within the meaning of the NYCHRL.

1026.   At all times relevant to the Complaint, Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class were covered persons and/or employees within the meaning of the NYCHRL.

1027.   Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class were a group protected by the provisions of N.Y.C. Admin. Code § 8-107(1) because they were disabled within the meaning of the NYCHRL.

1028.   Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class engaged in the protected activity of requesting disability-based fully remote work accommodations and were protected by the provisions of N.Y.C. Admin. Code § 8-107(7), because they were persons who had engaged in the protected activity of requesting a disability-based reasonable accommodation.

1029.   NYC and QCC had its own and/or implemented CUNY's 70/30 In-Person/Remote Policy's prohibition (absent undefined "unusual circumstances") on fully remote teaching, which, upon information and belief, had a disparate impact on Plaintiff, the

Community College Accommodation Class, and the QCC Accommodation Class, by way of statistically significant and/or disproportionate higher rates of discipline and/or disciplinary proceedings, unauthorized absences, terminations, and/or medical separations.

1030. NYC and QCC had a policy of granting only remote work accommodations as non-disability-based accommodations, which, upon information and belief, had a disparate impact on Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class, by way of statistically significant and/or disproportionate higher rates of discipline and/or disciplinary proceedings, unauthorized absences, terminations, and/or medical separations.

1031. NYC and QCC had a medical separation policy that did not provide for or consider the impact of reasonable disability-based accommodations and/or the denial of reasonable disability-based, accommodations, which, upon information and belief, have had a statistically significant and/or disproportionate disparate impact on Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class.

1032. Upon information and belief, each of these policies, or the effect of these policies combined, resulted in a disparate impact, in the form of statistically significant and/or disproportionate higher rates of discipline, termination unauthorized absences, and/or medical separation for members of the Community College Accommodation Class and QCC Accommodation Class.

1033. These policies and/or practices individually and/or collectively, caused Plaintiff, the Community College Accommodation Class, and the QCC Accommodation Class to be disproportionately disciplined, terminated, and/or resign, as contrasted with NYC and/or QCC employees who: (1) were not disabled; and/or (2) had not made protected requests for disability-

based fully remote work accommodations.

1034.   Upon information and belief, these policies were not consistent with business necessity.

1035.   Upon information and belief, these policies have not had a legitimate significant relationship to a significant business objective of NYC and/or QCC including, but not limited to, because NYC and/or QCC do not have a significant business objective in failing to accurately evaluate protected disability-based remote work requests, or eliminating otherwise qualified faculty from its workforce when they could carry out their teaching duties with a disability-based fully remote work accommodation.

1036.   NYC and/or QCC could have used less discriminatory measures, instead of some or all of these policies, including, but not limited to: (1) specifically exempting application of the policy to employees seeking a fully remote disability-based work accommodation; (2) incorporating the requirements of compliance with and consideration of the NYCHRL accommodation requirements into the policies; (3) mandating in-person teaching requirements only with respect to a total necessary number of in-person classes for each department, and/or providing department heads discretion in how to meet minimum in-person class numbers (*i.e.*, instead of imposing an in-person teaching requirement for each individual teacher); (4) explicitly requiring evaluation and consideration of whether the employee had previously successfully worked remotely as a primary or significant factor to consider in evaluating a disability-based work accommodation; (5) explicitly requiring evaluation of the undue hardship factors required to be considered when evaluating disability-based fully remote accommodation requests into the application of the policy;[43] and (6) correctly applying the NYCHRL accommodation

---

[43]     *See* 42 U.S.C. § 12111(10)(B); 29 C.F.R. § 1630.2(p)(2).  Indeed, all or the majority of undue hardship factors would favor grant of remote work given the organization(s)' financial resources, the

requirements, and by doing so, avoid the loss of funds to litigation that could have otherwise been utilized to support the institutions educational mission.

1037.  NYC and QCC are directly liable for their disparate impact violations pursuant to N.Y.C. Admin. Code § 8-107(17).

1038.  NYC and QCC's disparate impact NYCHRL violations had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

1039.  NYC and QCC's conduct proximately caused injuries to Plaintiff, and upon information and belief, the Community College Accommodation Class and the QCC Accommodation Class.

1040.  At all times relevant to the Complaint, as well as in the year proceeding such relevant times, NYC and/or QCC employed and/or jointly employed more than four persons in its employ as employees and/or independent contractors.

1041.  As a direct result of NYC and QCC's conduct, Plaintiff, and upon information and belief the Community College Accommodation Class and the QCC Accommodation Class, have suffered damages.

1042.  As a direct and proximate result of NYC and QCC's conduct, Plaintiff, and upon information and belief the Community College Accommodation Class and the QCC Accommodation, are entitled to back pay, as well as injunctive and declaratory relief, attorney's fees, costs and expert fees.

---

nominal cost (or potential cost savings of remote teaching), the large number of employees at NYC, CUNY, and/or QCC, and prior fully remote work arrangement for all faculty, during which time, upon information and belief, NYC, CUNY, and/or QCC continued to provide high quality instruction to students.

## FIFTEENTH CAUSE OF ACTION

**NYCHRL – Disparate Treatment Mental Health Disability Discrimination, Mental Health Disability Stereotyping Discrimination, Mental Health Disability Harassment, and Mental Health Disability-Based Hostile Work Environment**

**(Brought on Behalf of Plaintiff and the QCC Accommodation Class Against NYC and QCC)**

**(Brought on Behalf of Plaintiff Against Noel and Aspromatis)**

1043.   Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

1044.   Plaintiff, and upon information and belief QCC Accommodation Class, had a disability within the meaning of the NYCHRL.

1045.   Plaintiff, and upon information and belief the QCC Accommodation Class, had a mental and/or psychological impairment within the meaning of the NYCHRL.

1046.   Plaintiff had mental and/or psychological impairments within the meaning of the NYCHRL, including, without limitation, Bipolar II, Post-Traumatic Stress Disorder, anxiety, and depression, as well as impairments due to exposure to environmental toxins such as severe response to mold and other toxins.

1047.   Upon information and belief, the QCC Accommodation Class had mental and/or psychological impairments within the meaning of the NYCHRL.

1048.   Plaintiff disclosed her disabilities, mental health disorders, and/or impairments to NYC, QCC, Noel, and Aspromatis, including by submitting medical certifications.

1049.   Upon information and belief, the QCC Accommodation Class disclosed their mental health disability or disabilities, mental health disorder or disorders, and/or mental health impairment or impairments to NYC, QCC, Noel, and/or Aspromatis in connection with their fully remote work disability-based accommodation requests and/or via medical certifications.

233

1050.   In addition, or in the alternative, Plaintiff and the QCC Accommodation Class were regarded as disabled and/or as having a record of disability by NYC, QCC, Noel, and/or Aspromatis.

1051.   NYC, QCC, Noel, and/or Aspromatis, knew or should have known that Plaintiff, and upon information and belief the members of the QCC Accommodation Class, had a mental health disability or disabilities.

1052.   NYC, QCC, Noel, and/or Aspromatis discriminated against Plaintiff by treating her less well because of, or in part because of, her mental health disabilities, mental health disorders, and/or impairments, including, but not limited to, by pressuring her to resign, reassigning her classes and/or class schedules, doing pretextual evaluations, investigating her, bringing disciplinary charges against her, and medically separating her.

1053.   Upon information and belief NYC, QCC, Noel, and/or Aspromatis discriminated against the QCC Accommodation Class by treating them less well because of, or in part because of, their mental health disabilities, mental health disorders, and/or impairments, including, but not limited to, by pressuring them to resign, reassigning their classes and/or class schedules, doing pretextual evaluations, investigating them, bringing disciplinary charges against them, conducting bad faith disability accommodation evaluations, and/or medically separating them.

1054.   Upon information and belief, NYC, QCC, Noel, and/or Aspromatis discriminated against the QCC Accommodation Class by treating them less well because of, or in part because of, their mental health disabilities, mental health disorders, and/or mental health impairments.

1055.   NYC, QCC, Noel, and/or Aspromatis engaged in mental health and/or psychological disability-based harassment and created a mental health-based hostile work environment for Plaintiff and, and upon information and belief, the QCC Accommodation Class

234

at QCC.

1056.   NYC, QCC, Noel, and Aspromatis's mental health and/or psychological disability-based hostile work environment was a continuing violation.

1057.   NYC, QCC, Noel, and Aspromatis engaged in stereotyping discrimination against Plaintiff, and upon information and belief the QCC Accommodation Class, because of, or in part because of, their mental health and/or psychological disabilities.

1058.   NYC, QCC, Noel, and Aspromatis treated Plaintiff, and upon information and belief the QCC Accommodation Class, less well, and took materially adverse actions against them based on the discriminatory generalized sense that mental and/or psychological disabilities could rarely be accommodated, and/or that they were unlikely to be able to perform the essential functions of their teaching positions with a reasonable accommodation.

1059.   At all times relevant to the Complaint, as well as in the year proceeding such relevant times, QCC and/or NYC had more than four employees and/or independent contractors in their employ.

1060.   At all times during Plaintiff and the QCC Accommodation Class's employment with QCC and/or NYC, they were covered employees within the meaning of the NYCHRL.

1061.   At all times relevant to the Complaint, QCC and/or NYC were covered employers and/or joint employers within the meaning of the NYCHRL.

1062.   At all times relevant to the Complaint, QCC and/or NYC were each a person, covered entity, employer, and/or joint employer within the meaning of the NYCHRL.

1063.   Noel and Aspromatis were employees of, and/or agents of employer QCC and/or NYC, within the meaning of NYCHRL §§ 8-107(1)(a).

1064.   Noel and Aspromatis were persons within the meaning of the NYCHRL § 8-102.

1065.   NYC and/or QCC is directly liable for disability discrimination pursuant to N.Y.C. Admin. Code § 8-107(1)(b).

1066.   NYC and QCC are liable for Noel and/or Aspromatis's disability discrimination against Plaintiff and the QCC Accommodation Class, pursuant to N.Y.C. Admin. Code § 8-107(13)(b).

1067.   Noel and Aspromatis are individually liable to Plaintiff for their discrimination pursuant to N.Y.C. Admin. Code § 8-107(1)(b).

1068.   Noel exercised managerial and/or supervisory responsibility at NYC and/or QCC, including concerning Macea and Aspromatis.

1069.   While serving as Acting Human Resources Director Aspromatis exercised managerial and/or supervisory responsibility at NYC and/or QCC, including over Macea.

1070.   Aspromatis currently exercises managerial and/or supervisory responsibility at QCC as the QCC Human Resources Director.

1071.   Aspromatis exercised managerial and/or supervisory responsibility at NYC and/or QCC.

1072.   Chair Edlin exercised managerial and/or supervisory responsibility at QCC concerning Plaintiff.

1073.   Aspromatis and, upon information and belief, Noel, participated in the conduct giving rise to these NYCHRL violations.

1074.   At all times relevant to the Complaint, Noel, and at all or most times relevant Aspromatis, had the power to do more than carry out personnel decisions made by others, and upon information and belief, encouraged, condoned, and/or approved the disability discrimination against Plaintiff.

1075.   Noel and Aspromatis's conduct constituted willful wanton negligence, recklessness, and/or conscious disregard of the NYCHRL rights of others or conduct so reckless as to amount to such disregard.

1076.   Plaintiff, and upon information and belief the QCC Accommodation Class, suffered damages as a result of NYC, QCC, Noel, and/or Aspromatis's discrimination.

1077.   NYC, QCC, Noel, and/or Aspromatis's illegal conduct proximately caused Plaintiff's and upon information and belief the QCC Accommodation Class's injuries.

1078.   NYC, QCC, Noel, and/or Aspromatis's mental health disability discrimination, had an impact within New York City, including at QCC's campus at 222-05 56th Ave., Queens, NY 11364.

1079.   As a result of NYC, QCC, Noel, and/or Aspromatis's mental health disability discrimination, Plaintiff, and upon information and belief the QCC Accommodation Class, are entitled to back pay, front pay and/or reinstatement, compensatory damages, declaratory relief, injunctive relief, attorney's fees, expert fees, costs, and other compensation pursuant to N.Y.C. Admin. Code § 8-502(a).

1080.   Plaintiff is entitled to punitive damages from Noel and Aspromatis pursuant to N.Y.C. Admin. Code § 8-502(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff individually, and on behalf of the CUNY-Wide Accommodation Class, Community College Accommodation Class, QCC Accommodation Class, CUNY-Wide FMLA Class, Community College FMLA Class, and QCC FMLA Class, seeks the following relief:

(a)    Certification of the above-described Classes pursuant to Rule 23 of the Federal

Rules of Civil Procedure;

(b)    Designation of Plaintiff as class representative of the above-described Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(c)    Designation of Plaintiff's counsel as class counsel of the above-described Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(d)    Issuance of a declaratory judgment, on behalf of the above-described Classes, declaring the acts complained of herein are in violation of the Rehabilitation Act, FMLA, and NYCHRL, and that Defendants are liable for any damages and/or injunctive relief resulting there from;

(e)    Injunctive relief including an injunction permanently restraining the above-described violations of the Rehabilitation Act, FMLA and NYCHRL, including an injunction: (1) prospectively exempting disability-based fully remote work request from the 70/30 In-Person/Remote Policy; (2) requiring the creation and funding of an independent office and/or ombudsman to objectively evaluate all disability-based remote work requests and FMLA leave requests; (3) requiring the re-evaluation of all disability-based remote work requests and FMLA leave requests submitted within the last three years by the independent office and/or ombudsman; (4) reinstatement of all class members terminated or medically separated because of an illegal denial of a disability-based fully remote work accommodation and/or FMLA leave request; and (5) reclassification of time illegally categorized as an unauthorized absence as a protected authorized absence, under the Rehabilitation Act, FMLA and/or NYCHRL;

(f)    Reinstatement;

(g)    Compensatory damages;

(h)    Back pay;

(i)    Front pay;

(j)    Liquidated damages;

(k)    Pre-judgment interest;

(l)    Post-judgment interest;

(m)    Punitive damages against the individual defendants;

(n)    Nominal damages;

(o)    Actual damages;

(p)     Attorneys' fees;

(q)     Expert fees;

(r)     Costs; and

(s)     All such other and further relief as the Court deems necessary and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury on all questions of fact raised by this Complaint.


Dated: May 7, 2024
       Long Island City, New York

                          Respectfully submitted,

              By:      /s/ Cyrus E. Dugger

                       Cyrus E. Dugger

                       THE DUGGER LAW FIRM, PLLC

                       28-07 Jackson Ave., 5th Fl.
                       Long Island City, New York 11101
                       Tel: (646) 560-3208
                       Fax: (646) 390-4524
                       cd@theduggerlawfirm.com

                       *Attorney for Plaintiff Jan Ramjerdi and the*
                       *putative classes*